## UNITED STATES DISTRICT COURT
### FOR THE
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

| | | |
|---|---|---|
| **BRENDA J. COOPER; SYLVIA R.** | § | |
| **CAFFEY; MARGARET J. ODEMS;** | § | |
| **BERNICE B. RICHARDSON; DORA A.** | § | |
| **WARD; ROSIE BRADY; PEARL** | § | |
| **SELDON; BETTY PHILLIPS,** | § | |
| **PERSONAL REPRESENTATIVE AND** | § | |
| **DEVISEE OF HILDRED JOHNSON** | § | |
| **DECEASED; ALICE CRUMLEY,** | § | |
| **DEVISEE OF HILDRED JOHNSON; and** | § | |
| **SYLVIA CUNNINGHAM** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **4:16-CV-052-DMB-JMV** |
| | § | **CIVIL ACTION NUMBER** |
| **MERITOR, INC. f/d/b/a** | § | |
| **ROCKWELL INTERNATIONAL** | § | |
| **CORPORATION;** | § | |
| **TEXTRON, INC. f/d/b/a RANDALL** | § | |
| **DIVISION OF TEXTRON, INC.** | § | |
| | § | |
| **Defendants.** | § | |

## COMPLAINT
### *JURY TRIAL DEMANDED*

Plaintiffs bring this action against the Defendants as follows:

### INTRODUCTION

1.  This is an action to recover equitable relief and legal damages against the Defendants for toxic torts committed against the Plaintiffs' homes and property. The Plaintiffs are residents or former residents of a neighborhood adjacent to a manufacturing plant located at 635 Highway 332 in Grenada County, Mississippi. In 1967, Defendant Rockwell International Corporation ("Rockwell") (at the time operating as Rockwell Standard and now operating as Meritor, Inc.) acquired a manufacturing plant ("the plant") in Grenada County, Mississippi for the purpose of

manufacturing wheel covers for major automobile manufacturing companies such as Ford, General Motors, and Chrysler.

2.      The wheel covers manufactured by Rockwell in Grenada, Mississippi were produced through a series of operations that included electroflashing the wheel covers in a pool of chromic acid (hexavalent chromium), which resulted in a chromic acid mist harmful to workers and (it was later discovered) Plaintiffs' homes and property.   The manufacturing process for the wheel covers also included significant use of trichloroethylene (hereafter "TCE") and other solvents harmful to individuals and the environment.   Specifically, hexavalent chromium and TCE (and its degradation products including vinyl chloride) are known human carcinogens. Over the next two (2) decades, the Grenada manufacturing plant of Rockwell produced approximately one million wheel covers a month and became the second largest purchaser of TCE solvent in the United States.

3.      In June of 1985 Rockwell sold the Grenada manufacturing plant to the Randall Division of Textron, Inc. ("Randall") but the dumping, spilling, discharge, release, and contamination of hexavalent chromium, TCE, and toluene into the ground and ground water of the manufacturing plant continued.   Even before Randall acquired the plant, the dumping, spilling, discharge, release, and contamination of hexavalent chromium, TCE, and toluene into the ground and ground water of the manufacturing plant and other areas had come to the attention of the United States Environmental Protection Agency ("EPA") and the Mississippi Department of Environmental Quality ("MDEQ").   As a result, although Randall acquired the plant, Rockwell remained obligated for the monitoring of the "plume" of hazardous substances in and around the plant.   Although ownership of the plant has changed many times over the years and the manufacturing processes performed at the plant have not involved TCE or hexavalent chromium

for decades, Rockwell (now operating as Meritor, Inc.) continues to monitor the plant to this date as required by the EPA and MDEQ.

4.      During its years of operation Rockwell had actual knowledge of the toxic nature of hexavalent chromium and TCE and the health and environmental risks associated with these chemicals.   Rockwell and the other Defendants entered into a pattern of fraudulent concealment whereby the knowledge of discharge of intentional and accidental spillage of TCE and hexavalent chromium was concealed. In addition, illegal dumping of both hexavalent chromium and TCE directly into the ground near the facility and throughout Grenada County, Mississippi took place.   Airborne pollutants related to the use of the toxic substances and emitted by Rockwell also entered the Plaintiffs' homes and property.   As a result of intentional and negligent toxic torts committed by the Defendants, the market value of Plaintiffs' homes has been reduced to zero.   Defendants' toxic torts have been the proximate cause of all Plaintiffs' damages and injuries described herein.

## PARTIES

5.      The plaintiffs named below (hereinafter "Plaintiffs") are property owners in the same neighborhood located adjacent to the subject plant (described beginning at paragraph 10 below), share commonality of damages suffered, and assert identical liability claims against all defendants for identical conduct:

    a.      Brenda J. Cooper; Property owner of 117 Tallahoma Drive, Grenada, MS 38901.

    b.      Sylvia R. Caffey; Property owner of 137 Tallahoma Drive, Grenada, MS 38901.

    c.      Margaret J. Odems; Property owner of 139 Tallahoma Drive, Grenada, MS 38901.

    d.      Bernice B. Richardson; Property owner of 147 Tallahoma Drive, Grenada, MS

38901.

e.    Dora A. Ward; Property owner of 151 Tallahoma Drive, Grenada, MS 38901.

f.    Rosie Brady; Property owner of 153 Tallahoma Drive, Grenada, MS 38901.

g.    Pearl Seldon; Property owner of 164 Lyon Drive, Grenada, MS 38901.

h.    Betty Phillips, Personal representative and devisee of Hildred Johnson: Property owner of 176 Lyon Drive, Grenada, MS 38901.

i.    Alice Crumley, Devisee of Hildred Johnson: Property owner of 176 Lyon Drive, Grenada, MS 38901.

j.    Sylvia Cunningham: Property owner of 155 Tallahoma Circle, Grenada, MS 38901.

6.    Defendant Rockwell International Corporation doing business as successor entities ArvinMeritor, Inc., and Meritor, Inc. is a non-resident for-profit corporation with an entity address of 2135 West Maple Road, Troy, Michigan 48084. Rockwell International Corporation is admitted to do business in Mississippi in good standing and may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

7.    Defendant Randall Division of Textron, Inc. ("Randall") is or was previously a division of Textron Automotive, now Textron, Inc. or operating as Kautex Textron. Textron, Inc. is believed to be the parent or successor corporation of Randall and is a foreign corporation incorporated in Delaware with a principal office address of 40 Westminster St., Providence, Rhode Island 02903. Textron, Inc. is admitted to do business in Mississippi in good standing and may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332.   All homes at issue are located (and Plaintiffs reside) in Grenada County, Mississippi.   None of the defendants may be found in Grenada County, Mississippi and the amounts in controversy exceed $75,000; individually and collectively for all Plaintiffs.

9.      Venue is appropriate in the district and division asserted as the acts and damages complained of herein occurred in whole or in part in Grenada County, Mississippi, and the manufacturing plant giving rise to this action was operated in Grenada County, Mississippi.

## FACTS

10.     In 1967, Defendant Rockwell, then operating as Rockwell Standard, acquired the manufacturing facility (now closed) located at 635 Highway 332 in Grenada County, Mississippi from Lyon, Inc.

11.     The manufacturing facility ("the plant") had been established for the purpose of manufacturing stainless steel wheel covers, and after its acquisition Defendant Rockwell continued to manufacture wheel covers and hubcaps for major automobile manufacturing companies.

12.     Upon acquiring the plant, Rockwell modified and incorporated significant changes to accommodate the chroming of wheel covers or hubcaps through the use of hexavalent chromium and electroflashing.

13.     Rockwell incorporated a production system within the plant where the wheel covers would undergo a buffing operation before being conveyed to the "chrome department" or "chrome line."   The wheel covers would be manually placed in racks (6 wheel covers per rack) before immersion in a tank containing sulfuric acid or sodium hydroxide.   Six to eight racks

would be immersed in tanks at a time. The wheel covers would then be submerged in two (2) separate water tanks to rinse the sodium hydroxide before being submerged into a solution of sulfuric acid. The wheel covers would then be rinsed in another water tank before reaching the electroflashing tanks filled with a chromic acid plating solution. In the electroflashing tanks the wheel covers would be submersed between diodes that were electrically arced causing the hexavalent chromium to adhere to the wheel covers. After the submersion in hexavalent chromium, the wheel covers proceeded through a series of water rinse tanks. The wheel covers that had now been "chromed" would proceed from the "wet line" to the "dry line."

14.    The water from the "wet line" tanks would be boiled off to leave a high concentrated solution of hexavalent chromium, which would be recycled for further use. These tanks were called the reclaim tanks. This reclaiming process produced steam and spillovers that caused further contamination.

15.    In addition to the chrome department, the plant utilized a paint department and a buffing department. In both the paint department and the buffing department, large amounts of TCE were utilized by plant workers as a general cleaning solution, degreaser, solvent, and paint thinner. Adjacent to the paint department was a "solvent room" where TCE was pumped directly from storage tanks for use in cleaning and degreasing the manufacturing equipment and the plant itself. Also in this room was a "solvent tank" that was primarily used to strip off hexavalent chromium from the racks that would hold the wheel covers during the chroming process. The plant also incorporated a strip-off tank that utilized heated TCE to strip off from the wheel covers imperfections that occurred in the paint department. Afterwards, the workers would pour the used TCE down the drains that led to lagoons on the plant property.

16.    Rockwell incorporated a chemical treatment system to allegedly render hexavalent

chromium inert before releasing it into the environment near the plant including discharge into the ground and adjacent water systems. The chemical treatment system failed.

17.     At all relevant times, the Defendants had actual knowledge of the immediate and latent harm associated with exposure to hexavalent chromium and TCE.

18.     Defendants engaged in a pattern of illegal dumping of both TCE and hexavalent chromium in and around the plant facility. Illegal dumping took place at the following locations that have been thus far identified:

        a.     the plant location;

        b.     the Plaintiffs' neighborhood bordering the plant to the north;

        c.     Moose Lodge location on Moose Lodge Road, east of the plant and the neighborhood;

        d.     various other locations within five miles of the plant to the west, east, and northeast, including a gravel pit in northwest Grenada County;

        e.     16th Section land in Grenada County near Grenada Lake, north of the dam; and

        f.     within 600 feet from the Grenada Lower Elementary School.

19.     The Plaintiffs are residents of the Eastern Heights Subdivision adjacent to the plant.

20.     Rockwell employees were directed by management of Rockwell to illegally dump and dispose of "sludge" that contained hexavalent chromium and TCE. The sludge accumulated below the plant's manufacturing floor throughout the chroming process. For nearly 30 years, Rockwell employees removed an average of two to three dump-truck loads of the sludge per day from the plant and dumped it directly into the environment of Grenada County, Mississippi.

21.     Rockwell engaged in the pattern of "night burning" to improperly and illegally dispose of TCE and chromic acid and other materials through incineration at night and improperly and

illegally released toxic fumes into the environment of Grenada County, Mississippi.

22.     Prior to the acquisition of the plant in June of 1985 by Randall, a plume of volatile organic chemicals ("VOCs") including TCE and its degradation product, vinyl chloride, was identified in the ground water near the plant.    Rockwell had actual knowledge that the plant was the source of the plume of the hazardous substances identified and that the plumes identified near and around the plant were expanding through their presence in the shallow ground water of the area.

23.     Specifically, investigations into the areas identified as Rockwell International Wheel and Trim, EPA #MSD007037278, and Rockwell International Site II, EPA #MSD039133509, were initiated.    Defendant Rockwell did not, however, disclose all sites of contamination and illegal dumping as part of those investigations.

24.     Upon information and belief as a result of those regulatory investigations, Defendants have been and remain responsible for monitoring the levels of VOCs in the environment around the plant secondary to the contamination in the environment including TCE, chromic acid and other chemicals.     Defendants have not monitored environmental and ground water contamination in areas Defendants did not disclose.

25.     Upon information and belief, Don Williams was the individual primarily responsible for monitoring and reporting on behalf of Defendants Rockwell and/or Randall to the Mississippi Department of Environmental Quality and the EPA.    Information provided to these agencies was not complete, including mislabeling of wells, was inaccurate and was deliberately altered in order to conceal the severity of the contamination and the severity of the migration of the plume.

26.     As part of these regulatory investigations, Meritor (operating as Arvin Meritor, as successor entity of Rockwell) attempted to construct a Permeable Reactive Barrier ("PRB") at

the plant site between 2003 and 2005. Meritor installed the PRB after a massive fish-kill in Riverdale Creek alerted the attention of the EPA. The PRB was apparently an attempt by Meritor to stop the spread of VOC's and hexavalent chromium. The PRB is essentially a permeable "wall" sunken into the ground that is intended to filter out the plume's toxins as they passed "through" the wall. Meritor did nothing to stop the spread of the plume into the Eastern Heights neighborhood to the north of the plant or in any other direction, except for a small portion of Riverdale Creek. The PRB, as constructed, is totally ineffective in both its scope and construction. As a result, the plume from the plant continues to expand in all directions, including into Riverdale Creek.

27.    TCE exposures, even at relatively low levels, are known to affect humans adversely through auto-immune disease and cancer from long-term exposure.

28.    One of the degradation product created when TCE breaks down in the environment, vinyl chloride, is a known carcinogen responsible for nerve damage and immunosuppression.

29.    The respiratory tract is the major target organ for hexavalent chromium toxicity during short-term exposure. Chronic exposure to this carcinogen results in an increased risk of lung cancer and damage to the gastrointestinal and neurological system in humans. Following inhalation exposures, studies reveal that human lungs and kidneys have the highest tissue levels of chromium.

30.    Exposure to trichloroethylene (or "TCE") affects the human central nervous system and long-term exposures are associated with cancers in humans especially of the kidney, liver, cervix and lymphatic systems. Based on multiple studies there is an especially strong association between TCE exposure and kidney cancer.

31.    Upon information and belief, Defendants had actual knowledge of the fact that

hexavalent chromium and TCE (with vinyl chloride) were present in the neighborhood. In 2012 and 2013 Rockwell conducted vapor point testing just outside the boundary of the neighborhood. A May 29, 2015 EPA letter to Rockwell regarding the vapor testing states the "results far exceed the lower risk threshold . . . and well exceed the risk threshold for prompt action." The EPA letter also states:

> The EPA is concerned that TCE vapors from the groundwater plume may be intruding into the residences north of the facility. If a completed pathway exists, exposure can potentially result in risks to human health (both long-term cancer and near-term non-cancer risk). The EPA is particularly concerned for sensitive and vulnerable populations, especially women in the first trimester of pregnancy (because of potential cardiac mal formations to the developing fetus). Women of childbearing age are considered a sensitive population since they may not realize they are pregnant during the first trimester.

32.    Air, soil, and groundwater samples from in and around the neighborhood indicate a completed pathway exists from the groundwater plume into the neighborhood residences north of the facility. Maximum contaminant levels ("MCLs") and threshold value limits ("TVLs") are used to establish acceptable levels of these chemicals. The MCL for TCE is 5 parts per billion ("ppb"). In 1993, despite Rockwell's reports to the EPA and MDEQ that TCE was contained within the plant site, Rockwell's sampling from MW-20, a well offsite from the plant and just three to four feet from the property line of one of the residents' homes, contained TCE concentrations of 18 ppb—more than 3 ½ times MCL. In approximately 2012, Rockwell's reports show Rockwell's own sampling from MW-20 contained TCE concentrations in excess of 500 ppb—more than 100 times MCL.

33.    A groundwater sample collected in 2015 at the border of the Eastern Heights neighborhood contained TCE concentrations of 2,900 parts per billion.

34.    The EPA soil cancer screening level for hexavalent chromium is 0.00067 mg/kg. 2015 soil samples from the Eastern Heights neighborhood contained 0.56 mg/kg of hexavalent

chromium—836 times the EPA cancer screening level.

35.     A soil sample collected in 2015 from the northeast corner of the Eastern Heights neighborhood contained contaminants evidencing significant dumping of sludge.   The vinyl chloride concentration in this sample was 3,280 ppb, which is 4,750 times the EPA soil cancer screening level to protect infiltration to groundwater.

36.     Five outdoor air samples taken in 2015 from within the neighborhood ranged from 2.71 to 6.67 times the EPA cancer screening level for TCE. An upwind air sample taken at the same time from south of the plant and the neighborhood detected no TCE.

37.     Subslab air samples collected in 2015 through holes drilled in the slabs of neighborhood homes detected solvents and aromatic hydrocarbons related to TCE and its degradation products.

38.     2015 air samples taken from inside several neighborhood homes detected TCE concentration levels in excess of the EPA cancer screening level.

39.     Also in 2015, an air sample taken from the children's park in the middle of the neighborhood detected TCE at 3.13 times the EPA cancer screening level.

## CAUSES OF ACTION

### COUNT I:    FRAUD AND FRAUDULENT CONCEALMENT

40.     Plaintiffs incorporate herein, by reference, all of the allegations contained above.

41.     Defendants had actual knowledge of the negligent and intentional disposal of the contaminants, including the known human carcinogen hexavalent chromium and the toxic solvent, TCE, in Grenada County.   The contaminants continue to cause significant harm to Plaintiffs and their property.

42.     Defendants fraudulently concealed and intentionally misrepresented and suppressed material facts regarding the toxic contamination of the environment in and around Grenada

County, Mississippi.

43.     Defendants fraudulently concealed and intentionally suppressed information from investigators of agencies such as NIOSH/OSHA, EPA and MSDEQ that were specifically charged with investigating the contamination of Grenada County, Mississippi, exposure levels, injuries and deaths associated with exposures to these contaminants at the plant.   Defendants accomplished the fraudulent concealment and misrepresentation through reporting performed by the Defendant Don Williams and others in a calculated and intentional effort to misrepresent, mislead, and conceal the nature, extent, and severity of the contamination and migration of the plume of contaminates.

44.     Defendants had actual knowledge of the dangers and health risks associated with hexavalent chromium and TCE and deliberately concealed the disposal of these substances through incineration during night shifts directly releasing the fumes associated with the incineration into the atmosphere and illegally dumping barrels of chromic acid and high levels of TCE and chromic acid residue into the environment of Grenada County, Mississippi, thereby intentionally contaminating the ground water and environment of Grenada County, Mississippi.

45.     Despite actual knowledge of the levels of contaminants in the ground water in and around the plant, Defendants withheld this information and continued to withhold information despite actual knowledge of the harm being inflicted.

46.     Defendants had actual knowledge of spills, leaks and discharges involving hundreds of gallons of TCE from storage tanks at the plant and intentionally withheld reporting of the toxic spills to local, state and federal authorities and took no contemporaneous steps to protect against ground contamination and subsequent release of degraded TCE and vinyl chloride.

47.     As a direct result of the fraudulent concealment and fraudulent activities of the

Defendants the Plaintiffs suffered and continue to suffer the damages complained of herein.

## COUNT II:   CIVIL CONSPIRACY

48.     Plaintiffs incorporate by reference all of the allegations contained above.

49.     Plaintiffs allege that the Defendants, acting through their predecessor entities, employees, officers, directors, and management personnel, acted in concert with a common scheme or plan to deprive the Plaintiffs, the public, and relevant governmental agencies of information related to the use of hexavalent chromium and TCE at the plant and the levels of contaminants discharged into the environment.

50.     Defendants, acting through management personnel, entered into a plan to intentionally and actively deceive and mislead the workforce and state and federal regulatory and investigative agencies from the activities within the plant, as evidenced by the pattern of night burning, direct knowledge of environmental deaths of plant and animal life, and illegal dumping of toxic substances.

51.     As part of the co-conspirators' plan, by concealing the presence and nature of the contaminants, the trespass was facilitated for decades upon Plaintiffs' property.

52.     As direct result of this conspiracy, Plaintiffs have suffered the damages complained of herein.

## COUNT III: NEGLIGENCE

53.     At all relevant times, Defendants owed a duty to use reasonable care that a reasonably prudent person would use while using, handling, storing, or disposing of hazardous substances including hexavalent chromium and TCE.

54.     Defendants breached their duties by failing to use reasonable care that a prudent person should use under the circumstances and by releasing and/or discharging hazardous substances

into the ground so as to contaminate the soil, ground water, and other natural resources of the Plaintiffs. Additionally, when Defendants learned of the release and discharge of these contaminating substances and the resulting plume(s), they owed Plaintiffs a duty to act reasonably to investigate, report, cooperate, remediate, clean up, contain, minimize movement of, and eliminate these hazardous substances before they migrated, spread, contaminated, and damaged additional property owned by the Plaintiffs.

55.     Defendants failed in their affirmative duties to take reasonable steps or measures to investigate, report, correct, and remediate the intentional and negligent releases of these hazardous substances and failed to mitigate or minimize the damage being inflicted.

56.     At all relevant times, the damages suffered by Plaintiffs were foreseeable and directly related to Defendants' actions.

57.     At all relevant times, the acts and omissions of the Defendants directly resulted in and led to Plaintiffs' damages as complained of herein.

### COUNT IV: NUISANCE

58.     Plaintiffs incorporate by reference all of the allegations contained above.

59.     Defendants have created and continued a condition that is injurious to the property owned by Plaintiffs that has fundamentally interfered with Plaintiffs' right to use and enjoy their property and resources. Specifically, Defendants' actions as described herein have resulted in the creation and migration of contaminating substances onto Plaintiffs' properties, significantly damaging the Plaintiffs' properties and rendering the surface and ground water unwholesome and impure in contaminated areas.

60.     Defendants' actions and/or their failure to take reasonable acts to remediate the hazardous substances were a foreseeable and proximate cause of the substantial and unreasonable

interference with Plaintiffs' enjoyment and use of, and the cause of the damage to, Plaintiffs' properties.

## COUNT V: TRESPASS

61.    Plaintiffs incorporate by reference all of the allegations contained above.

62.    Defendants have caused hazardous substances, including hexavalent chromium, TCE, and their associated VOC's to enter Plaintiffs' properties, including contamination of ground water/aquifer, surface water, and soil. From these original dumping locations the toxins continue to migrate and invade the property owned and held by Plaintiffs.

63.    Defendants have negligently and intentionally dumped and disposed of hazardous substances into the ground and ground water of Grenada County and/or failed to remove the hazardous substances from the soil and water of Grenada County.

64.    At all relevant times, Defendants were aware of both the illegality of their disposal of these substances on or near Plaintiffs' property and the realization that there would be harm inflicted as a result of the release of these hazardous substances on or near Plaintiffs' property and to the environment.

65.    Defendants' actions in creating and failing to remove hazardous substances from Plaintiffs' properties are the proximate cause of the past, present, and continuing trespass, injury, and actual damage to Plaintiffs' properties and Plaintiffs' use of their properties and to their persons.

66.    Defendants' action in failing to take reasonable response measures to fully report, discover, remediate, eliminate and remedy the contamination of the air, soil, and ground water and Plaintiff's properties, as well as Defendants' property during all times of ownership, were intentional acts that were the proximate cause of the invasion and trespass to Plaintiffs' right of

interference with Plaintiffs' enjoyment and use of, and the cause of the damage to, Plaintiffs' properties.

## COUNT V: TRESPASS

61.     Plaintiffs incorporate by reference all of the allegations contained above.

62.     Defendants have caused hazardous substances, including hexavalent chromium, TCE, and their associated VOC's to enter Plaintiffs' properties, including contamination of ground water/aquifer, surface water, and soil. From these original dumping locations the toxins continue to migrate and invade the property owned and held by Plaintiffs.

63.     Defendants have negligently and intentionally dumped and disposed of hazardous substances into the ground and ground water of Grenada County and/or failed to remove the hazardous substances from the soil and water of Grenada County.

64.     At all relevant times, Defendants were aware of both the illegality of their disposal of these substances on or near Plaintiffs' property and the realization that there would be harm inflicted as a result of the release of these hazardous substances on or near Plaintiffs' property and to the environment.

65.     Defendants' actions in creating and failing to remove hazardous substances from Plaintiffs' properties are the proximate cause of the past, present, and continuing trespass, injury, and actual damage to Plaintiffs' properties and Plaintiffs' use of their properties and to their persons.

66.     Defendants' action in failing to take reasonable response measures to fully report, discover, remediate, eliminate and remedy the contamination of the air, soil, and ground water and Plaintiff's properties, as well as Defendants' property during all times of ownership, were intentional acts that were the proximate cause of the invasion and trespass to Plaintiffs' right of

exclusive possession of Plaintiffs' properties and the proximate cause of damages to Plaintiffs' properties.

## COUNT VI: INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

67.     Plaintiffs incorporate by reference all of the allegations contained above.

68.     Notwithstanding Defendants actual knowledge of the harm or potential harm caused by the hazardous substances, including hexavalent chromium, TCE, and their associated VOC's, Defendants continued to dump the hazardous substances, failed to clean up their dumping, and failed to inform Plaintiffs of the existence, potential harm, or actual harm associated with their dumping hazardous substances. Defendants knew that such actions and omissions on their part could potentially cause harm or would cause actual harm to Plaintiffs and would cause Plaintiffs to suffer severe emotional distress.

69.     Defendants' conduct toward Plaintiffs was malicious, intentional, and outrageous and rises to the level of an intentional infliction of emotional distress.

70.     At a minimum, or in the alternative, Defendants' conduct toward Plaintiffs was negligent or grossly negligent and constitutes a negligent infliction of emotional distress.

71.     Regardless of whether Defendants' conduct was intentional or negligent, it was reasonably foreseeable to Defendants that their conduct toward Plaintiffs would cause Plaintiffs to suffer severe emotional distress.

72.     Consequently, Plaintiffs are entitled to recover from Defendants all damages they have sustained for emotional distress as a proximate result of Defendants' intentional and/or negligent infliction of emotional distress.

## CERCLA SAVINGS PROVISION

73.     To any extent necessary, Plaintiffs invoke the procedural benefit of the savings

provisions set forth in 42 U.S.C. §9658(a)(1), of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), because Plaintiffs assert claims under State law (including those for property damage and other rights of reimbursements for expenses) caused or contributed to by exposure to hazardous substances, pollutants, or contaminants (such as hexavalent chromium and TCE) released into the environment by the Defendants from a facility owned, operated, and/or controlled by the Defendants (at the Grenada, Mississippi manufacturing plant).

## EQUITABLE RELIEF REQUESTED

74.     Defendants' actions have severely damaged, and continue to damage, the surface water, soil, and the groundwater in Grenada County and Plaintiffs' properties.   These Defendants have inflicted this damage without permission or compensation for the harm caused to the natural resources.   The extent of the damage to Plaintiffs' properties is not fully known because of Defendants' fraudulent concealment of the extent of the contaminating activities.

75.     Plaintiffs, therefore, request:

    a.     That the Defendants be ordered to immediately identify all sites of disposal of hazardous substances from Defendants' plant, or otherwise, within the state of Mississippi;

    b.     That the Defendants be ordered to fully cooperate to identity the scope of the contamination created and permitted by Defendants;

    c.     That Defendants be ordered to provide immediate and appropriate remediation to stop the spread of contaminants throughout the soil and ground water at all affected sites through the construction of effective Permeable Reactive Barriers or other emergent measures necessary to stop the ongoing spread and release of the

contaminants;

d.     That Defendants be ordered to provide Plaintiffs suitable substitute housing until their properties have been cleaned up fully and made safe.

## LEGAL RELIEF REQUESTED

76.     The Plaintiffs are entitled to amounts to be determined at trial associated with the injuries and losses sustained and necessary to restore their homes and property to their original position and status including, but not limited to, the difference between the current value of their homes and properties and such value if the contamination complained of herein had not occurred, the cost of all remediation actions necessary to restore their homes and properties, the value of the use of the continuing trespass, relocation costs (before and, if necessary, after conclusion of attempted cleanup efforts), and all other general and consequential damages associated with the acts and omissions of the Defendants herein.

## DAMAGES

77.     The actions of the Defendants described herein have caused, and continue to cause, significant damage to Plaintiffs as follows:

a.     Loss of property value secondary to permanent and irreparable contamination injury;

b.     Relocation costs (before and, if necessary, after conclusion of attempted cleanup efforts);

c.     Cost of all repair and abatement to restore any property to pre-contamination condition and restore market value;

d.     Diminution of property market value based on contamination and/or market stigma secondary to contamination;

e.   Emotional distress secondary to Defendants' breach of duties resulting in Plaintiffs' fear of illness from exposure to contaminants released by Defendants and which are foreseeable to cause illness, worry regarding Plaintiffs' property damage, impairment of Plaintiffs' property values, the necessity of relocation during remediation, upheaval, and inconvenience;

f.   Prejudgment interest to the extent allowed and determined by the Court;

g.   Post judgment interest on all damages as permitted by the Court;

h.   Punitive damages against each of the Defendants for their outrageous, conspiratorial, collusive, deceitful, and fraudulent conduct; and

i.   An award of attorneys' fees to Plaintiffs, in the event of an award of punitive damages.

78.   Plaintiffs request judgment against Defendants for the above and all other appropriate relief.

Respectfully submitted,

**LISTON LANCASTER, PLLC**

By: _____

WILLIAM LISTON, III, ESQ.
Mississippi State Bar No.8482
ALAN D. LANCASTER, ESQ.
Mississippi State Bar No.1792
P.O. Box 645
Winona, MS 38967
Telephone:     (662)283-2132
Facsimile:      (662)283-3742
dlancaster@listonlancaster.com
wlist3@aol.com

**REID STANFORD, ATTORNEY AT LAW**

By: _____

REID STANFORD
Mississippi State Bar No. 10011
2340 Sunset Drive, Suite D
Grenada, MS 38901
Telephone:     (662) 307-2600
reidstanford@gmail.com

**FUNDERBURG, SESSUMS & PETERSON, PLLC**

By: _____

STEVEN H. FUNDERBURG
Mississippi State Bar No. 9959
Post Office Box 13960
Jackson, MS 39236-3960
Telephone:     (601) 355-5200
Facsimile:      (601) 355-5400
sfunderburg@fsplawfirm.com

*ATTORNEYS FOR PLAINTIFFS*