# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

BRENDA J. COOPER, et al.,

                *Plaintiffs*,

v.

MERITOR, INC.,
ROCKWELL AUTOMATION, INC.,
THE BOEING COMPANY, and
TEXTRON, INC.,

                *Defendants.*[†]

Judge Debra M. Brown
Magistrate Judge Jane M. Virden

Lead Case No. 4:16-cv-52

Consolidated with:
   *Sledge v. Meritor, Inc.*, No. 4:16-cv-53
   *Cooke v. Meritor, Inc.*, No. 4:16-cv-54
   *SRA Invests., LLC v. Meritor, Inc.*, No. 4:16-cv-55
   *Willis v. Meritor, Inc.*, No. 4:16-cv-56

## MEMORANDUM IN SUPPORT OF
## <u>TEXTRON'S MOTION FOR SUMMARY JUDGMENT</u>

---

[†]    In accordance with the Court's October 25, 2017 Order, ECF No. 351, this Motion for Summary Judgment applies to the claims brought by the Plaintiffs in the *Cooper* case, No. 4:16-cv-52.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 4

    A.    Events That Occurred Before Textron Owned the Facility. ................................. 4

    B.    Textron Did Not Contaminate Groundwater and Appropriately Disposed of Wastes While It Owned and Operated the Facility. ............................................... 5

    C.    Remedial Investigations in the 1990s Concluded That Rockwell's Operations Caused TCE and Toluene Contamination at the Facility. .................... 6

    D.    Recent Remedial Investigations Find No Threat to Public Health, No TCE Vapor Entering Homes in the Neighborhood, and No TCE in the Outdoor Air Requiring Remediation. .................................................................................. 6

LEGAL STANDARD ......................................................................................... 7

ARGUMENT ...................................................................................................... 8

I.    Textron is Not Responsible for Any Groundwater Contamination in the Eastern Heights Neighborhood. ............................................................................. 9

    A.    Plaintiffs Claim That Disposal of Waste in the Moose Lodge Road Area Is the Source of Groundwater Contamination, but it Is Undisputed That Textron Did Not Dispose of Waste There. ............................................................ 10

    B.    Plaintiffs Have No Admissible Evidence that Textron Caused Any Groundwater Contamination at the Facility—Much Less That TCE in the Groundwater Beneath the Facility Is Moving North to the Neighborhood. ......... 10

II.    Plaintiffs Have No Admissible Evidence that Contaminants in the Groundwater Have Migrated to Their Properties. .................................................................... 12

        1.    Plaintiffs Cannot Base Their Claims on Contamination of Groundwater Beneath Their Homes, Which Belongs to the State. ........... 12

        2.    Plaintiffs Cannot Base Their Claims Against Textron on Alleged BTEX Contamination or Alleged Hexavalent Chromium Contamination. ............................................................................................ 14

        3.    Plaintiffs' Own Testing Shows That Nine of the Ten Plaintiffs Do Not Have TCE Contamination Anywhere on Their Properties. ............... 14

4.      Even though Some Properties Show Evidence of Contaminants, There Is No Evidence of a Completed Vapor Intrusion Pathway Connecting the Allegedly Contaminated Groundwater to Plaintiffs' Properties. ............................................................................................ 15

III.    Each Of Plaintiffs' Claims Suffers From Claim-Specific Defects. .................................. 17

        A.      All Plaintiffs' Emotional Distress Claims Fail Because There Is No Evidence Of Reasonable Fear Of Future Illness. ...................................................... 17

        B.      All Plaintiffs' Nuisance Claims Fail Because There Is No Evidence That Any Contamination Caused an Unreasonable Invasion of Plaintiffs' Use and Enjoyment of Their Properties. ...................................................................... 18

IV.     Plaintiffs' Damages Theories Fail Under Mississippi Law. .............................................. 20

        A.      Plaintiffs Have No Legal Right to Seek Remediation and Replacement Costs. ............................................................................................................ 20

        B.      Plaintiffs Are Not Entitled to Recover Relocation Costs. ...................................... 21

        C.      Plaintiffs Cannot Satisfy Their Burden of Presenting Clear and Convincing Evidence to Support Their Punitive Damages Claim Against Textron. .............. 22

CONCLUSION ................................................................................................................................ 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Allstate Prop. & Cas. Ins. Co.*,
   No. 4:14-cv-00064-DMB,
   2015 WL 1292220 (N.D. Miss. Mar. 23, 2015) ................................................... 22

*Baker v. Chevron U.S.A. Inc.*,
   533 F. App'x 509 (6th Cir. 2013) .................................................................... 13, 16

*Baker v. Chevron USA, Inc.*,
   No. 1:05-CV-227,
   2011 WL 3652249 (S.D. Ohio Aug. 19, 2011),
   *aff'd*, 533 F. App'x 509 (6th Cir. 2013) ....................................................... 3, 15, 16

*Blackard v. Hercules, Inc.*,
   No. 2:12-cv-175-KS-MTP,
   2014 WL 3548829 (S.D. Miss. July 17, 2014) ..................................................... 21

*Brooks v. Stone Architecture, P.A.*,
   934 So. 2d 350 (Miss. Ct. App. 2006) ............................................................ 15, 17

*Brown v. Inter-City Fed. Bank for Sav.*,
   738 So. 2d 262 (Miss. Ct. App. 1999) ................................................................. 18

*C.W. ex rel. Wood v. Textron, Inc.*,
   807 F.3d 827 (7th Cir. 2015) .............................................................................. 16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................ 7, 8

*City of Alexandria v. Brown*,
   740 F.3d 339 (5th Cir. 2014) ................................................................................ 8

Couch v. City of D'Iberville,
   656 So. 2d 146 (Miss. 1995) ................................................................................. 9

Fisher v. Deer,
   942 So. 2d 217 (Miss. Ct. App. 2006) ................................................................... 9

*Garcia v. U Pull It Auto & Truck Salvage, Inc.*,
   657 F. App'x 293 (5th Cir. 2016) (per curiam) ...................................................... 8

*Green v. Lakeview Loan Servicing, LLC*,
   No. 2:15-CV-156-KS-MTP,
   2017 WL 2126327 (S.D. Miss. May 16, 2017) ................................................................ 9

*Herrington v. Leaf River Forest Prods., Inc.*,
   733 So. 2d 774 (Miss. 1999) ....................................................................................... 14

*Hollingsworth v. Hercules, Inc.*,
   No. 2:15-CV-113-KS-MTP,
   2016 WL 7409130 (S.D. Miss. Dec. 22, 2016) ............................................................ 12

*Ivory v. Int'l Bus. Machs. Corp.*,
   116 A.D.3d 121 (N.Y. App. Div. 2014) ...................................................................... 13

*John v. Louisiana.*,
   757 F.2d 698 (5th Cir. 1985) ........................................................................................ 8

*Jones v. City of Hattiesburg*,
   228 So. 3d 816 (Miss. Ct. App. 2017) ........................................................................ 18

*Leaf River Forest Prods., Inc. v. Ferguson*,
   662 So. 2d 648 (Miss. 1995) ....................................................... 9, 15, 17, 18, 19

*Leaf River Forest Prods., Inc. v. Simmons*,
   697 So. 2d 1083 (Miss. 1996) ............................................................................... 12, 14

*McGlothin v. State Farm Mut. Ins. Co.*,
   __ F. Supp. 3d __, No. 1:17cv83-LG-RHW,
   2018 WL 1406607 (S.D. Miss. Mar. 19, 2018)............................................................ 22

*Mosley v. GEICO Ins. Co.*,
   No. 3:13CV161-LG-JCG,
   2014 WL 7882149 (S.D. Miss. Dec. 16, 2014) ............................................................ 9

*O'Connor v. Equitable Life Assurance Soc'y of U.S.*,
   592 F. Supp. 595 (N.D. Miss. 1984) ........................................................................... 22

*Patterson v. Holleman*,
   917 So. 2d 125 (Miss. Ct. App. 2005) ........................................................................ 20

*Postma v. Cty. of Ottawa*,
   No. 243602,
   2004 WL 1949317 (Mich. Ct. App. Sept. 2, 2004) (per curiam)........................................ 13

*Ragas v. Tenn. Gas Pipeline Co.*,
   136 F.3d 455 (5th Cir. 1998) ........................................................................................ 8

*Sandstad v. CB Richard Ellis, Inc.*,
   309 F.3d 893 (5th Cir. 2002) ...................................................................... 8

*Seaman v. Seacor Marine L.L.C.*,
   326 F. App'x 721 (5th Cir. 2009) (per curiam) ...................................... 16

*Spann v. Robinson Prop. Grp., L.P.*,
   970 F. Supp. 564 (N.D. Miss. 1997) ...................................................... 22

*Stagliano v. Cincinnati Ins. Co.*,
   633 F. App'x 217 (5th Cir. 2015) (per curiam) ...................................... 8

*Taylor v. Pharmacia-Uphohn Co.*,
   No. 4:03CV148LN,
   2005 WL 3502052 (S.D. Miss. Dec. 19, 2005) ...................................... 18

*Tolbert v. Denbury Onshore, LLC*,
   No. 3:08CV512TSL-JCS,
   2009 WL 700772 (S.D. Miss. Mar. 13, 2009) ........................................ 21

*Tompkins v. Vickers*,
   26 F.3d 603 (5th Cir. 1994) ...................................................................... 7

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) .................................................................... 8

*Waggener v. Leggett*,
   150 So. 2d 529 (Miss. 1963) .................................................................... 21

*Warren v. Derivaux*,
   996 So. 2d 729 (Miss. 2008) .................................................................... 22

**Rules and Statutes**

Fed R. Civ. P. 30(b)(6) .............................................................................. 5

Fed. R. Civ. P. 56 ...................................................................................... 9

Fed. R. Civ. P. 56(a) .................................................................................. 9

Miss. Code § 51-3-1 .................................................................................. 14

Miss. Code. § 11-1-65 ................................................................................ 24

**Other Authorities**

Restatement (Second) of Torts § 929(1)(a) .............................................. 22

U.S. EPA, Office of Solid Waste and Emergency Response (OSWER),
    *OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion
    Pathway from Subsurface Vapor Sources to Indoor Air*,
    June 2015, https://www.epa.gov/sites/production/files/2015-
    09/documents/oswer-vapor-intrusion-technical-guide-final.pdf (last accessed
    April 26, 2018) ................................................................................................................. 17

# INTRODUCTION

When Plaintiffs first filed this case, they made the Eastern Heights neighborhood sound like a toxic cesspool—a residential area teeming with all types of hazardous wastes. Plaintiffs alleged that all Defendants "engaged in a pattern of illegal dumping of both trichloroethylene ("TCE") and hexavalent chromium in and around the [Grenada manufacturing] facility." Compl. ¶ 18, ECF No. 1. They claimed that "[i]llegal dumping took place [in] . . . the Plaintiffs' neighborhood" itself and that all Defendants disposed of TCE and hexavalent chromium by incinerating it "into the atmosphere." *Id.* ¶ 44. They claimed that vapors from these chemicals had contaminated all Plaintiffs' homes through a "completed pathway . . . from the groundwater plume into the neighborhood residences," *e.g., id.* ¶¶ 32, 59, 63, and that the neighborhood's residents were breathing TCE and chromic acid in the outdoor air, *id.* ¶ 36.

Now, 18 months of discovery have shown that Plaintiffs have no evidence to back up these wild claims, especially as to Textron. Plaintiffs have abandoned their claims about hexavalent chromium and chromic acid: none of their experts address it, and there is no evidence that it is present anywhere on Plaintiffs' properties. Plaintiffs have also abandoned their claims of exposure to contaminants in air emissions: Plaintiffs have withdrawn their only expert on air emissions because of fundamental flaws in his analysis. And there is no evidence of any dumping or incineration of waste by Textron in the neighborhood, near the neighborhood, or at the facility. Textron's Statement of Undisputed Material Facts ("SOF") ¶¶ 11-14, 20, 24.

Plaintiffs' only theory now is that TCE, and to a lesser extent BTEX,[1] were released into groundwater outside the neighborhood, moved underground so that it is under some of their properties, and that vapors from these chemicals moved upward into the soil and air of some of their

---

[1]    BTEX refers to the chemicals benzene, toluene, ethyl benzene, and xylene, which naturally occur in crude oil and petroleum products such as gasoline.  SOF ¶ 48.

properties. Plaintiffs' theory of liability suffers from multiple overarching and independent defects that entitle Textron to summary judgment on all of Plaintiffs' claims.

**First**, Plaintiffs have no admissible evidence that Textron contaminated any groundwater at all—much less that Textron is responsible for groundwater contamination under a portion of the Eastern Heights neighborhood. Plaintiffs' primary contention is that the contaminants came from groundwater under the Moose Lodge Road Area ("MLRA"), a portion of which had been used by Rockwell for waste disposal for a limited period in the 1960s. It is undisputed, however, that Textron did not dispose of waste in the MLRA. It is also undisputed that Textron is not liable for environmental and waste-disposal issues that occurred before Textron purchased the Grenada facility in July 1985—nearly two decades after Rockwell disposed of waste in the MLRA. Thus, Textron cannot be liable for any alleged groundwater contamination originating in the MLRA.

There is also no admissible evidence that Textron caused any on-site groundwater contamination. To the contrary, the only evidence of any spills or leaks of contaminants at the facility is from the 1960s and 1970s when Defendant Meritor operated the facility—long before Textron entered the picture. And even setting aside whether Plaintiffs have admissible evidence showing that Textron is responsible for TCE in groundwater under the facility (they do not), Plaintiffs do not have admissible evidence that the TCE under the facility has moved under the neighborhood. Although Plaintiffs have suggested that it is **possible** that TCE in groundwater under the Grenada facility itself moved north and under portions of the neighborhood, Plaintiffs' experts admit that the groundwater under the facility moves west and **away** from the neighborhood, and "is not expected to cross from" the facility to the neighborhood. SOF ¶ 34. Accordingly, summary judgment is warranted on all of Plaintiffs' claims because they lack admissible evidence that Textron is responsible for any of the contaminants that allegedly are affecting portions of the Eastern Heights neighborhood.

***Second***, Plaintiffs also have no admissible evidence that contaminants are moving from groundwater (which is not Plaintiffs' property) up onto each Plaintiff's property. Plaintiffs have tried to morph their cases to complain about the presence of BTEX in the neighborhood. But Plaintiffs have no evidence of BTEX in groundwater under the neighborhood, let alone evidence that Textron is responsible for supposed BTEX contamination. With respect to TCE, ***none*** of the ten Plaintiffs in this case are being exposed to TCE vapors in the first place because Plaintiffs' own test results show that none of them have TCE in background air or indoor air. *Id.* ¶¶ 49-57. In fact, Plaintiffs' own test results show that eight of the ten Plaintiffs have ***no*** TCE anywhere on or beneath their properties—not even in the groundwater. *Id.* Plaintiffs Caffey, Crumley, Phillips, Cooper, Odomes, Richardson, Seldon, and Ward thus lack evidence of contamination sufficient to survive summary judgment.

Of the two remaining Plaintiffs, there was a detection of TCE in the groundwater beneath Cunningham's home but nowhere else, and there was a detection of TCE in the groundwater and sub-slab gas of Brady's property but nowhere else. *Id.* ¶¶ 49, 52. Those isolated test results are not sufficient for Brady and Cunningham to survive summary judgment because of the reasons noted above, and because Plaintiffs' own expert admits he has no evidence showing a vapor intrusion pathway by which contaminants are moving from groundwater to any Plaintiff's property. Absent evidence of a completed vapor intrusion pathway and evidence that Textron is responsible for the source of contamination, Textron is entitled to summary judgment on all of Plaintiffs' claims, as other courts have held. *Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2011 WL 3652249, at *7 (S.D. Ohio Aug. 19, 2011), *aff'd*, 533 F. App'x 509 (6th Cir. 2013). For these and the additional reasons described below, Textron is entitled to summary judgment on all claims asserted by each Plaintiff in the *Cooper* action.

## FACTUAL BACKGROUND

Plaintiffs do not dispute that Textron, Inc. is a separate legal entity from Meritor, Inc., Rockwell Automation, and The Boeing Company (collectively, "Meritor").[2] Plaintiffs also do not dispute that Textron is not liable (contractually or otherwise) for Meritor's actions or for events that occurred before Textron purchased the Grenada facility. SOF ¶ 19. Therefore, to analyze the viability of Plaintiffs' claims against Textron (as opposed to Meritor), it is critical to distinguish events that occurred before July 1, 1985, when a Textron subsidiary bought the facility, from events that occurred while a Textron entity owned the facility from July 1, 1985, through August 6, 1999.[3]

### A.    Events That Occurred Before Textron Owned the Facility.

Rockwell International owned and operated the Grenada Manufacturing Facility from 1965 until July 1, 1985. *Id.* ¶ 2. Rockwell used various chemicals, including TCE and toluene, in the facility operations. *Id.* ¶¶ 3, 15-18. The facility generated solid waste in the form of chromium buff sludge and TCE paint still bottoms. *Id.* ¶¶ 4, 9. Before 1967, Rockwell disposed of the chromium buff sludge in an on-site landfill. *Id.* ¶ 7. In 1966 and 1967, Rockwell disposed of buffing compound waste and paint still bottoms in an area east of the facility near Moose Lodge Road. *Id.* ¶¶ 6, 8, 9, 10 (Rockwell's corporate designee testifying that Rockwell disposed of "still bottoms, paint wastes" and "buff compound" "for a short period of time in the buff compound disposal area" in the Moose Lodge Road Area).

Before 1980, Rockwell stored TCE in above-ground tanks, with underground piping that transferred the TCE from the tanks to the facility buildings. Ex. 41 (T&M AOC-A Investigation

---

[2]    In 1996, Rockwell sold a portion of its business to Boeing North America (which later merged into The Boeing Company), and Rockwell later spun off its automotive division to form Meritor. Rockwell, Boeing, and Meritor have so far treated themselves as a single defendant represented by the same counsel throughout this litigation. This brief refers to these entities interchangeably as "Meritor" or "Rockwell" depending on the period.

[3]    In 1998, Textron, Inc. sold the Grenada facility to Textron Automotive Exteriors, Inc., a subsidiary of Textron Automotive Company, Inc., and a separate legal entity from Textron, Inc. On August 6, 1999, Textron Automotive Exteriors, Inc. sold the facility to Grenada Manufacturing L.L.C.

Report, MTOR-02-0005439 at 42). In 1977, one of the underground pipes ruptured and leaked thousands of gallons of TCE into the ground. SOF ¶ 15. Rockwell stored toluene in a 2,000-gallon steel underground storage tank. *Id.* ¶ 16. During the 1970s and early 1980s, this tank leaked toluene into the ground under the facility, and was replaced in 1982. *Id.* ¶¶ 17-18.

> **B.      Textron Did Not Contaminate Groundwater and Appropriately Disposed of Wastes While It Owned and Operated the Facility.**

Randall Wheel Trim, Inc. (a Textron subsidiary) bought the facility from Rockwell on July 1, 1985. *Id.* ¶ 19. Critically, the Purchase & Sale Agreement provided that Rockwell would retain all liability for "any actual or contingent liability, whether or not known prior to the Closing Date, relating to the handling, generation, treatment, storage, transportation or disposal of pollutants, contaminants, waste or hazardous or toxic materials prior to the Closing Date. . . ." Ex. 16 (1985 Purchase and Sale Agreement, at Section 17.1). Thus, Textron bears no responsibility or liability for Rockwell's onsite and offsite disposal of wastes in the 1960s and 1970s, or for the leaks of TCE and toluene in the 1970s and early 1980s.

Plaintiffs admit that Textron, throughout its ownership of the facility, used appropriate third-party contractors to dispose of all waste. SOF ¶¶ 20, 24. And Plaintiffs do not dispute that Textron did not cause any on-site releases of any groundwater contaminants and did not dispose of any contaminants in the Moose Lodge Road Area or anywhere else off-site. *Id.* ¶¶ 11-14; 20.

In fact, Textron took actions to decrease the total volume of chemical waste generated by the facility and improve waste disposal practices. Textron stopped purchasing TCE in October 1991 and eliminated its TCE use by April 1992. *Id.* ¶ 23; Ex. 42 (ICE-028814); Ex. 5 (G. Simpson Dep. Tr. 48:25-49:4). The EPA acknowledged Textron's accomplishments in a March 7, 1990 letter congratulating the staff "for making significant strides in improving the Randall-Textron self-monitoring program. The current program was well organized and efficiently carried out by your

environmental staff."  SOF ¶ 25.

### C. Remedial Investigations in the 1990s Concluded That Rockwell's Operations Caused TCE and Toluene Contamination at the Facility.

In January 1989, the EPA first requested to inspect the facility.  Ex. 43 (1/20/1989 EPA Letter at TEX_MDEQ_003497).  Textron readily cooperated with that request.  The EPA concluded that contamination in the soil and groundwater at the facility "is a direct result of the improper disposal practices and lack of containment structures used by *Rockwell* during the time period 1961-1967." SOF ¶ 28 (emphasis added).

In 1991, Rockwell began a remedial investigation at the facility under an administrative order from the Mississippi Department of Environmental Quality ("MDEQ").  Ex. 44 (1990 MDEQ Administrative Order).  Rockwell submitted a draft remedial investigation report to the MDEQ in January 1994, which identified the presence of TCE, as well as toluene and chromium, in the soil and groundwater at the site.  Ex. 19 (Eckenfelder Report at ES-13).  Rockwell identified the on-site landfill, toluene storage area, and TCE storage area—all issues that preceded Textron's ownership of the facility—as the "most significant sources of constituents of interest."  SOF ¶ 29.

### D. Recent Remedial Investigations Find No Threat to Public Health, No TCE Vapor Entering Homes in the Neighborhood, and No TCE in the Outdoor Air Requiring Remediation.

In August 2015, the EPA began testing the air and soil in the Eastern Heights neighborhood. The EPA has consistently found "no immediate threat to public health" in Eastern Heights, and no need for residents of the Eastern Heights neighborhood to be relocated.  SOF ¶¶ 58-61, 76.  The EPA has also found that chemicals present in the groundwater are not entering the homes via vapor intrusion: the "EPA did not find that chemicals present in the groundwater were entering homes via vapor intrusion" because "[a]n 8 to 12-foot silty clay layer underlies the neighborhood and appears to be preventing TCE vapors from coming up into the homes."  *Id.* ¶ 61.  And the EPA's outdoor air

6

tests in Eastern Heights have consistently detected either no TCE or TCE that is "below levels that require a response action." *Id.* ¶¶ 58-60. No regulatory agency has ordered Textron to remediate the neighborhood. *Id.* ¶ 26.

Despite the EPA's conclusions, Plaintiffs continue to suggest that TCE is entering their properties from the groundwater beneath their homes—a process called vapor intrusion. Rockwell's recent investigations conducted at MDEQ's direction have revealed that TCE is indeed in the groundwater under some Eastern Heights properties, in addition to TCE in groundwater underneath the facility. *Id.* ¶¶ 30-31. Plaintiffs claim that TCE from the Moose Lodge Road Area is affecting a portion of the Eastern Heights neighborhood, but they admit that Textron did not dispose of waste there. *Id.* ¶¶ 12-14. Plaintiffs' experts admit that the groundwater underneath the facility has moved, and continues to move west ***away*** from the neighborhood—not north toward the neighborhood. *Id.* ¶¶ 34-37, 39, 41. Thus, Plaintiffs do not have evidence that Textron is responsible for contaminants that may be affecting a portion of the groundwater under Eastern Heights. Finally, Plaintiffs' experts admit that (1) most properties in the neighborhood have no contamination, and (2) there is no evidence of a completed vapor intrusion pathway between the groundwater and Plaintiffs' properties. *See* Textron's Mem. in Supp. of Mot. to Exclude Testimony of Pls.' Expert J. Fineis at 6-8, 15-19.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While Textron, as the movant, bears the burden of showing the absence of a genuine issue of material fact, Textron need not "negat[e] [Plaintiffs'] claim[s]," but need only "'show[]'—that is, point[] out to the district court—that there is an absence of evidence to support [Plaintiffs'] claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986) (emphasis omitted). Textron "has no burden to disprove unsupported claims" by Plaintiffs. *Tompkins v. Vickers*, 26 F.3d 603, 608 (5th Cir. 1994).

7

Once Textron carries its "initial burden" of pointing to an absence of evidence, Plaintiffs "may not rest upon . . . [their] pleading[s]," but "must set forth specific facts showing that there is a genuine issue for trial." *John v. Louisiana*, 757 F.2d 698, 707-08 (5th Cir. 1985) (quoting Fed. R. Civ. P. 56). A genuine issue of fact does not exist "if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014).

In addition, "the content of summary judgment evidence must be generally admissible." *Garcia v. U Pull It Auto & Truck Salvage, Inc.*, 657 F. App'x 293, 297 (5th Cir. 2016) (per curiam) (citation omitted). As a result, Plaintiffs "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted). Likewise, "unsupported [expert] affidavits setting forth ultimate or conclusory facts are . . . insufficient," an expert's "subjective opinion," or an expert's "theoretical speculations" are insufficient to establish a genuine issue of material fact. *Stagliano v. Cincinnati Ins. Co.*, 633 F. App'x 217, 219-20 & n.2 (5th Cir. 2015) (per curiam) (brackets in original) (citations omitted). And although courts must "draw all reasonable inferences in favor of the nonmoving party," the summary judgment standard does "not require[]" courts to draw "unreasonable inference[s]" in favor of the non-moving party. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896, 901 (5th Cir. 2002).

As the Supreme Court and Fifth Circuit have emphasized, "[s]ummary judgment is not a 'disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.'" *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Celotex*, 477 U.S. at 327).

## ARGUMENT

To survive summary judgment, Plaintiffs must have admissible evidence to show that some

contaminants released by *Textron*—as opposed to Rockwell or any other party—are on or substantially affecting their properties. Discovery in this case has narrowed Plaintiffs' contamination hypothesis. Plaintiffs have identified only *two* contaminants affecting their properties, TCE and BTEX. Plaintiffs have abandoned their efforts to show contamination via air emissions by withdrawing their sole expert on this topic. Plaintiffs have no admissible evidence of dumping on Plaintiffs' properties or in the Eastern Heights neighborhood generally. In fact, many Plaintiff properties have *no evidence* of any contamination. Instead, Plaintiffs' theory is that TCE and certain BTEX constituents in groundwater have moved under their properties, and then through vapor intrusion, migrated up into the soil and air of some properties.

Plaintiffs can survive summary judgment only if they show that (1) Textron is responsible for groundwater contamination that is beneath their properties, (2) there is a completed vapor intrusion pathway from the groundwater to the soil or air circulating on each property, and (3) the other elements of their property damage claims. Plaintiffs have not met their burden.

## I. Textron is Not Responsible for Any Groundwater Contamination in the Eastern Heights Neighborhood.

No Plaintiff has admissible evidence to show that Textron caused any contamination affecting her property, which is an across-the-board defect for all claims against Textron.[4] A Plaintiff's claims against Textron cannot survive absent admissible evidence that: (1) it was *Textron's* operation of the facility after it took over in July 1985—after years of admitted spills, on-site and off-site dumping, and leaks during Rockwell's ownership—that caused contamination in the

---

[4]   *See, e.g., Fisher v. Deer,* 942 So. 2d 217, 219 (Miss. Ct. App. 2006) (citing *Couch v. City of D'Iberville,* 656 So. 2d 146, 150 (Miss. 1995)) (negligence); *Green v. Lakeview Loan Servicing, LLC,* No. 2:15-CV-156-KS-MTP, 2017 WL 2126327, at *1 (S.D. Miss. May 16, 2017) (trespass requires "damage to the plaintiff as a result of physical invasion of the land") (citation omitted); *Leaf River Forest Prods., Inc. v. Ferguson,* 662 So. 2d 648, 662 (Miss. 1995) (nuisance requires a showing the defendant's conduct is a "legal cause of an invasion of another's interest in the private use and enjoyment of land") (citation omitted); *Mosley v. GEICO Ins. Co.,* No. 3:13CV161-LG-JCG, 2014 WL 7882149, at *19 (S.D. Miss. Dec. 16, 2014) (infliction of emotional distress).

9

groundwater beneath the Plaintiff's property, and (2) contamination in groundwater beneath the Plaintiff's property is migrating upward into Plaintiff's soil or air. Plaintiffs' claims fail on both points.

> **A.** **Plaintiffs Claim That Disposal of Waste in the Moose Lodge Road Area Is the Source of Groundwater Contamination, but it Is Undisputed That Textron Did Not Dispose of Waste There.**

There is no admissible evidence that any alleged contamination affecting Plaintiffs' properties was caused by Textron's operation of the facility from 1985 to 1999. Although the parties disagree over whether any contamination in the MLRA is the source of contamination in the Eastern Heights neighborhood, the parties agree on a key point: Textron did not dispose of any wastes in that area. SOF ¶¶ 11-14. Instead, Plaintiffs have admitted that, from the first day it took over the facility in 1985, Textron disposed of hazardous waste, including TCE still bottoms and paint sludge, through licensed disposal vendors. *See id.* ¶¶ 20, 24.

There is no dispute about any of this. Plaintiffs have admitted, in response to Textron's requests for admission, that they "have no evidence of Textron employees hauling away" paint sludge, buffing compound waste, or materials from the facility's TCE recovery stills "at any time from 1985 to 1999." *Id.* ¶¶ 12-14. Plaintiffs have also admitted that "from 1985 to 1999 the Grenada Manufacturing Facility used a third-party waste disposal company to dispose of buffing compound waste from the facility." *Id.* ¶ 24. And none of Plaintiffs' experts purport to offer any opinions tracing contamination specifically to Textron's ownership. There is thus no factual basis for Plaintiffs' claims that Textron caused any contamination—and the Court need go no further to grant summary judgment in Textron's favor on all Plaintiffs' claims against Textron.

> **B.** **Plaintiffs Have No Admissible Evidence that Textron Caused Any Groundwater Contamination at the Facility—Much Less That TCE in the Groundwater Beneath the Facility Is Moving North to the Neighborhood.**

There is no admissible evidence that Textron caused a single spill or leak of contaminants

10

into the groundwater at the facility. Government investigation reports, third-party assessments of the area, and Rockwell's own corporate testimony, all confirm that, during Rockwell's ownership, Rockwell disposed of hazardous waste in on-site landfills, had TCE spills, and a toluene leak. *See id.* ¶¶ 6-10, 15-18; *see supra* pp. 4-5. All spills or leaks of hazardous waste at the facility occurred long before Textron acquired the Facility in 1985 and were not known to Textron until years after it purchased the facility. *See* SOF ¶¶ 21-22. Textron, during its ownership from 1985 to 1999, did not cause any spills or leaks of any contaminants—instead disposing of all hazardous waste through "licensed disposal vendor[s]." *Id.* ¶ 20, 24. Tellingly, none of Plaintiffs' experts purport to offer any opinions attributing any groundwater contamination to Textron.

Even if Plaintiffs could come up with evidence attributing some on-site contamination to Textron, there would still be no basis for any of Plaintiffs' claims against Textron. It is undisputed that groundwater underneath the facility flows west ***away*** from the neighborhood—not north toward it—and thus that any contamination underneath the facility has not moved into the neighborhood. Plaintiffs' experts have conceded that "under present conditions groundwater flow is ***not*** expected to cross from [the facility] to the [neighborhood]," *id.* ¶ 34. And they have testified that they have not seen any historical data showing that groundwater underneath the facility has ever flowed towards the neighborhood, *id.* ¶¶ 35, 37, 39, 41; *see* Textron's Mem. in Supp. of Mot. to Partially Exclude Testimony of Pls.' Groundwater Experts at 4, 8-11. Thus, while Plaintiffs lack evidence that Textron is responsible for contamination on-site at the facility or in groundwater under the facility,[5] the presence of contaminants there is irrelevant because Plaintiffs' experts admit such

---

[5]    SOF ¶¶ 12-14 (Plaintiffs have admitted that they "have no evidence of Textron employees hauling away" paint sludge, buffing compound waste, or materials from the facility's TCE recovery stills "at any time from 1985 to 1999."); Ex. 5 (G. Simpson Dep. Tr. 99:7-12) (Textron's 30(b)(6) witness testifying that there is no information regarding a leak from a TCE storage tank or any piping associated with that tank that occurred during Textron's ownership of the Facility).

11

contamination is not affecting the Eastern Heights neighborhood. There is therefore no basis for claims that *Textron*'s on-site operations caused any contamination affecting Plaintiffs.

## II. Plaintiffs Have No Admissible Evidence that Contaminants in the Groundwater Have Migrated to Their Properties.

Even if Plaintiffs had admissible evidence that Textron released contaminants into the groundwater and that those contaminants made their way to the groundwater under Plaintiffs' properties, Plaintiffs' claims would still fail as a matter of law. To prove property damage, Plaintiffs must present evidence showing a connection between contamination in the groundwater beneath their homes and contamination affecting their property interests. *See, e.g.*, *Leaf River Forest Prods., Inc. v. Simmons*, 697 So. 2d 1083, 1083, 1085-86 (Miss. 1996) (claims of negligence, nuisance, trespass, and emotional distress failed as a matter of law because the plaintiff offered "no scientific proof or analysis to establish the presence of dioxin on his land").[6] Plaintiffs do not own the groundwater beneath their homes. As a result, Plaintiffs rely solely on the concept of vapor intrusion—i.e., that vapors from contaminated groundwater underneath their properties are migrating upward into their soil and air. *See, e.g.*, 4th Am. Compl. ¶ 34, ECF No. 43 (alleging that a "completed pathway" for vapor intrusion "exists from the groundwater plume into the neighborhood residences north of the facility."). Plaintiffs' theory fails because there is no admissible evidence that any Plaintiff is experiencing vapor intrusion.

### 1. Plaintiffs Cannot Base Their Claims on Contamination of Groundwater Beneath Their Homes, Which Belongs to the State.

Plaintiffs cannot claim property damage based on contamination in groundwater beneath some of their homes because no Plaintiff has any property interest in groundwater. Mississippi law

---

[6]    *See also, e.g.*, *Hollingsworth v. Hercules, Inc.*, No. 2:15-CV-113-KS-MTP, 2016 WL 7409130, at *1 (S.D. Miss. Dec. 22, 2016) (holding that contamination on property immediately adjacent to plaintiffs' land was insufficient as a matter of law to support a trespass claim).

is clear that the State's waters—including groundwater—belong generally to the citizens of the state under the sovereign control of the State, not to any individual landowner. *See* Miss. Code § 51-3-1 ("The control and development and use of water for all beneficial purposes shall be in the state, which, in the exercise of its police powers, shall take such measures to effectively and efficiently manage, protect and utilize the water resources of Mississippi."). Courts throughout the country have thus consistently interpreted provisions like Mississippi's to mean that an individual landowner "has a property right in groundwater only to the extent he actually uses that water; he has no property interest in that water simply because it resides beneath his land." *Baker v. Chevron U.S.A. Inc.*, 533 F. App'x 509, 521 (6th Cir. 2013).[7]

Here, it is undisputed that none of the Plaintiffs uses the groundwater beneath their homes for any purpose; Plaintiffs and their experts have admitted as much. SOF ¶ 40; *id.* ¶¶ 70-72 (Simonton is not "aware of any Eastern Heights property owner that is using groundwater from the upper aquifer"). Rather, as Plaintiffs and their experts have admitted, the City of Grenada provides Plaintiffs' tap water, which is sourced from the uncontaminated deeper regional aquifer and from wells that are not near Eastern Heights or the facility. *See id.* ¶¶ 71-72.[8] Because Plaintiffs do not use the groundwater under their property and thus have no property interest in it, summary judgment is appropriate on Plaintiffs' claims to the extent that they are based on contaminated groundwater.

---

[7] *See also, e.g.*, *Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 130 (N.Y. App. Div. 2014) ("[Plaintiffs] cannot support trespass claims based on contaminated groundwater, because groundwater does not belong to the owners of real property, but is a natural resource entrusted to the state by and for its citizens." (citations omitted)); *Postma v. Cty. of Ottawa*, No. 243602, 2004 WL 1949317, at *9 (Mich. Ct. App. Sept. 2, 2004) (per curiam) ("[E]ven if plaintiff could prove the groundwater under his property is contaminated and that groundwater contaminants equate to physical, tangible objects, plaintiff's claim of trespass is without merit because this Court has recognized that one does not have ownership or exclusive possession over water beneath one's property.").

[8] Plaintiffs' experts concede that they are not "aware of any data collected by the City of Grenada or any other government entity suggesting that there is contamination from the facility in the regional aquifer" and that they did not make "any attempt to determine whether there was any contamination in the lower aquifer." SOF ¶¶ 46-47; SOF ¶ 38. To the contrary, Plaintiffs' experts "assume[] that the lower aquifer is okay." Ex. 21 (Simonton Dep. Tr. 235:4-12).

## 2. Plaintiffs Cannot Base Their Claims Against Textron on Alleged BTEX Contamination or Alleged Hexavalent Chromium Contamination

It is unclear whether Plaintiffs continue to base their claims on contamination due to BTEX or hexavalent chromium, but Textron would be entitled to summary judgment regardless, for the same reasons. Plaintiffs' own testing shows no BTEX in the groundwater beneath any Plaintiff's property. *See* SOF ¶¶ 49-57. There is no evidence that *Textron* caused any spills or leaks of BTEX: the only release of toluene (the "T" in BTEX) was a spill that occurred on Rockwell's watch before Textron ever entered the picture, and there is no evidence that contaminated groundwater underneath the facility has ever flowed north into the neighborhood. *See supra* pp. 10-12. Likewise, not a single Plaintiff's property has test results detecting hexavalent chromium, *see* SOF ¶¶ 49-57, and there is no evidence that Textron caused any hexavalent chromium to enter the groundwater, *see supra* pp. 10-12.

## 3. Plaintiffs' Own Testing Shows That Nine of the Ten Plaintiffs Do Not Have TCE Contamination Anywhere on Their Properties.

The results of Plaintiffs' own testing make clear that **nine** of the **ten** Plaintiffs in this case have **no** TCE anywhere on their properties—and thus cannot show that there is any contamination affecting their property interests. SOF ¶¶ 49-57. Each Plaintiff's trespass and negligence claim fails as a matter of law unless she can show that contaminants are actually "present on h[er] property." *Leaf River Forest Prod., Inc. v. Simmons*, 697 So. 2d 1083, 1083, 1085-86 (Miss. 1996) ("There is no evidence offered by [plaintiff] that dioxin is present on his property, and, without such evidence, a trespass verdict can not [sic] stand . . . ."); *see also Herrington v. Leaf River Forest Prods., Inc.*, 733 So. 2d 774, 778 (Miss. 1999) (affirming summary judgment for defendant on negligence claim where plaintiff "present[ed] the court with no scientifically verifiable evidence that there was dioxin in the river near her cabin or in her body"). Each Plaintiff's nuisance and emotional distress claims likewise fail because **none** of the ten Plaintiffs are being exposed to TCE vapors. *See Leaf River*

*Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 658-59 (Miss. 1995) (to recover for emotional distress predicated on potential future illness there must be substantial proof of exposure and medical evidence that would indicate possible future illness); *see also, e.g.*, *Brooks v. Stone Architecture, P.A.*, 934 So. 2d 350, 352, 354-56 (Miss. Ct. App. 2006) (affirming grant of summary judgment where plaintiff had evidence of substantial exposure, but no "medical or scientific evidence supporting the reasonableness of their emotional fear"); *see infra* pp. 18-20.

> **4.      *Even though Some Properties Show Evidence of Contaminants, There Is No Evidence of a Completed Vapor Intrusion Pathway Connecting the Allegedly Contaminated Groundwater to Plaintiffs' Properties.***

Only *two* Plaintiffs (Cunningham and Brady) have any TCE detected on or beneath their properties: Cunningham had a detection for TCE in the groundwater beneath her property, but no evidence of TCE anywhere above that, *see id.* ¶ 52, and Brady has a detection of TCE in the groundwater, no evidence of TCE in her soil gas, mixed test results for TCE in the sub-slab space beneath her house, and no evidence of TCE in her indoor air or background air, *see id.* ¶ 49.

Brady, however, cannot establish causation based on her theory of vapor intrusion. As the EPA has explained, vapor intrusion exists only when the route that the vapors take from the groundwater (the "vapor intrusion pathway") is "complete" and not blocked.[9] A plaintiff cannot show causation for a vapor intrusion theory as a matter of law where there is no evidence of a "completed vapor pathway" from the contamination to the plaintiff's property. *Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2011 WL 3652249, at *7 (S.D. Ohio Aug. 19, 2011) (granting summary judgment on negligence, trespass, private nuisance, and other claims because "[t]he plume is not underneath the properties of these Plaintiffs nor are the properties close enough to the plume

---

[9]      *See, e.g.*, Ex. 45 (U.S. EPA, Office of Solid Waste and Emergency Response (OSWER), *OSWER Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Vapor Sources to Indoor Air*, June 2015, at 1-2, 122, https://www.epa.gov/sites/production/files/2015-09/documents/oswer-vapor-intrusion-technical-guide-final.pdf (last accessed April 26, 2018)).

to be exposed to a completed vapor pathway from the plume"), *aff'd*, 533 F. App'x at 523-24.

Here, all of the admissible evidence shows that there is no completed vapor intrusion pathway and no vapor intrusion occurring on Brady's (or any other Plaintiff's) property. The sole expert that Plaintiffs put forward to address vapor intrusion (James Fineis) testified that his original expert report was incorrect because he could ***not*** opine that there is a completed vapor pathway for any property in Eastern Heights, as explained in Textron's motion to exclude him as an expert. *See* Textron's Mem. in Supp. of Mot. to Exclude J. Fineis at 8-11, 13-14; SOF ¶¶ 62, 65-68. Without any expert testimony on causation, Plaintiffs cannot survive summary judgment.[10]

Even putting Fineis's repeated disavowals aside, the vapor intrusion pathway for Brady's property is not complete under Fineis's own metrics. Fineis testified that a vapor intrusion pathway is complete only if testing detects the chemical at all levels above the groundwater. *See* SOF ¶¶ 63-64. Thus, Fineis agrees that the vapor intrusion pathway is not complete for a plaintiff like Brady who has a detection of TCE for only her groundwater and sub-slab, but no TCE in her soil gas or indoor air. On top of that, the EPA has repeatedly found that there is no vapor intrusion. "Consistent with previous results, EPA did not find that chemicals present in the groundwater were entering homes via vapor intrusion" because the pathway was blocked and not complete: "[a]n 8 to 12-foot silty clay layer underlies the neighborhood and appears to be preventing TCE vapors from coming up into the homes." *Id.* ¶ 61; *see also id.* ¶ 60. Third-party assessments agree. *See id.* ¶ 33

Without any evidence of a completed pathway, Brady (or any other Plaintiff) cannot establish that Textron (or any Defendant) caused the alleged TCE contamination on Plaintiffs' properties. This Court should thus reach the same result as cases like *Baker*, 533 F. App'x 509, and grant

---

[10]    *See, e.g.*, *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723 (5th Cir. 2009) (per curiam) (affirming summary judgment where plaintiffs could not prove general or specific causation after the exclusion of their experts); *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 838 (7th Cir. 2015) (similar).

summary judgment in Textron's favor on all claims for lack of causation.

### III.   Each Of Plaintiffs' Claims Suffers From Claim-Specific Defects.

#### A.     All Plaintiffs' Emotional Distress Claims Fail Because There Is No Evidence Of Reasonable Fear Of Future Illness.

Plaintiffs' emotional distress claims fail as a matter of law.  To prove emotional distress, there must be evidence showing that each Plaintiff has a reasonable fear of harm from the alleged contamination.  *Leaf River Forest Prods.*, 662 So. 2d at 658-59.  To "recover for emotional distress predicated on potential future illness there must be substantial proof of exposure and medical evidence that would indicate possible future illness."  *Id.* at 658.[11]

*First*, no Plaintiff has "substantial proof of exposure."  *Leaf River Forest Prods.*, 662 So. 2d at 658.  None of the Plaintiffs has a test result detecting TCE in indoor air or background air, and eight of the ten Plaintiffs do not have *any* TCE on or beneath their properties at all.  *See* SOF ¶¶ 49-57; *see supra* pp. 14-15.  Of the remaining two, one (Brady) has a test result detecting TCE only in the groundwater beneath her property and mixed test results for her sub-slab, and the other (Cunningham) has a test detecting TCE only in the groundwater beneath her property.  *See id.* ¶¶ 49, 52.  But that is not "substantial proof" that these two were actually exposed to TCE because it is undisputed that *none* of the Plaintiffs use the groundwater for any purpose (as Plaintiffs' experts agree), *see id.* ¶ 40; 70-72; *see supra* p. 13, and there is no evidence at all that Brady was ever exposed to any TCE in the soil beneath her concrete foundation (the sub-slab).  Moreover, the only expert Plaintiffs put forward on health risks (Nicar) testified that he did not assess any Plaintiff's actual exposure to any contaminants.  *See* SOF ¶ 77.[12]

---

[11]   *See also, e.g.*, *Brooks v. Stone Architecture, P.A.*, 934 So. 2d 350, 352, 354-56 (Miss. Ct. App. 2006) (affirming grant of summary judgment where plaintiff had evidence of substantial exposure, but no "medical or scientific evidence supporting the reasonableness of their emotional fear").

[12]   *See also* Ex. 38 (Nicar Dep. Tr. at 33:20–34:17) ("Q. [H]ave you done any analysis of any kind of bodily fluids of any of the plaintiffs in this case? A. No. Q.  So as you sit here, you can't tell us whether any of the plaintiffs in this case have any TCE or its byproducts in their system? A.  No. … Q.  Or any other chemical of interest,

**Second**, no Plaintiff has "medical evidence that would indicate possible future illness." *Leaf River Forest Prods.*, 662 So. 2d at 658. Again, the sole expert Plaintiffs have proffered to address health risks has testified that he has not performed any health risk assessment at all for any specific Plaintiff. *See* SOF ¶ 78; *see, e.g.*, *Taylor v. Pharmacia-Uphohn Co.*, No. 4:03CV148LN, 2005 WL 3502052, at *3 (S.D. Miss. Dec. 19, 2005) (granting summary judgment in toxic tort case where "there [was] no data whatsoever offered in support of [the plaintiffs' expert]'s conclusion" that each plaintiff was at an appreciably increased risk for developing cancer (emphasis omitted)). Indeed, based on several rounds of testing, the EPA has consistently found that "there is no immediate threat to public health in the Eastern Heights neighborhood due to trichloroethene (TCE)." SOF ¶¶ 58, 59, 76. Plaintiffs' emotional distress claims thus fail as a matter of law.[13]

**B.      All Plaintiffs' Nuisance Claims Fail Because There Is No Evidence That Any Contamination Caused an Unreasonable Invasion of Plaintiffs' Use and Enjoyment of Their Properties.**

Plaintiffs' nuisance claims fail as a matter of law. Although Plaintiffs need not show an "actual physical invasion" of their properties to succeed on this claim, Textron is "subject to liability for a private nuisance *if, but only if, [its] conduct is a legal cause of an invasion of [the Plaintiffs'] interest* in the private use and enjoyment of land . . . ." *Leaf River Forest Prods.*, 662 So. 2d at 662 (emphasis added). For the most part, Plaintiffs claim two types of "invasions" of their interest "in

---

correct? A.   Correct."); *id.* at 69:5-15 ("Q. All right. So as we sit here today, you can't identify the specific exposure levels for any individual plaintiff living in the Eastern Heights neighborhood? A. That's correct. Q. Nor any specific toxicities related to any level of exposure of any of those people? A. Correct. Q. Or any specific toxic effects that anyone has suffered or claims to have suffered? A. Correct."); *id.* at 156:1-12 ("Q. And you have no evidence and you don't have any opinion that any individual in the Eastern·Heights neighborhood exceeded that MRL [minimum risk level] for chronic duration exposure to TCE? A. That's correct. Q. Nor do you have any evidence or opinion·that they exceeded the other MRLs for either short or intermediate exposure, correct? A. Correct. Q. And that's the same whether it's for inhalation, oral or in drinking water, correct? A. Correct.").

[13]   Summary judgment should also be granted on any intentional infliction of emotional distress claim. *See* 4th Am. Compl. ¶¶ 70-71, ECF No. 43. There is no evidence that Textron "acted willfully or wantonly toward" Plaintiffs by engaging in conduct that was "outrageous in character" and "extreme in degree"—especially when Textron did not contaminate any groundwater. *Jones v. City of Hattiesburg*, 228 So. 3d 816, 819 (Miss. Ct. App. 2017); *Brown v. Inter-City Fed. Bank for Sav.*, 738 So. 2d 262, 264-65 (Miss. Ct. App. 1999) (citation omitted).

the private use and enjoyment" of their properties: (1) no longer gardening or barbequing outside due to a fear of contamination, or (2) a "bad odor" on their properties.[14] But given that no Plaintiff can show the presence of TCE in her background or indoor air, *see supra* pp. 14-15, they have no evidence that the alleged "invasions" of their property interests are traceable to TCE contamination. If Plaintiffs complain of a bad odor but there is no evidence of TCE in the air they are breathing, that odor must be attributable to some other cause. Similarly, TCE cannot be preventing Plaintiffs from gardening or barbequing outside when there is no TCE in the outdoor air on their properties.

More fundamentally, even if Plaintiffs could trace these complaints to TCE, Plaintiffs have not offered any evidence showing how ***Textron*** is responsible for allegedly bad odors or a fear of barbequing today when Textron has not owned or operated the facility in nearly twenty years and Textron stopped using TCE at the facility more than twenty-five years ago. To the contrary, as Textron's experts explain, any TCE emitted historically from the facility would have been diluted and ultimately evaporated from the air within weeks of its release. *See, e.g.*, Ex. 48 (Machado Rpt. at 33). To cap it off, Plaintiffs have withdrawn the only expert they put forward who purported to model TCE exposure in the air many years ago—leaving them with no evidence at all that spending time outdoors on their properties would increase their risk of potential harm from contamination.[15] Plaintiffs' nuisance theories are thus nothing more than speculation without actual proof of causation. *See Leaf River Forest Prods.*, 662 So. 2d at 662.

In addition, two Plaintiffs, Crumley and Phillips, are Texas residents who have not lived at their Eastern Heights property for over a decade. SOF ¶¶ 73, 75. Phillips testified that ever since she moved from Grenada to Texas two decades ago, she has never had any plan to return, and nobody

---

[14] *See, e.g.*, Ex. 46 (S. Cunningham Dep Tr. 20:20-23, 22:8-16); Ex. 47 (B. Cooper Dep. Tr. 36:10-21); Ex. 35 (M. Odomes Dep. Tr. 27:9-30:11).

[15] *See* ECF No. 506 ("Plaintiffs now stipulate and agree that they (a) withdraw their expert witness designation of Dr. Rosenfeld and (b) will not offer or rely on Dr. Rosenfeld's opinions, testimony, or the SWAPE Report.").

in her family (including Crumley) intends to either.  *Id.* ¶¶ 73-74.  There cannot be an unreasonable invasion of an interest in the "use" of a property that they do not use and have no desire to use.

## IV.     Plaintiffs' Damages Theories Fail Under Mississippi Law.

Even if they had some basis for claims against Textron, Plaintiffs have no legal right to recover most of their claims for economic damages, and they cannot clear the high hurdle to claim punitive damages against Textron.  Plaintiffs assert three theories of economic damages:

1.    The diminished value of their homes, which they value at $4 million for the entire neighborhood, on the theory that their properties' values have been entirely wiped out and all of their properties are now worth $0, *see id.* ¶ 79;

2.    The cost to replace their Eastern Heights homes with newly constructed homes in a new neighborhood and to relocate to those homes, which they value at $5.5 million, *see id* ¶ 80; and

3.    The cost to remediate the contamination in the Eastern Heights neighborhood, and protecting it from future contamination, which they estimate will cost $143 million, *see id* ¶ 81.

Even if Plaintiffs could prove the other elements of their claims, Mississippi law precludes Plaintiffs from recovering anything other than the diminished value of their homes.

### A.     Plaintiffs Have No Legal Right to Seek Remediation and Replacement Costs.

Under Mississippi law, "[a] landowner may recover restoration costs"—whether replacement or remediation—"only if the cost of restoration is less than the diminution in value of the entire property."  *Patterson v. Holleman*, 917 So. 2d 125, 132 (Miss. Ct. App. 2005); *see generally* Restatement (Second) of Torts § 929(1)(a) cmt. b.  Courts applying Mississippi law thus consistently grant summary judgment when the costs "to monitor and remediate [plaintiffs'] properties . . . exceed the alleged diminution in value of the properties caused by environmental contamination."  *Blackard v. Hercules, Inc.*, No. 2:12-cv-175-KS-MTP, 2014 WL 3548829, at *10

(S.D. Miss. July 17, 2014).[16]  Here, Plaintiffs' experts claim (for Plaintiffs across the litigation) over $140 million in remediation costs and $5.5 million in replacement (and relocation) costs—each of which exceeds Plaintiffs' calculation of $4 million in diminished property values.  SOF ¶¶ 79-81. Mississippi law therefore precludes recovery of these claimed remediation and replacement costs.

### B.      Plaintiffs Are Not Entitled to Recover Relocation Costs.

There is no legal basis for Plaintiffs to recover the costs to relocate to replacement properties in a new neighborhood.  As explained above, Plaintiffs' economic damages are limited to the diminished value of their properties: "the difference between the fair market value of the property before the alleged damage, and the fair market value of the property after the alleged damage." *Tolbert, LLC*, 2009 WL 700772, at *2.  No part of that measure includes relocation costs to a new property.  Moreover, because the law precludes Plaintiffs from recovering replacement costs in the first place, there is no legal basis for them to recover relocations costs.

In addition, there is no factual basis for any claimed need to relocate.  Nine of the ten Plaintiffs have no TCE on their properties, none of the Plaintiffs have any TCE in their indoor or outdoor air at all, and the EPA has consistently found that "there is no immediate threat to public health in the Eastern Heights neighborhood due to [TCE]."  SOF ¶ 59; *see also id.* at ¶¶ 58, 60-61. As a result, the EPA has rejected any need to relocate:  "Based on all the results received to date, EPA has determined that there is no immediate threat to public health and EPA is not considering temporary or permanent relocation of any Eastern Heights neighborhood residents."  *Id.* ¶ 76. Textron is thus entitled to summary judgment on Plaintiffs' relocation damages.

---

[16]    *Accord*, *Tolbert v. Denbury Onshore, LLC*, No. 3:08CV512TSL-JCS, 2009 WL 700772, at *3 (S.D. Miss. Mar. 13, 2009); *Waggener v. Leggett*, 150 So. 2d 529, 531 (Miss. 1963).

### C. Plaintiffs Cannot Satisfy Their Burden of Presenting Clear and Convincing Evidence to Support Their Punitive Damages Claim Against Textron.

There is no basis for an award of punitive damages against Textron. Where the evidence provides no basis for an award of punitive damages, a court may grant partial summary judgment rejecting punitive damages as a matter of law even if an underlying claim proceeds to trial.[17] "Mississippi law does not favor punitive damages; they are considered an ***extraordinary remedy*** and are allowed 'with caution and within ***narrow limits***.'" *Warren v. Derivaux*, 996 So. 2d 729, 738 (Miss. 2008) (emphases added) (citation omitted). Plaintiffs must present "'clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.'" *Abel v. Allstate Prop. & Cas. Ins. Co.*, No. 4:14-cv-00064-DMB, 2015 WL 1292220, at \*4 (N.D. Miss. Mar. 23, 2015) (Brown, J.) (quoting Miss. Code. § 11-1-65).

Here, Plaintiffs cannot prove, by clear and convincing evidence, that *Textron*'s conduct falls into any of these three categories. There is no fraud claim.[18] And as explained above, it is undisputed that Textron did not engage in *any* on-site or off-site disposal or cause *any* releases of contaminants into the groundwater while it operated the facility from 1985 to 1999, *see supra* pp. 4-6—much less clear and convincing evidence that Textron did so with "actual malice" or "gross negligence" with a "willful, wanton or reckless disregard for the safety of others."

To the contrary, it is undisputed that when Textron purchased the facility in 1985, it was handed undisclosed environmental problems, including now-admitted spills and dumping by

---

[17] *See, e.g.*, *McGlothin v. State Farm Mut. Ins. Co.*, __ F. Supp. 3d __, No. 1:17cv83-LG-RHW, 2018 WL 1406607, at \*4 (S.D. Miss. Mar. 19, 2018) (granting partial summary judgment on claim for punitive damages where there was "no evidence of malice or gross or reckless disregard" by defendant); *Spann v. Robinson Prop. Grp., L.P.*, 970 F. Supp. 564, 565 (N.D. Miss. 1997) (similar); *O'Connor v. Equitable Life Assurance Soc'y of U.S.*, 592 F. Supp. 595, 599 (N.D. Miss. 1984) (similar).

[18] Plaintiffs dismissed their additional claims for fraud and civil conspiracy. *See* ECF No. 174.

Rockwell, that Textron voluntarily worked with government authorities when Textron discovered those historical issues, and that Textron endeavored to fix multiple historical issues. *See* SOF ¶¶ 20-24; *see supra* pp. 4-6. In the end, Textron decreased the facility's generation of chemical waste and improved how the facility disposed of it—so much so that the EPA ***praised*** Textron's for its efforts to monitor its chemical use and guard against potential releases. SOF ¶ 25. There is no evidence that Textron ever polluted the facility grounds or Plaintiffs' properties, and certainly no clear and convincing evidence that it ever did so knowingly or with wanton disregard for Plaintiffs' rights. Accordingly, Plaintiffs' claim for punitive damages against Textron fails as a matter of law.

## CONCLUSION

For the reasons stated above, the Court should grant Textron's motion for summary judgment on all of Plaintiffs' claims.

23

Dated: May 9, 2018          Respectfully submitted,

COUNSEL FOR TEXTRON INC.

*/s/ William L. Smith*
WILLIAM L. SMITH (MB No. 7635)
WALTER H. BOONE (MB. No. 8651)
BALCH & BINGHAM LLP
Suite 1400
188 East Capitol Street
Jackson, MS 39201-2133
Tel: (601) 965-8175
Fax: (888) 506-8673
Email: bsmith@balch.com
Email: wboone@balch.com


BARRY E. FIELDS, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
3000 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2081
Fax: (312) 862-2200
Email: barry.fields@kirkland.com

PETER A. FARRELL (*pro hac vice*)
KIRKLAND & ELLIS LLP
665 Fifteenth Street, N.W.
Washington, DC 20005
Tel: (202) 879-5959
Fax: (202) 879-5200
Email: peter.farrell@kirkland.com