# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

| | |
|---|---|
| BRENDA J. COOPER, et al., | Judge Debra M. Brown |
| *Plaintiffs*, | Magistrate Judge Jane M. Virden |
| v. | Lead Case No. 4:16-cv-52 |
| MERITOR, INC., | Consolidated with: |
| ROCKWELL AUTOMATION, INC., | *Sledge v. Meritor, Inc.*, No. 4:16-cv-53 |
| THE BOEING COMPANY, and | *Cooke v. Meritor, Inc.*, No. 4:16-cv-54 |
| TEXTRON, INC., | *SRA Invests., LLC v. Meritor, Inc.*, No. 4:16-cv-55 |
| | *Willis v. Meritor, Inc.*, No. 4:16-cv-56 |
| *Defendants*. | |

## PLAINTIFFS' RESPONSE TO TEXTRON'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs object to Textron's Statement of Undisputed Material Facts filed in support of its Motion for Summary Judgment (Dkt. No. 591) for failure to identify which "facts" are "material" to its motion, and why. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(a fact is only "material" if it "might affect the outcome of the suit under the governing law.")  Rather than providing only material facts, Textron offers 81 statements of varying sorts, some of which are have little to nothing to do with either the basis of its motion or the issues genuinely in dispute, and others of which are intentionally incomplete, misleading, or concern matters that are openly contested between the parties.  Plaintiffs further object to Textron's attempts to assert as undisputed material facts the content of cherry-picked snippets of testimony where there exists other contradictory testimony and evidence of which Textron is fully aware. Textron's failure to acknowledge such adverse evidence and testimony, particularly in the context of a submission of "undisputed" facts in support of a motion for summary

judgment, is inappropriate and creates a needless burden on the Plaintiffs, in drafting, and the Court, in considering, many of these responses. Subject to these objections, Plaintiffs respond to Textron's proffered statements as follows:

I. **Rockwell's Ownership and Operation of the Facility**

1. The Grenada Stamping and Assembly Facility (the "Facility") is bordered to the north by the Eastern Heights residential neighborhood, to the east and south by vacant land, and to the west by Riverdale Creek and agricultural land. Ex. 1 (1997 VSI Report at I-1).

   **RESPONSE: Plaintiffs dispute this statement and assert that it mispresents the 1997 Visual Site Inspection Report performed by A.T. Kearney, Inc., which actually reads:**

   **"The Randall Textron facility is located on Route 332 East, approximately 0.75 miles north of Grenada, Mississippi. It is separated from the town of Grenada by the Yalobusha River and adjacent swamps. The site is actually bisected by Route 332. The main plant area is located southeast of the road. The facility Wastewater Treatment Plant (SWMU 13), Sludge Lagoon (SWMU 4), inactive On-Site Landfill (SWMU 3) and a baseball field are located northwest of the road. The plant property includes 48.6 acres bordered by the Illinois Central Gulf Railroad to the north and east, a swampy area to the south, an abandoned road bed to the west, and Riverdale Creek to the northwest. Surrounding land use is mixed residential, agricultural and industrial."**

   **See 1997 VSI Report at I-1 (Dkt. Nos. 601 and 601-1).**

2. Rockwell International ("Rockwell") owned and operated the Facility from 1965 through July 1, 1985. *Id.*; Ex. 2 (D. O'Connor Dep. Tr. at 26:7-27:1;28:6-8).

   **RESPONSE: Plaintiffs agree that from November 1965 until July 1, 1985, the Facility was owned by Rockwell International or another affiliated Rockwell entity. There were, however, several ownership changes as a consequence of spin-offs, mergers and acquisitions during that time, such that Rockwell International was not the owner of the Facility for the entire period. See Stipulation of Undisputed Facts (Filed by Plaintiffs and Meritor re: Meritor's Corporate History)(Dkt. No. 445).**

3. Rockwell used trichloroethylene ("TCE") and toluene in the Facility operations. Ex. 1 (VSI Report at II-12-13); Ex. 2 (D. O'Connor Dep. Tr. 56:12-56:12-57:7).

   **RESPONSE: Plaintiffs do not dispute that the Rockwell-affiliated entities that owned the Facility during this period used TCE and Toluene in the operation of the Facility.**

4. Buffing compound waste was generated from the buffing machines used to polish the wheel covers (hub caps) manufactured by the Facility. Ex. 1 (VSI Report at II-12).

   **RESPONSE: Not disputed by Plaintiffs as stated, but Plaintiffs would clarify that the waste created by the buffing machines was contaminated, prior to 1967, by TCE from vapor degreasers, and thereafter, by TCE from maintenance uses, that was dumped into the buff basement, such that the buffing compound waste that was hauled from the plant and dumped on a daily basis contained concentrations of TCE. See Deposition of Phillip Backlund, begun 3/13/1996 ("1996 Backlund Dep."), Excerpts at Exhibit 1, pp. 658-59; Deposition of Sayles Martin, begun 6/22/1995 ('1995 Martin Dep."), Excerpts at Exhibit 2, p. 55.**

5. Meritor's Fed. R. Civ. P. 30(b)(6) witness, David O'Connor, testified that Rockwell used TCE in manufacturing operations from 1965 to 1985. Ex. 2 (D. O'Connor Dep. Tr. 56:12-56:12-57:7).

   **RESPONSE: Plaintiffs do not dispute that Rockwell-affiliated entities used TCE in manufacturing operations from 1965 to 1985, nor that David O'Connor testified to such usage.**

## II. On-Site Waste Disposal and Moose Lodge Road Disposal Area

6. The Mississippi Department of Environmental Quality ("MDEQ") submitted a fact sheet describing the Moose Lodge Road Disposal Site as follows: "The Moose Lodge Road Disposal Site was first brought to the attention of MDEQ in 1993. According to company records, the Facility used the site to dispose of a buffing compound containing chlorinated solvents used to polish the wheel covers produced in the stamping operation in the 1960s." Ex. 3 (Jan. 2016 MDEQ Fact Sheet: Moose Lodge Road Disposal Site and Moose Lodge Road Area at 1).

   **RESPONSE: Plaintiffs do not dispute that the MDEQ document cited by Textron reads as quoted, but do dispute the accuracy of the factual information contained therein. Plaintiffs assert that the evidence in this case shows that Rockwell dumped not only buffing sludge, but also paint sludges, barium/chrome plating sludges, still bottoms and other plant wastes at various locations along Moose Lodge Road during the 1966-1968 time period, and that these materials contained chlorinated solvents, chromium and other toxic chemicals from the Facility. These were the types of waste that were typically dumped by Rockwell on a daily basis, and the testimony provided by witnesses involved in directing and performing the dumping at Moose Lodge Road and elsewhere indicates that the same wastes were disposed of at the Moose Lodge Road dumpsites as had been disposed of at the on-site landfill` and which were later disposed of at the 16th Section dump. See following evidence:**

   - **1995 Martin Dep., pp. 27-30, 43-48, 81-83, Exhibit 2;**
   - **Deposition of John Ashley, begun 5/31/1995 ("1995 Ashley Dep."), pp. 40-48, 82, 159, 393, Excerpts at Exhibit 3;**
   - **1996 Backlund Dep., pp. 681-682, Exhibit 1;**
   - **Deposition of David O'Connor, 4/4/2018 ("O'Connor Dep."), p. 93-94, Excerpts at Exhibit 4.**

- **Deposition of Jerry Williams, 10/24/2017 ("J. Williams Dep."), pp. 8-12, Excerpts at Exhibit 5;**
- **Theo Berry, Statement Under Oath; 2/20/2015 ("Berry SUO"), pp. 6, 10, 13, Excerpts at Exhibit 6;**

7. O'Connor testified that after Rockwell took over the plant in 1965, "it was stockpiling its waste on what we call the onsite landfill" through 1966. Ex. 2 (D. O'Connor Dep. Tr. 168:1- 21).

   **RESPONSE: Plaintiffs do not that Mr. O'Connor testified as stated, but do dispute the factual accuracy of his testimony. The evidence in this case shows that the materials in the on-site landfill were not "stockpiled" in the sense that they were being kept there for later transportation to another location, but rather that the Facility's waste was dumped there with the intent and effect that it remain there permanently. In addition to the testimony of numerous witnesses who examined the onsite landfill in the 1980s and 1990s, Plaintiffs' position is supported by the following environmental studies that establish beyond argument that plant waste was located in the onsite landfill more than two decades after 1966:**

   - **Dkt. No. 601 and 601-1 -- RCRA Facility Assessment of Randall Textron, Visual Site Inspection Report;**
   - **Dkt. No. 597-13, NUS Corporation, Final Screening Site Inspection;**
   - **Dkt Nos. 601-3, 601-4, 601-5 and 601-6, Eckenfelder Draft Remedial Investigation Report, Randall Textron Plant Site;**

8. O'Connor testified that after 1966, "the plant staged the same materials at the buff compound disposal area off Moose Lodge Road at one specific location." *Id.* 168:1-21.

   **RESPONSE: Plaintiffs do not dispute that Mr. O'Connor testified as stated, but do dispute the factual accuracy of his testimony. The evidence in this case shows that the materials dumped along Moose Lodge Road were not "staged" in the sense that Rockwell intended to move them to another location, but were rather disposed of with the intent that they remain in the location where they were dumped permanently. Further, the evidence, both testimonial and scientific, shows that plant waste was disposed in multiple locations along Moose Lodge Road, not just in the area Rockwell now refers to as the "Buff Compound Disposal Area." For example, Jerry Williams, an employee that hauled waste from the Plant, testified that he dumped facility waste north of the Buff Compound Disposal Area on the east side of Moose Lodge Road. Meritor's environmental consultants working in the Moose Lodge Road Area identified areas of high concentrations of TCE contamination north of the Buff Compound Disposal Area, and Meritor has engaged in more than two and a half decades of active remediation efforts in those areas as the responsible party pursuant to agreed orders reached with the Mississippi Department of Environmental Quality. Tens of thousands of pages of regulatory filings made by Meritor exist related to this work. Even omitting the bulk of those materials for purposes of economy, Plaintiffs' positions are amply supported for the purposes of establishing disputed issues of fact by the following evidence:**

   - **J. Williams Dep., pp. 29-30, 52-54, Exhibit 5;**

- **2014 Environmental Power Point Presentation by David O'Connor, Exhibit 7;**
- **October 25, 2011 Email from Matthew Dagon (Stantec) to David O'Connor (Meritor) containing history of Moose Lodge Road remediation, Exhibit 8.**

9. O'Connor testified that Rockwell disposed of "still bottoms, paint wastes" and "buff compound" "first at the on-site landfill, next for a short period of time in the buff compound disposal area, and then finally at the 16th Section landfill." *Id.* 92:24-94:2.

   **RESPONSE: Plaintiffs do not dispute that Mr. O'Connor testified as stated, but do dispute the factual accuracy of his testimony to the extent it suggests that only still bottoms, paint wastes and buff compound was dumped at Moose Lodge Road and that waste from the Facility was only dumped in the Buff Compound Disposal Area. The evidence in this case shows that other wastes, including chromium sludge, TCE sludge from the vapor degreasers in the press, buff and butler departments, and general plant refuse was disposed of by dumping during this period, including at Moose Lodge Road, and that dumping took place in multiple locations along Moose Lodge Road, most significantly at a location to the east of Moose Lodge Road and well to the North and East of the Buff Compound Disposal Area. High concentrations of TCE have been detected in the groundwater in this area, which was identified by Jerry Williams during his deposition, and Meritor has engaged in repeated permanganate injection remediation efforts during the past decades in the same area at the direction of the Mississippi Department of Environmental Quality. Further, the dumping location identified by Mr. Williams coincides with a point of origin for one of the TCE groundwater plumes affecting the Eastern Heights neighborhood, as shown on plume depictions drawn by Meritor's consultants. <u>See</u> Evidence cited in response to Item 8, *supra.*

10. T&M Associates submitted a Moose Lodge Road Area Investigation Report to the MDEQ, which stated: "The BCDA [Buffing Compound Disposal Area] reportedly was used by the the the facility for disposal of an unknown quantity of buffing compound between 1966 and 1967." Ex. 4 (MTOR-00-0000003 at 11).

    **RESPONSE: Plaintiffs do not dispute that T&M Associates report reads as stated, but do dispute the factual accuracy of the statements in that report on the same grounds noted for Items 6 though 9, *supra*.**

11. Textron did not dispose of waste along Moose Lodge Road, and all disposal of waste in the Moose Lodge Road Area happened before Textron acquired the plant. Ex. 5 (G. Simpson Dep. Tr. at 119:23-120:8); Ex. 6 (All Plaintiffs' Responses to RFA Nos. 8-10).

    **RESPONSE: Not disputed by Plaintiffs.**

12. Plaintiffs "have no evidence of Textron employees hauling away paint sludge from the Grenada Manufacturing [F]acility at any time from 1985 to 1999." Ex. 6 (All Plaintiffs' Responses to RFA No. 8).

    **RESPONSE: Not disputed by Plaintiffs.**

13. Plaintiffs "have no evidence of Textron employees hauling away materials from the Grenada

Manufacturing Facility's TCE recovery stills at any time from 1985 to 1999." *Id.* at RFA No. 9.

**RESPONSE: Not disputed by Plaintiffs.**

14. Plaintiffs "have no evidence of Textron employees hauling away buffing compound waste from the Grenada Manufacturing Facility at any time from 1985 to 1999." *Id.* at RFA No. 10.

**RESPONSE: Not disputed by Plaintiffs.**

## III. Rockwell's Storage of TCE and Toluene

15. In the late 1970s, thousands of gallons of TCE leaked into the ground from storage and/or piping at the Facility. *See e.g.*, Ex. 7 (ICE-019002); Ex. 8 (S. Martin 2017 Dep. Tr. 65:11- 22); Ex. 5 (G. Simpson Dep. Tr. 98:20-99:6).

**RESPONSE: Not disputed by Plaintiffs.**

16. Rockwell stored toluene in a 2,000-gallon underground storage tank located near the southeast corner of the main manufacturing building. Ex. 9 (T&M Annual Monitoring Report for 2014 at 1-6).

**RESPONSE: Disputed. Plaintiffs assert that the underground toluene storage tank was located near the northeast corner of the main manufacturing building and had a volume of 2500 gallons. Plaintiffs' position is supported by the following evidence:**

- **TEX_MDEQ_082651, Eckenfelder Solid Waste Management Unit and Area of Concern Location Map (as included in 1997 A.T. Kearney Visual Site Inspection Report), Exhibit 9;**
- **ICE-021851, Brown and Caldwell Site Map, May 2000, Exhibit 10;**
- **1975 Rockwell Spill Prevention and Control Plan, Exhibit 11;**
- **1995 Ashley Dep, p. 422-429, Exhibit 3.**

17. Phil Backlund, the then-Director of Facilities Administration for Rockwell, testified that the the original underground toluene tank was removed "because apparently it sprung a leak." Ex. 10 (P. Backlund (Redacted) Dep. Tr. 669:4-25).

**RESPONSE: Not disputed by Plaintiffs.**

18. The original toluene underground storage tank leaked into the ground during Rockwell's ownership and was replaced in 1982. *See* Ex. 11 (M. Williams (Redacted) Dep. Tr. 101-02); Ex. 12 (S. Martin 1995 Dep Tr. 179); Ex. 13 (G. Boyd Dep. Tr. 54).

**RESPONSE: Not disputed by Plaintiffs.**

## IV. Textron's Ownership and Operation of the Facility

19. Randall Wheel Trim, Inc. (a Textron subsidiary) acquired the Facility from Rockwell on July 1, 1985. Ex. 14 (1985 Purchase & Sale Agreement).

**RESPONSE: Not disputed by Plaintiffs.**

20. At the time Randall took over operations at the plant, it used a licensed disposal vendor to dispose of all hazardous waste. Ex. 5 (G. Simpson Dep. Tr. 33:12-17; 70:14-19; 72:6-25); Ex. 6 (All Plaintiffs' Responses to RFA Nos. 11-12).

    **RESPONSE: Plaintiffs do not dispute that Textron hired licensed vendors to collect and transport its hazardous wastes upon taking over operations at the Facility.**

21. At the time Randall took over operations of the plant, it did not know about the leak from a TCE storage tank or any piping associated with that tank. Ex. 5 (G. Simpson Dep. Tr. 99:7- 12); Ex. 14 (Schedule IX to 1985 Purchase and Sale Agreement).

    **RESPONSE: Disputed. When Textron purchased the facility it became the employer, by virtue of the terms of the purchase agreement, of the former Rockwell employees that had knowledge of the TCE tank piping rupture and release, the fact that no remediation or clean up of the TCE that had been released had been conducted, the fact that the released TCE remained in the ground, the fact that the TCE was hazardous to the environment and human health and the fact that TCE was a RCRA hazardous material with carcinogenic properties and that spills of TCE were legally required to be reported to regulatory agencies. The knowledge of those employees was imputed to Textron as a matter of Mississippi law. Plaintiffs' positions are supported by controlling legal precedent and the following factual evidence in this case:**
    - **1995 Martin Dep., pp. 177-184, Exhibit 2.**
    - **1996 Backlund Dep., pp. 706-707, Exhibit 1.**

22. At the time Randall took over operations of the plant, it did not know about the leak from a toluene tank or associated piping. Ex. 5 (G. Simpson Dep. Tr. 99:13-18); Ex. 14 (Schedule IX to 1985 Purchase and Sale Agreement).

    **RESPONSE: Disputed. When Textron purchased the facility it became the employer, by virtue of the terms of the purchase agreement, of the former Rockwell employees that had knowledge of the toluene leak, the fact that no remediation or clean up of the toluene that had been released had been conducted, the fact that the released toluene remained in the ground and the fact that toluene was a RCRA hazardous material and that spills of toluene were legally required to be reported to regulatory agencies. The knowledge of those employees was imputed to Textron as a matter of Mississippi law. Plaintiffs' positions are supported by controlling legal precedent and the following factual evidence in this case:**
    - **1995 Martin Dep., pp. 184-188, Exhibit 2.**

23. Plaintiffs have admitted that "the Facility ceased purchasing TCE in substantial quantities for use as a solvent in the paint department in or about 1992." Ex. 6 (All Plaintiffs' Responses to RFA No. 13).

    **RESPONSE: Plaintiffs do not dispute that the Facility stopped using TCE as a solvent in**

**the paint department in 1992 and did not purchase substantial quantities of TCE after that time.**

24. Plaintiffs have admitted "that from 1985 to 1999 the Grenada Manufacturing Facility used a third-party waste disposal company to dispose of buffing compound waste from the facility." *Id.* at RFA No. 12.

**RESPONSE: Not disputed by Plaintiffs as stated, though Plaintiffs submit that both Textron misrepresented to the transporters of the buffing waste the characteristics of that waste by failing to disclose that the Mississippi State Chemical Laboratory analyzed the buffing compound and determined it to constitute and hazardous waste. See Correspondence and Testing Materials for Buffing Sludge, Exhibit 12.**

25. In a March 7, 1990 letter to Textron's Sayles Martin, the EPA wrote: "Please congratulate your staff for making significant strides in improving the Randall-Textron self-monitoring program. The current program was well organized and efficiently carried out by your environmental staff." Ex. 15 (3/7/1990 EPA Letter (ICE-018984)).

**RESPONSE: Plaintiffs do not dispute that the letter quoted, which concerned the monitoring of the wastewater treatment facility at the plant, was sent by the EPA to Mr. Martin. Plaintiffs dispute that this fact is material to any issue raised in Textron's motion for summary judgment.**

26. No regulatory agency has ordered or directed Textron to conduct remediation or corrective action in the Eastern Heights neighborhood. Ex. 5 (G. Simpson Dep. Tr. 134:17-21).

**RESPONSE: Not disputed by Plaintiffs.**

## V.    Remedial Investigations and Orders

27. EPA inspectors took notes of their January 31, 1989 inspection of the Facility in a Site Inspection Report, which stated: "Dumping of wastes took place from 1961-1967 . . . disposal areas could be best described as open dumps or piles of waste" and "[a]djacent to the second disposal area, are +50 drums scattered through the wooded, swampy area. Some of the drums are full of partially dried sludge, some partially empty. Ex. 16 (TEX_MDEQ_005943 at 51- 52).

**RESPONSE: Disputed. Plaintiffs are unable to locate the information or quotations included above at the citation provided, which does not exist. Plaintiffs do not dispute, however, that Rockwell dumped plant waste in the onsite dump from 1965 until 1967, or that Lyon, Inc. dumped waste in that location from 1961 until 1965.**

28. In their Report of the 1989 Facility investigation, the EPA found that contamination in the soil and groundwater at the Facility "is a direct result of the improper disposal practices and lack of containment structures used by Rockwell during the time period 1961-1967." *Id.* (TEX_MDEQ_005943 at Section 5.0).

8

**RESPONSE: Disputed. The actual language found on the cited page states "*It is suspected* that this inorganic contamination is a direct result of the improper disposal practices and lack of containment structures used by Rockwell during the time period 1961-1967." This statement is fundamentally flawed, as Rockwell did not purchase the Facility until 1965. Further, the author of the document in question was not the Environmental Protection Agency, but rather NUS Corporation, who was a contractor working for the EPA. Textron's assertion, therefore, is misleading on several fronts. See VSI Report §5.0 (Dkt. Nos. 601 and 601-1).**

29. The Eckenfelder Report identified the on-site landfill, toluene storage area, and TCE storage area as the "most significant sources of constituents of interest." Ex. 17 (1994 Remedial Investigation Report at ES-12).

**RESPONSE: Disputed. Again, Textron's statement is grossly misleading. The actual language of the Eckenfelder Report reads:**

**"Three of the most significant sources of constituents of interest at the site appear to have been the on-site landfill, the toluene storage area, and the trichloroethene storage area. *In addition, there appear to have been significant releases in the area that includes the equalization lagoon, the chromium reduction unit, the wet well, and the process sewers.* The wastewater treatment plant at the site has been shown to be another source of constituents, through its discharge to the outfall ditch. In addition, the sludge lagoon may be a source of constituents, generally blending in with contributions from the landfill." See 1994 Remedial Investigation Report at ES-12 (Dkt. No. 601-3) emphasis added.**

## VI.  Areas of Contaminant Plumes

30. The T&M Associates Moose Lodge Road Additional Investigation Report prepared for the MDEQ described the "Facility CVOC [Chlorinated Volatile Organic Compound] Plume" as follows: "The largest source of CVOC mass for these plumes is AOC [Area of Concern] A, where a known release of TCE occurred . . . ." Ex. 18 (T&M MLRA Report at 4-1).

**RESPONSE: Disputed. The above description is incomplete and misleading. The actual language of the quoted report reads:**

**"There is an SZ (Shallow Zone) and a DZ (Deep Zone) plume at the facility. The largest source of CVOC mass for these plumes is AOC A, where a known release of TCE occurred in the 1980s. Other, lesser sources of CVOC to groundwater at the facility include the former EQ Lagoon, the former Sludge Lagoon and the former On-Site Landfill (all of which have been remediated and closed)."**

**It is critical to note that Textron, during its ownership, used the EQ Lagoon and Sludge Lagoon in its operations, and was responsible for the closure of the EQ Lagoon, which was "dirty closed", meaning that the contaminated sludges from the lagoon were deposited in a cell within the boundaries of the old lagoon and will remain there permanently. The EQ Lagoon, in fact, is generally accepted to be a source of**

groundwater contamination at the Facility site. See Dkt. No. 544-12 (Brinkman, et al. Report); Supplement to 2012 Groundwater Monitoring Report, T&M Associates, Inc., § 2.3.2.1, Dkt. No. 618-33; Equalization Lagoon Characterization Study, 1994, Woodward-Clyde Consultants, pp. 9-12, Dkt. No. 618-32. In fact, Textron accepted financial responsibility, on a percentage basis, for remediating contamination from the lagoon as a part of its 1995 settlement with Rockwell related to disputes arising from the contamination at issue in this lawsuit. Textron's suggestions, now, that it played no role in the contamination existing at the site cannot be squared with either its past acknowledgment of its role as a polluter or the fact that it sent process waters loaded with toxic contaminants to the EQ Lagoon for more than a decade.

When regulators required the closure of the lagoon under RCRA, sampling showed high levels of TCE, chromium and other contaminants. Equalization Lagoon Characterization Study, Dkt. No. 618-32, Table 2. Textron's consultants determined that the lagoon did not have an intact clay bottom and that the groundwater was likely able to communicate directly with the sludge on the lagoon's floor. Id., p. 12. Additionally, to protect against continued contributions to groundwater contamination from the lagoon, MDEQ required that Textron provide confirmatory sampling of the margins of the floor and walls of the lagoon during the closure to ensure that contaminated materials were not trapped beneath the cell created to hold the sludge gathered in the dirty closure process, but Textron failed to perform this testing. 1996 Backlund Dep., p. 1039, Exhibit 1.

31. The T&M Associates Moose Lodge Road Additional Investigation Report identified a plume beneath the Eastern Heights neighborhood as follows: "the neighborhood plume includes some CVOCs in the shallow and deep portions of the Upper Aquifer." *Id.* at 4-3.

RESPONSE: Plaintiffs do not dispute that the cited report reads as stated, but do dispute the factual accuracy of the statement itself. The neighborhood contaminant plume, as shown by the VAP testing conducted by Arcadis in 2015, includes constituents other than CVOCs. In fact, the entire Eastern Heights neighborhood is underlain by groundwater containing arsenic, lead and chromium in concentrations that greatly exceed the EPA established MCLs for these contaminants. The TCE contamination, which impacts roughly the southern third of the neighborhood's land area, is only one aspect of the environmental impacts visited on Eastern Heights as a consequence of the Facility's operations. See Affidavit of Scott Simonton, Dkt. No. 618-44; 2015 Arcadis VAP Testing Report, Dkt. No. 618-43.

32. The T&M Associates Moose Lodge Road Additional Investigation Report described evidence supporting the "firm conclusion that CVOC [Chlorinated Volatile Organic Compound] transport in groundwater from the facility to the neighborhood has not occurred and will not occur in the absence of major changes to the Study Area flow system." *Id.* at 4-5.

RESPONSE: Disputed. The cited T&M Report purports to list four factors that it contends support the conclusion here stated. However, the evidence in this case shows groundwater flows that move directly from AOC A in the direction of Eastern Heights, refuting the central premise of Mr. Peeples' argument: that groundwater from the facility never flows north toward the neighborhood. Further, documents obtained from

Meritor reflect that the "separate plumes" theory espoused in the cited section was a construct created by Mr. Peeples at the instruction of Meritor's lawyers in an effort to avoid liability in this lawsuit and other related actions. **See Plaintiffs' Response in Opposition to Textron's Motion to Partially Exclude Testimony of Plaintiff's Groundwater Experts ("Textron Groundwater Motion"), Dkt No. 629; J. Peeples Notes 5/22/17, Dkt. No. 618-41; J. Peeples Notes 4/20/17, Dkt 618-39.**

33. The T&M Associates Moose Lodge Road Additional Investigation Report described the Shaley Clay Aquitard ("SCA") as follows: "The SCA beneath the Upper Aquifer acts as a low-permeability barrier separating the Upper and Lower Aquifers in the Study Area . . . . the SCA is considered to be consistently present throughout the area." *Id.* at 3-14.

    **RESPONSE: Not disputed by Plaintiffs that this statement is contained in the report cited, though the accuracy of the statement is disputed. Testimony from experts in this case, as well as the report of Tetra Tech, a consultant hired by the EPA, both indicate that the upper and lower aquifers in the area are hydraulically connected, meaning that the SCA is <u>not</u> consistently present throughout the area or, alternatively, that it is not impermeable. Further, constituents of concern found at the plant have been detected in the lower, regional aquifer. The Plaintiffs' positions are supported by the following evidence:**

    - **Deposition of David Jenkins, 8/8/2017, pp. 139-140, Excerpts at Exhibit 13.**
    - **Final Expanded Site Inspection Report, Tetra Tech, 4/28/2017, Dkt. No. 618-2.**

34. Plaintiffs' proffered groundwater experts (James Brinkman, David Jenkins, and Scott Simonton) stated in their expert report that "under present conditions groundwater flow is not expected to cross from" the Facility to the Eastern Heights neighborhood. Ex. 19 (Groundwater Report at 7).

    **RESPONSE: Disputed as incomplete and misleading. The actual text of the cited report reads:**

    **"The facility borders the subdivision, and at least under present conditions groundwater flow is not expected to cross from one property to another. However, groundwater flow direction has varied over time and at time has flowed from the facility toward the subdivision." <u>See</u> Expert Report of Brinkman, Jenkins and Simonton, p. 7 (Dkt. No. 598-4).**

    **Neither Mr. Jenkins nor any of Plaintiffs' groundwater experts testified or opined that groundwater from the facility does not cross into Eastern Heights under some groundwater conditions, and Textron is aware of that fact, and that a large number of detailed groundwater flow maps created by Secor and Stantec, the consultants that have worked on Moose Lodge Road since 1993, clearly show groundwater flows that move north from the Facility into Eastern Heights. <u>See</u> Plaintiffs' Response Textron's Groundwater Motion, Dkt No. 629, collecting opinions, evidence and testimony relevant to this topic, which reflect clearly that this is not a subject area in which the facts are, in any**

**fashion, undisputed.**

35. Brinkman testified that groundwater underneath the Facility "flows first to the northwest, and it flows to Riverdale Creek." Ex. 20 (J. Brinkman Dep. Tr. 210:17-20).

   **REPONSE: Disputed. Mr. Brinkman testified that reports he had reviewed regarding the groundwater flow underneath the facility showed a northwest, then westerly flow. See Plaintiffs' Response to Textron's Groundwater Motion, Dkt. No. 629, collecting opinions, evidence and testimony relevant to this topic.**

36. Brinkman testified that he did not evaluate the permeability of the soils beneath the equalization lagoon before it was remediated. *Id.* at 212:10-12.

   **RESPONSE: Disputed as misleading. Mr. Brinkman was not present when the EQ Lagoon was remediated and could not have evaluated any soils at that time. He testified he did not know the conductivity sample for the EQ Lagoon before it was remediated. See text of cited testimony.**

37. Brinkman testified that he was not sure of any modeling that has been performed that simulates the flow of groundwater from the Facility north into the Eastern Heights neighborhood. *Id.* at 213:8-13.

   **RESPONSE: Not disputed that Mr. Brinkman testified he was "not sure" of any modeling simulating the flow of groundwater from the facility north into the Eastern Heights neighborhood. Disputed that any modeling was necessary, where the actual, recorded water level measurements are available over the better part of two decades and reveal northerly groundwater flows from the Facility are towards Eastern Heights. See Plaintiffs' Response to Textron's Groundwater Motion, Dkt. No. 629, collecting opinions, evidence and testimony relevant to this topic.**

38. Brinkman testified there was no detection of TCE, DCE, or vinyl chloride in the drinking water from the City of Grenada wells. *Id.* at 218:5-12.

   **RESPONSE: Plaintiffs do not dispute that there has been no detection of these compounds in the City of Grenada drinking water that they are aware of, nor that Mr. Brinkman so testified.**

39. Simonton, testified that he was not aware of any table that supports the statement in his report that says groundwater flow direction has varied over time and at times has flowed from the facility toward the neighborhood, and he relied on a table that concerned groundwater flow from the MLRA. Ex. 21 (S. Simonton Dep. Tr. 249:4-250:1-6).

   **RESPONSE: Disputed as incomplete and misleading. Dr. Simonton testified that he is aware of maps that show water flowed from the facility towards the neighborhood but not aware of any tables describing those maps. See cited testimony. See also Plaintiffs' Response to Textron's Groundwater Motion, Dkt. No. 629, collecting opinions, evidence and testimony relevant to this topic.**

40. Simonton testified that he was not aware of of any Eastern Heights property owner that is using groundwater from the upper aquifer. *Id.* at 212:6-8.

   **RESPONSE: Not disputed by Plaintiffs.**

41. Jenkins testified that he has not seen any data that would suggest that the groundwater flow direction is from the Facility north into the Eastern Heights neighborhood. Ex. 22 (D. Jenkins Dep. Tr. 72:10-14).

   **RESPONSE: Disputed. <u>See</u> Plaintiffs' Response to Textron's Groundwater Motion, collecting opinions, evidence and testimony relevant to this topic.**

42. Jenkins testified that there is modeling that he could have performed to evaluate whether groundwater has moved from the facility north into the Eastern Heights neighborhood. *Id.* at 72:25-73:5.

   **RESPONSE: Not disputed that Mr. Jenkins testified that there is modeling that could have been performed to make such a determination. It is disputed that any such modeling would have been of benefit, given that actual groundwater data, over more than a decade is available to show what the groundwater in the area did do, as opposed to what it potentially *might* have done. <u>See also</u> Plaintiffs' Response to Textron's Groundwater Motion, Dkt. No. 629, collecting opinions, evidence and testimony relevant to this topic.**

43. Jenkins testified that he did not perform any modeling to determine whether before the equalization lagoon was remediated, groundwater could have flowed from the Facility north into the Eastern Heights neighborhood. *Id.* at 72:15-24.

   **RESPONSE: Disputed. Incomplete and misleading. Mr. Jenkins testified as follows:**

   **Q: There is a reference in your expert report, which is Exhibit 458, that there is a potential that at some point in time before the equalization lagoon was line that there could have been groundwater flow from south to north. Do you recall that?**

   **A:   Yes.**

   **Q: Was there any type of modeling that you performed to determine whether or not that hypothesis is correct?**

   **A: No, there was not.**

   **<u>See</u> text of cited testimony.**

44. Jenkins testified that he did not try to collect any additional data to input into a model to predict what the historical groundwater flow patterns were in the Eastern Heights neighborhood. *Id.* at 76:20-25.

   **RESPONSE:  Not disputed by Plaintiffs.**

45. Jenkins testified that he was not asked to perform modeling to determine whether the groundwater ever flowed north from the Facility toward the Eastern Heights neighborhood, before the equalization lagoon was remediated. *Id.* at 78-9-14.

   **RESPONSE: Not disputed by Plaintiffs.**

46. Jenkins testified that he did not attempt to determine whether there was any contamination in the lower aquifer. *Id.* at 137:23-138:5.

   **RESPONSE: Disputed as incomplete. Mr. Jenkins testified that he did not attempt to determine whether there was any contamination in the deeper regional aquifer, as opposed to the lower portion of the upper aquifer. See text of cited testimony.**

47. Jenkins testified that he is not aware of any data collected by the City of Grenada or any other government entity suggesting that there is contamination from the Facility in the regional aquifer. *Id.* at 140:7-11.

   **RESPONSE: Not disputed that Mr. Jenkins testified as stated. This testimony was given, however, before Mr. Jenkins had reviewed the Tetra Tech Expanded Site Review, which provided evidence that the regional aquifer had been compromised by lead, which is a constituent of concern from the Grenada Facility. See Dkt. No. 618-2, p. 23.**

## VII. Testing of Plaintiffs' Properties

48. BTEX refers to the chemicals benzene, toluene, ethyl benzene, and xylene, which naturally occur in crude oil and petroleum products such as gasoline. *See e.g.*, Ex. 21 (S. Simonton Dep. Tr. 83:1-5).

   **RESPONSE: Not disputed by Plaintiffs.**

49. <u>Brady.</u> Plaintiffs' experts tested the groundwater and sub-slab soil gas of Plaintiff Brady's property at 153 Tallahoma Drive. The groundwater test detected TCE, but had no detections for BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23)[‡]; Ex. 24 (GCAL Report # 216071312 at 7, 27-29). The sub-slab soil gas test detected TCE and one or more BTEX constituents. Plaintiffs' experts did not test the soil gas, indoor air, or outdoor air at 153 Tallahoma Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).[§]

   **RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Brady's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Brady's property at levels exceeding EPA MCLs: Chromium (570 ug/l), Arsenic (60 ug/l), Lead (300 ug/l) and TCE (150 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

50. <u>Caffey.</u> Plaintiffs' experts tested the groundwater and soil gas of Plaintiff Caffey's property at 137 Tallahoma Drive. The groundwater test showed non-detects for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 26 (GCAL Report # 216071409 at 15). The soil gas test detected one or more BTEX constituents, but showed a non-detect for TCE. Plaintiffs' experts did not test the sub-slab soil gas, indoor air, or outdoor air at 137 Tallahoma Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

**RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Caffey's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Caffey's property at levels exceeding EPA MCLs: Chromium (600 ug/l), Arsenic (50 ug/l) and Lead (180 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

51. <u>Crumley and Phillips.</u> Plaintiffs' experts tested the groundwater, soil gas, and background air of Plaintiffs Crumley and Phillips' property at 176 Lyon Drive. The groundwater test showed a non-detect for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 27 (GCAL Report # 216071505 at 6). The soil gas test detected one or more BTEX constituents, but showed a non-detect for TCE. Plaintiffs' experts did not test the sub-slab soil gas or indoor air at 176 Lyon Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

**RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at this property. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at this property at levels exceeding EPA MCLs: Chromium (570 ug/l), Arsenic (49 ug/l) and Lead (76 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

52. <u>Cunningham.</u> Plaintiffs' experts tested the sub-slab soil gas and background air of Plaintiff Cunningham's property at 155 Tallahoma Drive. The groundwater test detected TCE, but showed a non-detect for BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 28 (GCAL Report # 216071408 at 6, 10-12). The sub-slab soil gas test showed non-detects for TCE and BTEX. Plaintiffs' experts did not test the soil gas or indoor air at 155 Tallahoma Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

**RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Cunningham's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations**

present at Ms. Cunningham's property at levels exceeding EPA MCLs: Chromium (380 ug/l), Arsenic (60 ug/l), Lead (300 ug/l) and TCE (300 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.

53. <u>Cooper.</u> Plaintiffs' experts tested the soil gas of Plaintiff Cooper's property at 117 Tallahoma Drive. The groundwater test showed non-detects for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 27 (GCAL Report # 216071505 at 12-14). The soil gas test detected one or more BTEX constituents, but showed a non-detect for TCE. Plaintiffs' experts did not test the sub-slab soil gas, indoor air, or background air at 117 Tallahoma Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

**RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Cooper's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Cooper's property at levels exceeding EPA MCLs: Chromium (450 ug/l), Arsenic (60 ug/l) and Lead (260 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

54. <u>Odomes.</u> Plaintiffs' experts tested the groundwater and soil gas of Plaintiff Odomes' property at 139 Tallahoma Drive. The groundwater test showed non-detects for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 24 (GCAL Report # 216071312 at 21-23). The soil gas test detected one or more BTEX constituents, but showed a non- detect for TCE. Plaintiffs' experts did not test the sub-slab soil gas, indoor air, or background air at 139 Tallahoma Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

**RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Odomes' residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Odomes' property at levels exceeding EPA MCLs: Chromium (640 ug/l), Arsenic (50 ug/l) and Lead (200 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

55. <u>Richardson.</u> Plaintiffs' experts tested the soil gas of Plaintiff Richardson's property at 147 Tallahoma Drive. The groundwater test showed non-detects for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 26 (GCAL Report # 216071409 at 11-12). The soil gas test detected one or more BTEX constituents, but showed a non-detect for TCE. Plaintiffs' experts did not test the sub-slab soil gas, indoor air, or background air for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

**RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts"**

**generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Richardson's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Richardson's property at levels exceeding EPA MCLs: Chromium (680 ug/l), Arsenic (48 ug/l) and Lead (260 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

56. <u>Seldon.</u> Plaintiffs' experts tested the groundwater and soil gas of Plaintiff Seldon's property at 164 Lyon Drive. The groundwater test showed non-detects for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 27 (GCAL Report #216071505 at 24-26). The soil gas test detected one or more BTEX constituents, but showed a non-detect for TCE. Plaintiffs' experts did not test the sub-slab soil gas, indoor air, or background air at 164 Lyon Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

   **RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Seldon's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Seldon's property at levels exceeding EPA MCLs: Chromium (570 ug/l), Arsenic (70 ug/l) and Lead (140 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

57. <u>Ward.</u> Plaintiffs' experts tested the sub-slab soil gas, indoor air, and background air of Plaintiff Ward's property at 151 Tallahoma Drive. The groundwater test showed non-detects for TCE and BTEX. *See* Ex. 23 (Plaintiffs' Review of the Data at 23); Ex. 24 (GCAL Report #216071312 at 6, 25-27). The sub-slab soil gas test detected one or more BTEX constituents, but showed a non-detect for TCE. The indoor air test detected one or more BTEX constituents, but showed a non-detect for TCE. The background air test detected one or more BTEX constituents, but showed a non-detect for TCE. Plaintiffs' experts did not test the soil gas at 151 Tallahoma Drive for TCE or BTEX. Ex. 25 (Fineis Rpt. App'x IV, Tables 2, 4, 6, 8).

   **RESPONSE: Disputed as incomplete and misleading. Textron's proffered "facts" generalize the findings contained in the testing cited and fail to acknowledge testing by the Defendants and regulators in Eastern Heights that establishes the presence of contaminants at Ms. Ward's residence. By way of example, for the purposes of the present motion, the 2015 VAP Testing conducted by Arcadis in the Eastern Heights Neighborhood shows the following contaminants associated with Facility operations present at Ms. Ward's property at levels exceeding EPA MCLs: Chromium (640 ug/l), Arsenic (60 ug/l), Lead (280 ug/l) and TCE (150 ug/l). See 2015 Arcadis VAP Testing Report, Dkt. No. 618-43; Affidavit of Scott Simonton, Dkt. No. 618-44.**

## VIII. <u>Vapor Intrusion</u>

58. In April 2016, the EPA released a Fact Sheet to the public regarding "EPA Sampling Activities in April and May 2016" which stated: "Based on results received to date, EPA has determined there is no immediate threat to public health." Ex. 29 (Apr. 2016 EPA Fact Sheet #4).

   **RESPONSE: Plaintiffs do not dispute that the cited EPA fact sheets were released, nor that they contain the quoted language, along with considerable other material. Plaintiffs dispute that the offered statement(s) are complete and assert that, taken out of context, they are misleading. Plaintiffs further object on the grounds that the EPA's opinions are untestable, and therefore unreliable and inadmissible, expert opinions. <u>See</u> Plaintiffs' Motion to Exclude Reports and Opinions of US EPA and Memorandum in Support, Dkt. Nos. 589, 590.**

59. In August 2016, September 2016, and April 2017, the EPA released to the public three fact sheets titled "Sampling Results in Eastern Heights," which state that "[b]ased on results received to date, EPA has determined that there is no immediate threat to public health in the Eastern Heights neighborhood due to TCE." Ex. 30-32 (Aug. 2016 - Apr. 2017 EPA Fact Sheets ##5-6, 9).

   **RESPONSE:  Plaintiffs do not dispute that the cited EPA fact sheets were  released, nor that they contain the quoted language, along with considerable other material. Plaintiffs dispute that the offered statement(s) are complete and assert that, taken out of context, they are misleading. Plaintiffs further object on the grounds that the EPA's opinions are untestable, and therefore unreliable and inadmissible, expert opinions. <u>See</u> Plaintiffs' Motion to Exclude Reports and Opinions of US EPA and Memorandum in Support, Dkt. Nos. 589, 590.**

60. In March 2017, the EPA reported the following results of its vapor intrusion testing conducted in November/December 2016 in the Eastern Heights neighborhood:

   In November/December 2016, EPA conducted a second round of vapor intrusion testing in [17 homes in the south and southeast area of the neighborhood]. TCE was detected in the indoor air of one resident at a level below the screening level. TCE was also detected in sub-slab air in two homes at levels far below the screening level. Consistent with previous results, EPA did not find that chemicals present in the groundwater were entering homes via vapor intrusion.

   Ex. 33 (Mar. 2017 EPA Sampling Results at 2, https://www.epa.gov/grenadacleanup/sampling-results-eastern-heights-grenada-ms).

   **RESPONSE:  Plaintiffs do not dispute that the quoted language was released by the EPA.  Plaintiffs object to Textron's presentation of or reliance on  these statements as facts in that the EPA's opinions are untestable, and therefore unreliable, expert opinions. <u>See</u>  Plaintiffs' Motion to Exclude Reports and Opinions of US EPA and Memorandum**

in Support, Dkt. Nos. 589, 590.

61.  The EPA reported in its April 2017 Fact Sheet that "Consistent with previous results, EPA did not find that chemicals present in the groundwater were entering homes via vapor intrusion. An 8 to 12-foot silty clay layer underlies the neighborhood and appears to be preventing TCE vapors from coming up into the homes." Ex. 32 (Apr. 2017 EPA Fact Sheet #9 at 1).

**RESPONSE: Plaintiffs do not dispute that the quoted language appeared in the April 2017 EPA Fact Sheet. Plaintiffs object to Textron's presentation of these statements as facts in that the EPA's opinions are untestable, and therefore unreliable, expert opinions. See Plaintiffs' Motion to Exclude Reports and Opinions of US EPA and Memorandum in Support, Dkt. Nos. 589, 590. Plaintiffs further dispute the factual accuracy of the statements contained in this submission. The testing performed by consultants working for Plaintiffs, Meritor and the EPA shows that the clay layer, to the extent it exists in Eastern Heights, does not prevent the migration of vapor contamination from migrating to the surface. See Affidavit of Scott Simonton, Dkt. No. 629-13, collecting and discussing testing results.**

62.  Fineis testified that he was not able to form an opinion to a reasonable degree of scientific certainty that there is a completed pathway from background air to indoor air for each of the Plaintiffs homes. Ex. 34 (Fineis Dep. Tr. 143:16-20).

**RESPONSE: Disputed as incomplete and misleading. Mr. Fineis was being questioned in this excerpt only about houses where no indoor air testing was performed at the same time as soil gas testing. He testified only that he could not establish a completed pathway in the residences of Plaintiffs where he had no indoor air testing data. He did not testify that he could not, if proper testing was performed and he was asked to do so, establish such a pathway. Textron's suggestion otherwise is misleading. See Plaintiffs' Opposition to Motion to Exclude Testimony and Opinions of James Fineis, Dkt. No. 626.**

63.  Fineis testified that if a chemical is found in the soil gas but not found in the sub-slab and not found in the house, then there is not a completed pathway for that chemical. *Id.* at 128:6-21.

**RESPONSE: Not disputed by Plaintiffs that Mr. Fineis testified as stated. Disputed that this fact is material to Textron's motion, or to this case, which does require proof of a vapor intrusion pathway.**

64.  Fineis testified that if a chemical is not found in the soil gas, is not found in the sub-slab, and is not in the ambient air, but it may be inside the house, there is not a completed pathway from the sub-slab. *Id.* at 128:6-21.

**RESPONSE: Not disputed by Plaintiffs that Mr. Fineis testified as stated. Disputed that this fact is material to Textron's motion, or to this case, which does require proof of a vapor intrusion pathway.**

65.  Fineis testified that he could not render an opinion to a reasonable degree of scientific or engineering certainty, of a completed pathway from the sub-slab to the indoor air for any home

in the Eastern Heights neighborhood. *Id.* at 201:23-202:4.

**RESPONSE: Disputed as misleading and incomplete. Mr. Fineis stated that as the subslab and indoor samples were not taken at the same time, he could not render an opinion as to a completed pathway at a given time. He did not testify that completed pathways do not exist, nor was he retained in this case to perform work to establish the existence of such pathways. Dkt. No. 599-6, pp. 198-200.**

66. Fineis testified that he could not testify that the vapor intrusion pathway from groundwater is complete for Plaintiffs' homes. *Id.* at 203:9-13.

**RESPONSE: Disputed as incomplete and misleading. Mr. Fineis testified that he could not opine on such a pathway because he did not do groundwater sampling, as neither groundwater sampling nor establishing exposure pathways were part of the work he was asked to perform. See Deposition of James Fineis, Dkt. No. 599-6, pp. 198-200.**

67. Fineis testified that he could not testify that there is a completed vapor intrusion pathway from Plaintiffs' sub-slab gas. *Id.* at 203:20-204:6.

**RESPONSE: Disputed as incomplete and misleading. To the extent this proposed statement suggests Mr. Fineis could not opine that completed exposure pathways have been shown to exist through objective measurement, it is inaccurate and misleading. See Deposition of James Fineis, Dkt. No. 599-6, pp. 198-200.**

68. Fineis testified that he could not render an opinion that the pathway was complete from the soil gas to the sub-slab of Plaintiffs' homes. *Id.* at 184:14-25.

**RESPONSE: Disputed as incomplete and misleading. Mr. Fineis testified that because no soil gas samples were collected at the same time as the sub-slab samples at properties, he could not opine on a completed pathway. He did not testify that such pathways could not be proven, if the right testing were performed. See Deposition of James Fineis, Dkt. No. 599-6, pp. 198-200.**

69. Fineis testified that he has done no source identification and could not testify that the Grenada manufacturing facility is the source of any subsurface contaminants or ambient air contamination that he detected during testing. *Id.* at 202:20-203:2.

**RESPONSE: Disputed as incomplete and misleading. Mr. Fineis testified that he did no source identification work, but noted that the contaminants he found in the Eastern Heights neighborhood were consistent with those confirmed by the EPA to be present on the Grenada Manufacturing site. See Deposition of James Fineis, Dkt. No. 599-6, pp. 198-200.**

## IX.    Plaintiffs' Use of Groundwater and Use of Their Properties

70. Plaintiffs do not use the groundwater from beneath the Eastern Heights Neighborhood for water for drinking. Ex. 6 (All Plaintiffs' Responses to RFA No. 14).

   **RESPONSE:  Not disputed by Plaintiffs.**

71. The City of Grenada supplies the homes in the Eastern Heights Neighborhood with what is commonly referred to as "tap water," which Plaintiffs' may use, if they so desire, for drinking, bathing, or washing clothing. *Id.* at RFA No. 15.

   **RESPONSE: Not disputed by Plaintiffs, as to the availability of city water, though the city water supply in the area of Eastern Heights has been noted by a number of witnesses in this matter to be often discolored and malodorous.**

72. Plaintiff Odomes testified that everybody in the Eastern Heights neighborhood is on City water and nobody has well water. Ex. 35 (M. Odomes Dep. Tr. 134:10-13).

   **RESPONSE: Plaintiffs do not dispute that Ms. Odemes testified that residents of Eastern Heights all had city water service to her knowledge.**

73. Plaintiff Phillips testified that she had no plans to move back to the Eastern Heights neighborhood and hasn't had those plans for 20 years. Ex. 36 (B. Phillips Dep. Tr. 42:6-18).

   **RESPONSE:  Not disputed by Plaintiffs.**

74. Phillips testified none of her family members had any intention to live in her Eastern Heights house. *Id.* at 122:17-24.

   **RESPONSE:  Disputed as misleading.  Ms. Phillips testified that she wasn't aware of any family members that had an intention to move into the property in Eastern Heights. She did not testify that she knew, factually that no family member had such an intention. See text of cited testimony.**

75. Plaintiff Crumley testified that she has lived in Texas since 1986, and she has not lived in Mississippi since 1986. Ex. 37 (A. Crumley Dep. Tr. 8:9-11).

   **RESPONSE:  Not disputed by Plaintiffs.**

76. The EPA's September 2016 Fact Sheet stated: "Based on all the results received to date, EPA has determined that there is no immediate threat to public health and EPA is not considering temporary or permanent relocation of any of the Eastern Heights neighborhood residents." Ex. 31 (Sept. 2016 EPA Fact Sheet #6 at 2).

   **RESPONSE:  Plaintiffs do not dispute that the 2016 EPA Fact Sheet contains the quoted language, but dispute that the offered statement is complete and submit that, out of context, it is misleading.**

## X.    Emotional Distress

77.  One of Plaintiffs' proffered experts, Michael Nicar, testified that did no work to quantify any exposure or dose for any of the individual plaintiffs in this case. Ex. 38 (M. Nicar Dep. Tr. at 81:21-24).

**RESPONSE: Not disputed by Plaintiffs, as Mr. Nicar as not retained to perform such work or to make such calculations.**

78.  Nicar testified that he did not perform a risk assessment for to any of the Plaintiffs in this case. *Id.* 64:12-14.

**RESPONSE: Not disputed by Plaintiffs, as Mr. Nicar as not retained to perform such work or to make such calculations.**

## XI.    Damages

79.  Plaintiffs' proffered expert, Dixie Clay, stated in her expert report that the diminution in value of all Plaintiffs' 49 properties amounts to $4,129,440, and the current value of Plaintiffs' properties is $0. Ex. 39 (Clay Report at 3, 11).

**RESPONSE: Not disputed by Plaintiffs.**

80.  Plaintiffs' proffered expert, Howard Herring, stated in his expert report that the cost to replace Plaintiffs' Eastern Heights homes with newly constructed homes in a new neighborhood and to relocate to those homes is $5,487,195. Ex. 40 (Herring Report at 3, 20)

**RESPONSE:  Not disputed by Plaintiffs.**

81.  Brinkman, Simonton and Jenkins stated in their expert report that the cost to remediate contamination in the Eastern Heights neighborhood would be approximately $143 million. Ex. 19 (Groundwater Report at 19).

**RESPONSE:  Not disputed by Plaintiffs.**

DATED this the 22nd day of May, 2018.

Respectfully submitted by,

/s/ *W. Lawrence Deas*

**W. LAWRENCE DEAS** (MB #100227)
**WILLIAM LISTON** (MB #8482)
LISTON & DEAS PLLC
Post Office Box 14127
Jackson, MS 39216
Tel. (601) 981-1636
Fax. (601) 982-0371
william@listondeas.com
lawrence@listondeas.com

**MARQUETTE WOLF** (MB #104996)
**BEN TAYLOR**
**CHARLES BENNETT**
**TED LYON**
TED B. LYON & ASSOCIATES, P.C.
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150
Tel. (972) 279-6571
Fax. (972) 279-3021
mwolf@tedlyon.co

**STEVEN H. FUNDERBURG** (MB #9959)
FUNDERBURG SESSUMS & PETERSON PLLC
Post Office Box 13960
Jackson, MS 39236-3960
Tel. (601) 355-5200
Fax. (601) 355-5400
sfunderburg@fsplawfirm.com

**ALAN D. LANCASTER**
P.O. Box 645
Winona, MS  38967
Tel.  (601) 283-2132
dlancaster@listonlancaster.com

**ATTORNEYS FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

This is to certify that I, W. Lawrence Deas, served a true and correct copy of the above and foregoing document on all counsel of record by transmitting the same *via* electronic mail and/or by filing the same with the ECF system established by the Court, which sent a copy of the same to all counsel of record.

This the 22nd day of May, 2018.

/s/ *W. Lawrence Deas*
W. Lawrence Deas