**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

| | |
|---|---|
| BRENDA J. COOPER, et al.,<br><br>              *Plaintiffs*,<br><br>v.<br><br>MERITOR, INC.,<br>ROCKWELL AUTOMATION, INC.,<br>THE BOEING COMPANY, and<br>TEXTRON, INC.,<br><br>              *Defendants.* | Judge Debra M. Brown<br>Magistrate Judge Jane M. Virden<br><br>Lead Case No. 4:16-cv-52<br><br>Consolidated with:<br>  *Sledge v. Meritor, Inc.*, No. 4:16-cv-53<br>  *Cooke v. Meritor, Inc.*, No. 4:16-cv-54<br>  *SRA Invests., LLC v. Meritor, Inc.*, No. 4:16-cv-55<br>  *Willis v. Meritor, Inc.*, No. 4:16-cv-56 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSE IN
OPPOSITION TO TEXTRON'S MOTION FOR SUMMARY
JUDGMENT**

From 1985 until 1999, Textron, Inc. ("Textron") or its affiliated companies operated the Grenada Wheel Cover Facility (the "Facility") as a chrome plating plant. Over the course of those years, Textron knowingly released toxic waste from its processes into the soil, air and groundwater. These contaminants, including trichloroethylene ("TCE"), lead, arsenic, chromium and BTEX, have migrated to and are present on the Plaintiffs' properties. The evidentiary record developed in this action includes materials confirming these basic facts, supporting Plaintiffs' claims, and requiring the denial of Textron's motion for dispositive relief.

**I.    FACTUAL SUMMARY**

    **A.  The Grenada Wheel Cover Facility**

The Grenada Facility manufactured automotive wheel covers (*i.e.*, hubcaps), using in the production process numerous raw materials which included metals, chrome, solvents, paint and paint

1

thinners. (Dkt. 618-1), RFA, I-1. The Facility's manufacturing operations generated an enormous volume of hazardous wastes which contained chemical constituents of these raw materials.

The plant property is located in Grenada, Mississippi, and is situated to the west of Moose Lodge Road; to the south of the Eastern Heights neighborhood; and to the east of Riverdale Creek. The plant property is divided by Highway 332, which transects the property into an east side and west side. (Dkt. 618-2). Tetra Tech Report, p. 2.

An aerial image of the plant property and its surrounding area demonstrates the close proximity of the plant to the Eastern Heights neighborhood. See Exhibit 1, Aerial Overview. The plant's Equalization ("EQ") Lagoon, depicted in the aerial image, lies less than 200 feet from Eastern Heights. (Dkt 544-12), Brinkman, et al. report, p. 3. The EQ Lagoon received all the wastewaters generated by plant operations, as well as all run-off and storm water from the plant grounds. (Dkt. 618-1) RFA, III-6 to 7.

B. **Equalization ("EQ") Lagoon**

During the period of Textron's ownership, billions of gallons of process wastewater were routed through the Facility's sewer system to the EQ Lagoon. (Dkt. 618-1) RFA, III-6. The EQ Lagoon was an earthen, unlined holding pond[1] and the closest component of the plant's wastewater system to Eastern Heights. See Aerial Overview, Exhibit 1. The plant's wastewater contained chromium, VOC's and other contaminants, which settled to the bottom of the EQ Lagoon to form a toxic sludge which, due to the permeable nature of the lagoon's floor, mixed with and contaminated the groundwater underneath the lagoon. 2012 Supp. to Groundwater Monitoring Report, (Dkt. 618-32) §2.3.2.1; (Dkt. 618-22) Equalization Lagoon Characterization Report. The EQ's Lagoon's role as a source of ground water contamination has been recognized by numerous consultants who have performed assessments on the plant site. See Eckenfelder Remedial Investigation, pp. ES-12 to ES-19; (Dkt. 601-3); NUS,

---

[1] The EQ Lagoon was originally constructed as a sewage lagoon for the Facility's sanitary waste, but was converted to a holding pond for process waters when the wastewater treatment system was constructed in the late 1970s.

Visual Site Inspection, pp. III-6 to III-8 (Dkt. 601); ENSR Draft Audit for Textron at ICE-007682, Exhibit 2; ERM Draft Audit Report, April 1989, pp. 7-8, Exhibit 3; Equalization Lagoon Characterization Report, p. 12 (Dkt. 618-32); Tetra Tech Report, p. 6 (Dkt. 618-2); Supplement to 2012 Groundwater Monitoring Report, §2.3.2.1 (Dkt. 618-33).

The EQ Lagoon received process waters from the roll department, the boilers, the chrome-plating units, boil-off unit, butler wash, buff wash and buff basement, and stormwater. ENSR Draft Audit Report, Exhibit 2. These wastewaters included electroplating wastes that contained hexavalent and trivalent chromium. Tetra Tech, p. 5. (Dkt. 618-2). Additionally, water from the paint department was apparently routed to the lagoon for some period of time before it was closed in 1994 at the insistence of the MDEQ. Exhibit 2 at ICE-007682. As late as 1990, Textron's environmental managers were aware that the wastewater flowing to the lagoon contained chromium in excess of EPA and MDEQ limits and that Textron's operation of the EQ Lagoon was a violation of the law. Meeting Notes, 7/20/90, Exhibit 4.

When the EQ Lagoon sludge was tested in 1994, prior to closure, it contained significant, super-regulatory concentrations of chromium (up to 137,000 ppm) and TCE (up to 9500 ppm). EQ Lagoon Characterization Report, Tables 2 and 3, (Dkt. 618-32). Prior to Textron's purchase of the Facility in 1985, it had commissioned testing of the EQ Lagoon, as well. At that time, no contamination above regulatory limits was found. May 1985 Testing, McClelland Consulting Engineers, Exhibit 5.

The floor and walls of the EQ Lagoon were permeable and did not prevent contaminants in the sludge from seeping into the groundwater. EQ Lagoon Characterization Report, p. 12 (Dkt. 618-32). Though aware of the risk of groundwater contamination posed by the permeable bottom, Textron took no corrective steps related to the lagoon until 1991, when the Mississippi Department of Environmental Quality determined that Textron had been illegally operating the lagoon without a permit, imposed a $69,000 fine, and ordered that the lagoon be closed. March 15, 1991 Agreed Order, Exhibit 6.

3

In the course of pre-closure testing, it was determined that a complete clean up ("clean closure") of the EQ Lagoon could not be accomplished because: (1) there was no liner in the lagoon to restrict the release of chromium and other toxic substances; and (2) measurable levels of contaminants in the soil under the lagoon indicated that the lagoon had interacted with and contaminated the ground water. (Dkt. 618-32) pp. 11-12. The EQ Lagoon was instead "dirty" closed in 1994. In this process the sludge in one half of the lagoon was removed, dewatered and placed in a synthetically lined holding cell built inside the excavation along with the remainder of the sludge in the lagoon. The storage cell was then capped and closed. (Dkt. 618-2) p. 6. Textron was supposed to perform confirmatory testing to ensure that all contaminated soils had been removed from the soil under the storage cell. Id. This testing was never performed, and constituents of concern have been detected in the monitoring wells installed around the EQ Lagoon throughout the years since its closure. Id. T&M Associates, Inc., the primary environmental contractor for the site for the last decade, reported to the EPA in 2014 that, based on this history, it believes the EQ Lagoon remains a source of groundwater contamination to this day. (Dkt. 618-33), § 2.3.2.1.

Textron has openly acknowledged that its operations contributed to the contamination associated with the EQ Lagoon, most tellingly in its negotiations with Rockwell after the discovery of the widespread environmental issues at the Facility. In 1995, Daniel Squire, an attorney working for Textron, wrote to Jerome Muys, an attorney for Rockwell, stating:

> The proposal would be to split the costs for the equalization lagoon closure based on lagoon usage (i.e., 80% to Rockwell and 20% to Randall Textron) and either to defer the remaining issues or to agree on a procedure for resolving those issues…Both parties have regulatory obligations to the State and both parties recognize that the issue of the relative responsibilities will not go away.

Letter from Squire to Muys, 2/16/95, Exhibit 7.

This allocation of financial responsibility was agreed upon and memorialized in a settlement agreement between the parties dated July 12, 1996, which divided the costs of remediation at the site

between Textron and Rockwell on a percentage basis. <u>See</u> Settlement Agreement, Exhibit 8. Phil Backlund, the Rockwell officer primarily in charge of negotiating the settlement, described the rationale behind the agreement as follows:

> The logic in round numbers was that Rockwell operated the plant for 20 years, Textron operated it for 10 years, but during our 20 years the sludge generation was probably twice the rate as during Textron's operations. That's based essentially on the plant production volumes as well as the technology that was used on the plant. And that logic was accepted by Textron.

Backlund Dep., p. 633, Exhibit 9.

### C. <u>Groundwater Flow</u>

As a consequence of the multiple investigations that have been performed on the plant property and in the Moose Lodge Road Area, a large body of groundwater flow data exists for the Facility. This data shows that the groundwater patterns in the EQ Lagoon area include flows that would direct contaminants towards and into the Eastern Heights neighborhood. Groundwater Flow Maps (Dkt. 629-3); Affidavit of Scott Simonton (Dkt. 629-13); Email by James Peeples admitting northerly groundwater movements (Dkt. 629-4). Plaintiffs' experts noted this succinctly in their report, stating that "groundwater flow has varied over time and at times has flowed from the facility towards the subdivision." <u>See</u> Brinkman et al. Expert Report, p. 7 (Dkt. 598-4).

More recently, Tetra Tech, an EPA Superfund contractor, noted that the testing data it reviewed as part of its Expanded Site Investigation supports the existence of a groundwater pathway from the plant to Eastern Heights. Tetra Tech Report, pp. 24-26 (Dkt. 618-2)(noting that the same contaminants present on the plant site were found in Eastern Heights, with concentrations decreasing as distance from the plant increased.) In its report, Tetra Tech concluded that "[t]he ground water pathway is of concern at the GM site…ground water samples collected off site during the ESI contained cis-1,2-DCE, TCE, arsenic, beryllium, chromium and lead. These same contaminants have been detected in ground water samples collected from

5

monitoring wells throughout the GM site as part of GM's annual monitoring program" <u>Id.</u> at 26.

### D. Air Emissions

During its ownership, Textron expelled millions of pounds of TCE and chromic acid vapors into the air, and did so without a permit permitting such emissions. ERM Audit Report, p. 9, Exhibit 3. Textron's consultants called this situation to the attention of management as early as 1989, noting that the plant produced approximately 245 tons of solvent emissions per year, all of which were "conspicuous by their absence" from the plant's permit from the Mississippi Department of Natural Resources. <u>Id.</u> Such emissions, the report continued "pose some degree of environmental liability. It is quite possible that the plant is the largest single source of solvent emissions in the entire Grenada area" <u>Id</u>. at 11.

### E. Underground Storage Tanks

Gary Boyd, a former chemist at the plant, testified regarding the removal of a leaking unleaded gasoline tank at the plant in the mid-1980s. Boyd Dep., pp. 137-139, Exhibit 10. In 1989, ERM's audit of the facility voiced serious concerns about the manner in which Textron had handled the removal of its underground storage tanks:

> According to the plant, some of the tanks visually appeared to be in poor condition at the time of their removal. Also, the plant evidently has had difficulty in matching the quantity of material delivered with the estimated amount of material used. However, at the time of the tank removal, no soil samples were taken from the excavations to check for soil contamination. For these reasons, coupled with the old age of four of the tanks, a *fairly high level of concern appears to be justified over the possibility of tank leakage and resultant soil and potential ground water contamination*"

ERM Audit, p. 16, Exhibit 3, emphasis added.

Recent testing under the plant has confirmed the presence of gasoline-derived contaminants, and Arcadis, one of Defendants' experts, concluded that the BTEX constituents in the Eastern Heights neighborhood came from a "high-end" petroleum product, like unleaded gasoline, rather than automobile exhaust or some other source. 10/5/15 Arcadis Email, Exhibit 11. Mr. Peeples, another

6

expert for Defendants, also communicated to Meritor in 2014 that he had identified both a pathway and a mechanism for soil gases such as BTEX to be transported from the plant to the Eastern Heights vicinity. 1/31/14 Peeples Email, Exhibit 12.

### F. AOC-A and AOC-B

Prior to Textron's purchase of the Grenada plant, sizable releases of Toluene and TCE occurred near the northeastern corner of the plant. The areas in which these spills occurred are referred to as Area of Concern A (AOC-A) and Area of Concern B (AOC-B). Two above-ground tanks at AOC-A stored virgin TCE. (Dkt. 618-1) RFA, p. II-12, 13. In the early 1980s, an underground pipe rupture at AOC-A resulted in the release of approximately 10,000 to 12,000 gallons of TCE into the surrounding soil and groundwater. *Id.* At AOC-B, an underground toluene storage tank leaked, releasing an unknown quantity of toluene into the ground. Over 3000 gallons have been recovered since the beginning of remediation. RFA, p. III-53 (Dkt. 618-1). No remediation was conducted when the releases occurred in the early 1980s. Martin Dep., p. 184, Exhibit 13.

By the terms of its purchase agreement with Rockwell, a number of salaried, management level employees were transferred from Rockwell to Textron as of the date of closing. Rockwell/Textron Purchase Agreement (Dkt. 597-11) at p. 72 of 83. Among these transferred employees were managers with personal knowledge of the TCE and toluene releases and the fact that neither had been remediated. Id.; Martin Dep, p. 184. Both federal law and Textron's environmental policies required the immediate reporting of any known release of a hazardous substance to EPA National Response Center. Textron Environmental Policies, Policy 3, Exhibit 14. Textron employees with knowledge of the releases were aware in 1985 that TCE and toluene were defined as hazardous substances under federal law. Boyd Dep. 75-76, 87-89, Exhibit 10. Textron, however, did not report either release nor attempt to remediate either release during its ownership of the Facility.

### II. THE SUMMARY JUDGMENT STANDARD

7

Fed.R.Civ.P. 56 (a) states that the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. The substantive law pertinent to the case identifies which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Id.

A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id at 249. At the summary judgment stage, the Court's function is not to weigh the evidence or to rule on the truth of disputed issues, but to determine whether there is a genuine issue for trial. Id. If reasonable minds could differ as to the import of the evidence, summary judgment should not be granted. Id. at 251.

On summary judgment, a court must view all facts, and reasonable inferences which arise therefrom, in the light most favorable to the nonmoving party. McManaway v. KBR, Inc., 852 F.3d 444, 449 (5th Cir. 2017); Anderson, 477 U.S. at 255. Even in instances where the burden of proof is clear and convincing, the role of the jury should not be denigrated. Id. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id.

### III.  ARGUMENT

Plaintiffs' Complaint alleges claims for negligence, nuisance, trespass and infliction of emotional distress. Each claim specifically alleges damages stemming from Defendants' release of "hazardous" and "contaminating" substances into the environment. See Plaintiffs' Amended Complaint, ¶¶ 56, 60, 65, 67, 70. Nowhere do Plaintiffs limit their claims to specific compounds or substances, as Textron asserts, other than that they be hazardous and have originated from the plant. Id. Nor have Plaintiffs ever pled or asserted that the only impacts visited on Plaintiffs or their properties were a consequence of vapor intrusion. Id. (stating that Plaintiffs' sole "theory" is that TCE and BTEX

are impacting Plaintiffs' properties through vapor intrusion.") These arguments are created from whole cloth, and are flatly contradicted by the opinions of Plaintiffs' groundwater experts, who discussed the contamination in Eastern Heights in their report:

> The objective is to decontaminate the subdivision properties and protect them from additional environmental contamination. The contamination resulted from activities from the facility. These activities include onsite and offsite chemical dumping, onsite leaks, discharges to ground water and air emissions. *The contaminants have trespassed and continue to trespass in the subdivision groundwater, soil, soil gas and air. The contaminants in the subdivision environment include but are not limited to trichloroethene (TCE), 1,2-dichloroethene (DCE), vinyl chloride, tetrachloroethene, toluene, xylenes, benzene, methylene chloride, acetone, 2-butonone, bis (2-ethylhexyl) phthalate, chromium, hexavalent chromium, and lead.* (2015 Moose Lodge Road Area Additional Investigation Report Tables 4-1 and 4-2). Many of these contaminants, including TCE, DCE, methylene chloride, arsenic, lead, chromium and hexavalent chrome are in the subdivision at concentrations that exceed USEPA Risk – Based Screening Levels.

Brinkman, et al. Report, p. 5 (Dkt. 598-4), emphasis added.

Discovery in this case has shown that the contamination in Eastern Heights is sourced from both off-site (the MLRA) and on-site (AOC-A, EQ Lagoon) locations and that part of the contamination is provably attributable to Textron's operation of the plant from 1985 to 1999.

### A. Plaintiffs' Properties are Contaminated

Each of the Plaintiffs' properties are contaminated by toxic substances known to have been generated at the Grenada Plant and which have been identified as constituents of concern during the remedial investigations conducted at the plant. Vertical Aquifer Profile Testing conducted by Arcadis at the request of the EPA in 2015 defined a plume of lead, arsenic and chromium that extends under the entirety of the Eastern Heights neighborhood and a plume of TCE that extends into the southern portion of the neighborhood, closest to the facility. VAP Testing Report (Dkt. 618-43); Affidavit of Scott Simonton, (Dkt. 618-44). Arcadis' test results show the following ground water contaminant levels exist at each of the Plaintiffs' properties and that each residence is "over the plume."

| Property | Chromium *(ug/l)* | Arsenic *(ug/l)* | Lead *(ug/l)* | TCE *(ug/l)* |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 117 Tallahoma (Cooper) | 450 | 60 | 260 | ND |
| 137 Tallahoma (Caffey) | 600 | 50 | 180 | ND |
| 139 Tallahoma (Odemes) | 640 | 50 | 200 | ND |
| 147 Tallahoma (Richardson) | 680 | 48 | 260 | ND |
| 151 Tallahoma (Ward) | 640 | 60 | 280 | 150 |
| 153 Tallahoma (Brady) | 570 | 60 | 300 | 150 |
| 155 Tallahoma (Cunningham) | 380 | 60 | 300 | 300 |
| 164 Lyon (Seldon) | 570 | 70 | 140 | ND |
| 176 Lyon (Crumley and Phillips) | 570 | 49 | 76 | ND |

VAP Testing Report (Dkt. 618-43); Affidavit of Scott Simonton (Dkt. 618-44)

Textron erroneously argues that Plaintiffs' evidence of ground water contamination is inconsequential because "no Plaintiff has any property interest in ground water." Textron's Memo., p. 12. Textron relies on a provision of the Mississippi Code, § 51-31-1, which provides that the state has the right to manage, protect and utilize the water resources of Mississippi. Id. This code provision, Textron argues, precludes any claim by the Plaintiffs arising out of contaminated ground water. Id.

Contaminated groundwater supports an action for trespass under Mississippi law. See i.e. Bradley v. Armstrong Rubber Co., 130 F.3d 168 (5th Cir. 1997)(holding ground water contamination could give rise to a trespass claim). This is consistent with longstanding Mississippi precedent recognizing the surface owner's right to possession of ground water or subterranean waters. In Board of Sup'rs of Clarke County v. Mississippi Lumber Co., 301 So. 905, 906 (Miss. 1902), the Mississippi Supreme Court wrote "it is universally held that [subterranean] waters belong to the realty, to be used at will by its owner for any purpose of his own…The right to bore for water to be used on the land for the business uses of the owner of the land is fully recognized. This right is nowhere denied." Id. Mississippi's broad grant of authority over ground water to the surface owner differs considerably,

10

therefore, from the Ohio law considered by the court in Baker v. Chevron U.S.A., Inc., 533 F.App'x 509, 521 (6th Cir. 2013), which is cited by Textron. Ohio courts have limited the rights of the surface owner to a far greater extent – absent actual use, no rights attach. Id.

Mississippi law is also consistent with logic and science, which establishes that where there is contaminated ground water, there must also be contaminated soil, because water moves through the sub-surface like it would through a sponge, leaving particles of the substances it carries trapped in the small spaces it passes through. This truth was recognized by the court in Ivory v. Int'l Bus. Machs. Corp., 116 A.D.3d 121, 130 (N.Y. App. Div. 2014), which Textron cites for the proposition that "ground water does not belong to the owners of real property." Id., Textron Memo, p. 13. Textron omits, however, the following sentence in that opinion, which states "[o]n the other hand, as to contaminated soil, title to real property includes the air above the parcel and the earth below it. The record contains sufficient evidence of groundwater that apparently flowed through the soil…to survive summary judgment on [plaintiffs'] trespass claims as related to contaminated soil." Id.

Here, Plaintiffs' claims are no different. They have alleged contamination to their soil, and sufficient ground water, as a medium of transport, has flowed through their property to render their soil contaminated and preclude summary judgment on their claims.

Textron's contention that Plaintiffs' claims depend on the demonstration of a vapor intrusion pathway to each property are likewise misguided. See Textron Memo., p. 15. As discussed above, Plaintiffs do not rely on vapor intrusion to show their properties are contaminated. The Baker decision, upon which Textron again relies, has no application to the facts of this case, as Plaintiffs' properties are situated on top of a contaminated ground water plume. The Baker case involved, to the contrary, landowners who did not have contaminated water under their property and who were relying on vapor intrusion as their only physical connection with the contamination. In dismissing those claims, the court found that "[t]he plume is not under the properties of these Plaintiffs, nor are the properties close

11

enough to the plume to be exposed to a completed vapor pathway. Therefore, these Plaintiffs have not been injured as a matter of law by Chevron's alleged tortious conduct." 2011 WL 365229 at *7. Where, as here, proof of subsurface contamination exists, the presence or absence of vapor intrusion pathways is irrelevant.

 B. **<u>Textron Contributed to the Contamination at Plaintiffs' Properties</u>**

When Textron began operations at the Plant, the EQ lagoon contained no industrial contaminants that exceeded an applicable regulatory threshold. May 1985 Testing, McClelland Consulting Engineers, Exhibit 5. Eight years later, the lagoon sludge was heavily contaminated with metals and solvents. Equalization Lagoon Characterization Report (Dkt. 618-32). These contaminants necessarily came from Textron's operations.

In fact, Textron admitted in an order entered by the MDEQ that it had disposed of toxic substances in the lagoon illegally. Exhibit 5. Overwhelming evidence exists, and has been offered by Plaintiffs, showing that (1) elevated levels of chromium and TCE were present in the EQ lagoon from Textron's operations; (2) the permeable floor of the lagoon allowed those toxins to seep into and contaminate the ground water; and (3) that contamination of the ground water has been exacerbated by Textron's failure to ensure that the EQ Lagoon was properly tested prior to closure <u>See</u>, § (I)(B), *supra*.

Ample evidence also exists that Textron contaminated the soils, and ultimately the ground water, of the plant site with unleaded gasoline. Gary Boyd testified that he personally observed a leaking and damaged gasoline tank be removed from the ground. Boyd Dep., p. 137, Exhibit 10. ERM's 1989 audit indicates that plant employees were interviewed and indicated other tanks removed between 1985 and 1988 were also in poor condition, justifying a "fairly high level of concern" that soil and ground water contamination had occurred. ERM Audit, p. 16, Exhibit 3. Defendants experts agree that the BTEX found in Eastern Heights appeared to be sourced from a "high-end petroleum" like unleaded gasoline (Exhibit 11) and that a soil gas pathway exists through which BTEX constituents

might move from the plant property to the neighborhood (Exhibit 12).

The ground water contamination at the plant site was also allowed to spread, undetected, through the upper and lower aquifers for almost a decade due to Textron's failure to report the AOC-A and AOC-B releases. Textron's suppression of this information, particularly in light of its established corporate policy requiring immediate disclosure of all known contaminate releases to the EPA, breached the standard of care it had established for itself, delayed remediation efforts, permitted the destruction of evidence, and increased the magnitude of the environmental calamity these lawsuits now seek to address.

Finally, Textron's catch-all argument – that ground water at the plant only flows to the west and could not have transported such contamination into Eastern Heights – has been rebutted by historical groundwater flow data that demonstrates that groundwater at the plant could, and did, move northward towards Plaintiffs' residences. (Dkt. 628-6) This data is further supported by the opinions of independent experts, such as Tetra Tech, whose analyses show concentration trends consistent with the transfer of contaminants via groundwater from the Facility to Eastern Heights. (Dkt. 618-2).

Textron's professions of innocence, viewed in light of the evidence of culpability present in the record, are untenable. At a minimum, the facts establish that Textron released toxic wastes into the environment during its operation of the Facility, that those contaminants were introduced into the upper aquifer less than 100 yards from Eastern Heights, that ground water flowed at some times from the area of this contamination towards the Plaintiffs' homes, and that the same contaminants released by Textron are present in the water and soil of Plaintiffs' properties.

### C. **Textron's Conduct Presents a Jury Issue on Plaintiffs' Claims for Emotional Distress**

Textron's Motion asserts that Plaintiffs emotional distress claims fail because they can't show "substantial proof of exposure" to toxic chemicals. Textron's Memo., p. 17. Textron misstates the law.

It is true that Mississippi courts have not allowed recovery for fear of future illness in the context of emotional distress claims or negligence actions, absent proof of injury that is medically cognizable and treatable. See Hollingsworth v. Hercules, Inc., 2016 WL 7409130, at *3 (citing Paz v. Brush Engineered Materials, Inc., 949 So.2d 1, 5 (Miss. 2007)). However, a plaintiff may recover on a claim for intentional infliction of emotional distress "where there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally, though there be no physical injury." Id. (citing Bowden v. Young, 120 So.3d 971,980 (Miss. 2013)). The standard has been described as "malicious, intentional, willful, wanton, grossly careless, indifferent or reckless." Id. "It is the nature of the act itself – as opposed to the seriousness of the consequences – that gives impetus to legal redress." Id.

The evidence marshaled by Plaintiffs shows that Textron intentionally persisted in practices at the Grenada facility with the knowledge that those practices, such as releasing contaminants to an unlined lagoon abutting a neighborhood and illegally emitting toxic fumes, might foreseeably cause injury to its neighbors, including the Plaintiffs. See §(I), *supra*. It is likewise established that Textron knew that its property was contaminated with various toxic wastes, including toluene, TCE and BTEX, and that it understood those toxic wastes had the capacity to harm people and property. Id. Yet, Textron made no effort to ameliorate the danger to its neighbors, its workers or the environment, but rather wrongfully concealed these environmental issues until forced to reveal them as a consequence of regulatory investigations. Based on these facts, Plaintiffs submit that jury might reasonably find that Textron's course of conduct evokes outrage and revulsion and supports an award of damages for emotional distress, and that a fact issue therefore exists that should be tendered to the jury for resolution.

### D. The Evidence Supports Plaintiffs' Nuisance Claims

TCE is present in the ambient air in Eastern Heights at levels that exceed EPA health screening limits. Arcadis Maps of Test Results, Exhibit 15; EPA Fact Sheet, January 2016, Exhibit 16. Its

existence has been confirmed by EPA testing and by testing conducted by Arcadis. Id. Textron's contention that "there is no TCE in the outdoor air" is simply inaccurate. Meritor, apparently, has long viewed the environmental issues in Eastern Heights as largely one of ambient air contamination, even proposing internally the installation of a soil vapor extraction system in the MW-20 area (between the railroad tracks and Eastern Heights) to protect the residents of the subdivision. DaLaet Notes, 6/2/14, Exhibit 17; J. DaLaet Notes, 2/12/15, Exhibit 18.

In recent years, unsafe concentrations of TCE were detected inside the plant, and the EPA ordered the installation of a sub-slab depressurization system to protect the health of the workers in the facility. EPA Fact Sheet, January 2017, Exhibit 19; EPA Fact Sheet, July 2017, Exhibit 20. The EPA has further expressed the opinion that the facility is the plausible source of the ambient air contamination in the neighborhood. J. Peeples Notes, 3/3/17, Exhibit 21. Defendants' experts, moreover, have identified the EQ Lagoon as the most likely source of soil gas contamination in the Eastern Heights area. Data Transmittal to EPA of MW-20 Sampling Results, p. 2, Exhibit 22. Put simply, the presence of toxins in the air of Eastern Heights is an actual problem, not a theoretical one, and it has impacted the use and enjoyment of the Plaintiffs who reside there.

The law provides that a landowner may not used his property in such a way as to inconvenience or harm others. Lambert v. Matthews, 757 So.2d 1066, 1069 (Miss. Ct. App. 2000). "A private nuisance is a non-trespassory invasion of another's interest in the use and enjoyment of his property." Biglane v. Under the Hill Corp., 949 So.2d 9, 14 (Miss. 2007). The tort does not require that property owners be driven from their homes, but only that their enjoyment of life and property is "rendered materially uncomfortable and annoying." Alred Jacobshagen Co. v. Dockery, 139 So.2d 632, 634 (Miss. 1962). A plaintiff may recover damages for diminution in value of her property and special or incidental damages for annoyance, discomfort, inconvenience and sickness. City of Oxford v. Spears, 87 So.2d 914, 916 (Miss. 1956).

15

With two exceptions[2], each of the Plaintiffs in this case have expressed that their use and enjoyment of their property have been negatively impacted by the presence of contamination from the Facility and that they have experienced annoyance and discomfort as a consequence.[3] At the essence of nuisance is peace of mind, the right to feel happy, comfortable and safe in one's home." Travis v. Moore, 377 So.2d 609, 612 (Miss. 1979). Plaintiffs have been deprived of that right by the conduct of Textron, and should be permitted to testify to a jury regarding how their enjoyment of their properties has been impacted so that the jury can determine whether normal persons in their community would regard the invasion at issue as offensive, oppressive or intolerable. See Blackard v. Hercules, Inc., 17 F.Supp.3d 576, 583 (S.D.Miss. 2014).

### E. Plaintiffs Do Not Seek Remediation Costs

In § IV A. of its brief, Textron argues that Plaintiffs may not recover remediation costs. Plaintiffs, however, have never sought the costs of remediation as damages in this lawsuit. Rather, remediation costs were calculated in order that they might be used to determine the costs of restoration, which is the proper measure of damages in a case of this nature, where the damage done to real property is able to be remedied. See Patterson v. Holleman, 917 So.2d 125 (Miss.Ct.App 2005). A landowner may recover for damages caused by trespass using this measure, however, "only if the costs of restoration is less than the diminution in value of the entire property." Id. at 132. As the costs to remediate exceed the value of the properties of the Plaintiffs, a fact which could only be established by first *calculating* the costs of remediation, Plaintiffs' trespass damages are limited to the value of their properties. Id., see also Teasley v. Buford, 876 So.2d 1070 (Miss.Ct.App. 2005).

### F. **Plaintiffs May Recover All Damages Occasioned by Textron's Negligence,**

---

[2] Plaintiffs Betty Phillips and Alice Crumley are not residents of Eastern Heights, but own a residence there that was left to them by their mother.

[3] See Deposition of Rosie Brady, pp. 42-46, Exhibit 23; Deposition of Sylvia Caffey, p. 26, Exhibit 24; Deposition of Brenda Cooper, p. 68, Exhibit 25; Deposition of Sylvia Cunningham, pp. 30-33, Exhibit 26; Deposition of Margaret Odemes, p. 184-185, Exhibit 27; Deposition of Bernice Richardson, p. 67, Exhibit 28; Deposition of Diane Seldon, p. 30, Exhibit 29; Deposition of Dora Ward, 38-40, Exhibit 30.

### Including the Costs of Relocation

Textron briefly attacks the Plaintiffs claim for damages that include the costs of relocating to another residence. Textron's Memo., pp. 21-22. However, the costs of relocation, should relocation be determined necessary, are damages that flow directly from the wrongful conduct of the Defendants. They are precisely the sort of incidental damages the Mississippi Supreme Court has acknowledged to be available to plaintiffs claiming nuisance or other invasions of property. In City of Oxford v. Spears, 87 SO.2d 914 (Miss. 1956), the Court held:

> In addition, the landowner is entitled to recover such special and other damages as he may be able to prove. These special and incidental damages <u>are elements of damage separate, distinct and independent of the depreciation of the value of the property</u>…Included in the category of special and incidental damages are annoyance, discomfort, inconvenience and sickness. There may be others.

Id. at 916. See also Fulton v. Mize, 274 So.2d 129 (Miss. 1973).

While the burden rests with Plaintiffs to establish that they are entitled to be relocated, if they succeed in their effort, there is no legal impediment to their recovery of additional damages occasioned by Defendants' conduct that they incur as a consequence. See Plaintiffs' Response in Opposition to Motion to Exclude Reports and Opinions of Howard Herring, (Dkt. 614).

### G. Textron's Conduct Presents a Jury Issue as to Punitive Damages

*Miss. Code Ann.* § 11-1-65 (1)(a) provides that

Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud."

Section 11-1-65 does not define "actual malice," "gross negligence," or "reckless disregard." These terms, however, are sufficiently defined in the jurisprudence.

"Malice," for purposes of actual malice, "does not necessarily mean actual malice or ill will, but the intentional doing of a wrongful act without justification or excuse." DIJO, Inc. v. Hilton Hotels

17

Corp., 351 F.3d 679, 684 (5th Cir. 2003).

Mississippi courts view "gross negligence" as "conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them." Teche Lines v. Pope, 166 So. 539, 540 (Miss. 1936) (emphasis added); McDonald v. Lemon-Mohler Ins. Agency, LLC, 183 So.3d 118, 126 (Miss. Ct. App. 2015). Gross and reckless negligence is considered, under Mississippi law, to be the equivalent of willful wrong. Teche Lines, 166 So. at 540. Mississippi law recognizes that one who is reckless "evinces [a] disregard of, or indifference to, consequences," [Turner v. City of Ruleville, 735 So.2d 226, 229 (Miss. 1999)], and accordingly, reckless disregard "embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." Collins v. City of Newton, 2018 WL 1193549, at *8 (Miss. Mar. 8, 2018) (citing Davis v. City of Clarksdale, 18 So.3d 246, 249 (Miss. 2009)). "While it is less than an intentional act, it is more than mere negligence." Davis, 18 So.3d at 249.

Section 11-1-65 (1)(a), and the concept of reckless disregard, incorporate the term "wanton." One acting wantonly is "not trying to avoid [harm] and is indifferent to whether harm results." Shotts v. City of Madison, 170 So.3d 554, 566 (Miss. Ct. App. 2014). "Wantonness" is a failure or refusal to exercise any care, as opposed to negligence, which is a failure to exercise due care. Covington v. Carley, 19 So.2d 817, 818 (Miss. 1944).

There is some overlap in the definitions of these terms, but they indicate that punitive damages may be awarded under section 11-1-65 (1)(a) where a tortfeasor is grossly negligent and exhibits indifference for the consequences of his conduct.

Textron's Memo argues, essentially, Textron cannot be subject to an award of punitive damages because it "did not engage in *any* on-site or off-site disposal or cause *any* releases of contaminants into the groundwater while it operated the facility…much less [can Plaintiffs show] clear and convincing evidence that Textron did so with "actual malice" or "gross negligence"  with a "willful, wanton or

reckless disregard for the safety of others." Textron's Memo., p. 22. As demonstrated above, the record is replete with evidence that Textron did, in fact, cause contamination during its ownership of the plant, and that its actions were intentional and done, at a minimum, without regard for the foreseeable harm to others that might occur as a consequence. Under Mississippi law, this evidence is sufficient to support an award of punitive damages.

## IV. CONCLUSION

Textron's participation in the contamination of the Facility Site, and its subsequent migration to Eastern Heights, was substantial. Textron has acknowledged as much. In 1996, it agreed with Rockwell that it bore 15 percent of the responsibility for groundwater contamination at the Facility, and agreed to pay for remediation costs based on that allocation. The evidence as developed in this case makes clear why it believed such a deal to be in its interest. During its ownership of the Facility, Textron knowingly and intentionally polluted its property. That pollution has now made its way off-site, and Textron must share in the responsibility owed to its neighbors who have been damaged as a result. Plaintiffs submit to the Court that Textron has not shown the absence of disputed material fact questions as to any of the Plaintiffs' claims, and that its motion for summary judgment is therefore due to be denied in its entirety.

DATED this the 23rd day of May, 2018.

Respectfully submitted by,

/s/ *W. Lawrence Deas*

**W. LAWRENCE DEAS** (MB #100227)
**WILLIAM LISTON** (MB #8482)
LISTON & DEAS PLLC
Post Office Box 14127
Jackson, MS 39216
Tel. (601) 981-1636
Fax. (601) 982-0371
william@listondeas.com
lawrence@listondeas.com

**MARQUETTE WOLF** (MB #104996)
**BEN TAYLOR**
**CHARLES BENNETT**
**TED LYON**
TED B. LYON & ASSOCIATES, P.C.
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150
Tel. (972) 279-6571
Fax. (972) 279-3021
mwolf@tedlyon.co

**STEVEN H. FUNDERBURG** (MB #9959)
FUNDERBURG SESSUMS & PETERSON PLLC
Post Office Box 13960
Jackson, MS 39236-3960
Tel. (601) 355-5200
Fax. (601) 355-5400
sfunderburg@fsplawfirm.com

**ALAN D. LANCASTER**
P.O. Box 645
Winona, MS 38967
Tel. (601) 283-2132
dlancaster@listonlancaster.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that I, W. Lawrence Deas, served a true and correct copy of the above and foregoing document on all counsel of record by transmitting the same *via* electronic mail and/or by filing the same with the ECF system established by the Court, which sent a copy of the same to all counsel of record.

This the 23rd day of May, 2018.

/s/ *W. Lawrence Deas*
W. Lawrence Deas