# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### GREENVILLE DIVISION

**BRENDA J. COOPER, et al.**                                                                PLAINTIFFS

**V.**                                                                NO. 4:16-CV-52-DMB-JMV

**MERITOR, INC., et al.**                                                                DEFENDANTS

## ORDER

Before the Court in these consolidated cases is the "Plaintiffs' Motion to Exclude Testimony and Opinions [sic] James Peeples." Doc. #586.

## I
## Relevant Background

These consolidated cases concern the Eastern Heights neighborhood ("Subdivision") in Grenada, Mississippi; a neighboring industrial facility ("Facility"); and various bordering properties.

The Facility property includes three areas of interest: (1) a former equalization lagoon on its northern border; (2) a known area of contaminant release referred to as AOC-A; and (3) another known area of contaminant release referred to as AOC-B, which is just to the west of AOC-A.

The footprint of the Eastern Heights neighborhood may be described as a rough inverted cone shape, with the angled "bottom" pointing northwest and the round "top" pointing southeast. The round part of the cone is bordered to the southwest by the Facility, to the south by a triangular-shaped railyard property ("Railyard") owned by the Grenada Railway, to the southeast by a stoneyard ("Stoneyard") now owned by Dunham, Inc., and to the east by a railroad which runs south past the Subdivision and the Facility.

To the east of the railroad is a large rectangular tract of land which the parties refer to as the Moose Lodge Road Area ("MLRA"). Four rectangular parcels of interest sit on the MLRA's western border, and run from north to south in the following order: (1) property owned by Kirk Family Holdings, LLC ("Kirk Property"); (2) property owned by Packaging Corp of America ("PCA Property"); (3) property owned by International Paper ("IP Property"); and (4) an area on the IP Property known as the former Buffing Compound Disposal Area ("BCDA"), where Facility employees disposed of chemicals in the late 1960s. These four areas are bordered to the east by Moose Lodge Road, which runs north to south through the MLRA and then turns east at the southern edge of the BCDA. A Permeable Reactive Barrier Wall ("PRB"), which was constructed in approximately 2004 to filter out chemicals from the groundwater, sits to the west between the Facility and Riverdale Creek.

The locations described above are roughly demonstrated in Figure 1[1] below.

---

[1] Doc #569-5. The plaintiffs take issue with the size of the BCDA reflected in Figure 1, which was generated by the defendants. The Court's use of the map does not reflect a finding of the precise locations and sizes of the relevant properties. The map is cited only as a demonstrative aid to show the general locations of the areas described.

**Figure 1**



The Kirk Property has housed various structures of unknown purpose and has been used, at least in part, for storage of drums of unknown substances. The drums were stored in the southwest portion of the property. The PCA Property was used primarily as agricultural land but has since been abandoned. The Railyard has "historically been used for railcar storage."

The various properties sit atop a layer of surficial soil, which is primarily made up of silt and clay. The surficial soil overlays an upper aquifer, which is comprised primarily of fine to coarse sand. The upper aquifer is divided in places into shallow and deep zones by a layer of intermediate clay, and overlays a layer of shaley clay, which itself overlays a lower regional aquifer comprised of sand with trace clay partings. The regional aquifer is the source of water for the area, including the Subdivision.

# II
# Procedural History

On March 16, 2016, Brenda Cooper, Sylvia Caffey, Margaret Odems, Bernice Richardson, Dora Ward, Rosie Brady, Pearl Seldon, Betty Phillips, Alice Crumley, and Sylvia Cunningham filed a complaint in the United States District Court for the Northern District of Mississippi against Rockwell International Corporation and the Randall Division of Textron, Inc. Doc. #1. On June 30, 2016, United States Magistrate Judge Jane M. Virden consolidated the case with four member cases[2] for purposes of discovery and motion practice. Doc. #41. The day after consolidation, the plaintiffs filed an amended complaint against Meritor, Inc., Rockwell Automation Inc., The Boeing Company, and Textron, Inc. Doc. #43.

In the amended complaint, the plaintiffs, residents or former residents of the Subdivision, seek damages for injuries to their homes and property caused by the operation of the Facility. The plaintiffs allege that the Facility was operated by (1) Rockwell International Corporation, the predecessor to Rockwell Automation, Inc., which itself is a predecessor to The Boeing Company, from 1965 until 1985; and (2) Randall Wheel Trim, a subsidiary of Textron, Inc., from 1985 until the present. The plaintiffs further allege that the Facility, which was used to manufacture chrome-plated wheel covers, utilized numerous chemicals, including hexavalent chromium and trichloroethylene ("TCE"), and that these chemicals were illegally placed into the environment, including the air and groundwater, with the defendants concealing such disposal.

On August 18, 2017, Meritor, Boeing, and Rockwell ("Meritor Defendants") served their joint expert designations. Doc. #511-1. Of relevance here, they designated James Peeples as both

---

[2] *Sledge, et al. v Meritor, Inc., et al.*, No. 4:16-cv-53; *Cooke, et al. v. Meritor, Inc., et al.*, No. 4:16-cv-54; *SRA Investments, LLC, et al. v. Meritor, Inc., et al.*, No. 4:16-cv-55; *Willis, et al. v. Meritor, Inc., et al.*, No. 4:16-cv-56.

a retained and non-retained expert witness. *Id*. at 3. In an order issued April 2, 2018, United States Magistrate Judge Jane M. Virden struck the former of these designations.[3] Doc. #526.

Peeples, through his company T&M Associates, Inc., produced two reports related to the MLRA—a February 2016 "Moose Lodge Road Area Additional Investigation Report" ("2016 Report") and a July 2017 "Kirk and PCA Properties Investigation Report" ("2017 Report"). The Meritor Defendants have relied on these reports in support of their summary judgment and related briefing.

On May 9, 2018, the plaintiffs filed a motion to exclude certain opinions and testimony of Peeples. Doc. #586. The Meritor Defendants responded in opposition on May 23, 2018. Doc. #640. The plaintiffs replied one week later. Doc. #716.

### III
### **Standard**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

A "district court has wide latitude when navigating the expert-qualification process." *Williams v. Manitowoc Cranes, L.L.C.*, 896 F.3d 607, 625 (5th Cir. 2018). "As long as there are sufficient indicia that an individual will provide a reliable opinion on a subject, a district court may qualify that individual as an expert." *Id*. (quotation marks omitted).

---

[3] The Meritor Defendants objected to the order striking Peeples. Doc. #530. This Court overruled the objection on May 31, 2018. Doc. #730.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), a district court has a "special obligation … to ensure that any and all scientific testimony is not only relevant, but reliable." *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 802 (5th Cir. 2018) (internal alterations and quotation marks omitted). "To establish reliability under *Daubert*, an expert bears the burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal alterations and quotation marks omitted).

When evaluating reliability, *Daubert* dictates that trial courts should consider: (1) "the extent to which a given technique can be tested;" (2) "whether the technique is subject to peer review and publication; (3) "any known potential rate of error, the existence and maintenance of standards governing operation of the technique; and (4) "whether the method has been generally accepted in the relevant scientific community." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The *Daubert* factors "are not mandatory or exclusive." *Id*. Rather, the district court should consider whether the enumerated factors "are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id*. (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

In addition to the specific factors enumerated in *Daubert*, the Advisory Committee's Note to the 2000 Amendment to Rule 702 states that the following five "factors remain relevant to the determination of the reliability of expert testimony:"

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
> (3) Whether the expert has adequately accounted for obvious alternative explanations.

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amendment (quotation marks and citations omitted).

Overall, the Court must be mindful that "the fact that … testimony may be assailable does not mean it is inadmissible under Rule 702. The trial court's role as gatekeeper … is not intended to serve as a replacement for the adversary system." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012)

## IV
## Analysis

The 2016 Report contains opinions related to four chlorinated ethane volatile organic compound ("CVOC") groundwater plumes: (1) a shallow and deep zone plume which sits underneath the Facility and stretches west to Riverdale Creek ("Facility Plume"); (2) a shallow and deep zone plume which stretches from just east of Moose Lodge Road into the Subdivision ("Neighborhood Plume"); (3) a shallow and deep zone plume which stretches from just east of Moose Lodge Road into the Railyard ("North Plume"); and (4) a shallow zone plume which sits under the BCDA ("South Plume"). The deep zone portions of the plumes are shown in Figure 2 below.[4] The shallow zone portions are represented in Figure 3 below.[5]

---

[4] Doc. #586-1 at Figure 4-1.

[5] *Id*. at Figure 4-2.

**Figure 2**



**Figure 3**

With regard to the Neighborhood Plume, the 2016 Report states:

This plume is in the [deep zone] of the Upper Aquifer, but expands to higher elevations where the [intermediate clay] confining layer is absent. The source of this plume has been the focus of much of the investigational work conducted in recent years. Based on the location and axis of the plume, it cannot be sourced by groundwater flow from the facility. Ample historical data and recent investigation

findings indicate that groundwater cannot flow in a direction perpendicular to the well-defined east-west axis of the facility plume to source the neighborhood plume.

Doc. #586-1 at § 5.3. Peeples evaluated "[m]ultiple potential source areas and release scenarios" for the Neighborhood Plume and concluded that "[t]he likely scenarios involved TCE DNAPL releases in the stoneyard … and the railyard …." *Id*. In a related analysis, Peeples considered the likelihood that four potential release sites on the PCA Property contributed to the Neighborhood Plume. *See id*. at § 4.2.2.2. Ultimately, the 2016 Report determines the probabilities that these sites contributed to the plume ranged from "neutral" to "unlikely."

In the 2017 Report, Peeples opines:

The VOC plume that appears to originate near TW-204D [the Neighborhood Plume] is not sourced at a location to the east, south or north of TW-204D and traveling to this location. For this to be the case, one or more of the wells installed on the PCA Property for this investigation would have to have shown similar or higher CVOC concentrations in comparison to TW-204D and this investigation provided clear evidence to the contrary.

Doc. #586-11 at § 4.2. The 2017 Report concludes that the source of the "CVOCs previously identified at TW-204D is either the railyard or the stoneyard and is not the PCA Property." *Id*. at § 3.3.5.

The plaintiffs' motion challenges two opinions offered by Peeples—that there are "independent" (a term the plaintiffs have defined as "unrelated to the Defendant") sources of contamination to the east of Moose Lodge Road, and that there are "independent" sources of contamination in the Railyard and Stoneyard areas.

**A. Eastern Sources**

The plaintiffs argue that opinions regarding the possibility of "independent" eastern contamination sites should be excluded as unreliable. Doc. #587 at 3. However, the portion of Peeples' report referenced in the plaintiffs' brief only sets forth a conclusion that the Neighborhood

9

Plume "cannot be sourced by groundwater flow from the facility," and posits that "[l]ikely [release] scenarios involved … releases in the stoneyard and railyard …." *Id*. at 4. The quoted language does not purport to opine on the party responsible for the potential releases and thus does not seem to set forth an opinion on the "independence" of the potential sources.

As a cautionary measure, the Court searched both reports prepared by Peeples for *any* opinion related to "independent" eastern contamination sites. This inquiry revealed no such opinion. While Peeples regularly opines on the locations of sources which could have contributed to the relevant plumes, he offers no opinion that any potential source east of the railroad tracks is attributable to any party. Put differently, Peeples opines on the locations of potential eastern sources, not the parties responsible for such sources. Accordingly, to the extent the plaintiffs have moved to exclude opinions which do not exist, the motion to exclude will be denied.

### B. Railyard and Stoneyard

In a similar misinterpretation, the plaintiffs attribute Peeples' statement in the 2017 Report that "the source of the CVOCs … identified at TW-204D is either the railyard or the stoneyard" to be a statement of *fault* rather than a statement of location. That is not the case. Although the 2017 Report refers to various commercial activities in the Railyard and Stoneyard, it does not purport to link these activities to the pollution at issue in this case.

In contrast, the 2016 Report includes the following opinions: (1) the existence of a rail spur in the Stoneyard suggests "[t]he use of TCE in [the stoneyard] *may* date to the initial widespread production of TCE in the 1920s and its use as a degreasing agent;" (2) "[t]he later use of the area as a stoneyard … *could* have resulted in TCE releases, if it was used as a degreaser in maintenance work;" and (3) a storage building on the Stoneyard property "*may* have been used for

equipment maintenance or storage, and both such activities could have resulted in TCE releases." Doc. #586-1 at § 4.2.2.1.2 (emphases added).

To be admissible, an expert opinion must "assist the trier of fact to determine a fact in issue." *Barefoot v. Weyerhaeuser NR Co.*, 729 F. App'x 300, 303 (5th Cir. 2018) (alteration omitted). As this Court has previously explained, "imprecise and unspecific testimony should be excluded as unhelpful to the jury." *Wu v. Miss. State Univ.*, 1:13-cv-2, 2014 WL 5799972, at *12 (N.D. Miss. Nov. 7, 2014) (internal quotation marks omitted). "Statements frequently appear in the case law that for an expert to testify that defendant's conduct was unfortunate or that certain events or substances 'might' or 'could' have caused a specified result, are of little help to a fact-finder and therefore should be excluded." 6 JONES ON EVIDENCE § 42:32 (7th ed.).

In light of the authority above, Peeples' opinions that certain activities in the Stoneyard "may" or "could" have caused TCE releases which contributed to the Neighborhood Plume are imprecise opinions which would be unhelpful to the jury and should, therefore, be excluded.

## V
## Conclusion

The plaintiffs' motion to exclude the described testimony and opinions of James Peeples [586] is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent it seeks to exclude opinions regarding the potential causes of TCE releases in the Stoneyard, and is DENIED in all other respects.

**SO ORDERED**, this 11th day of February, 2019.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**