# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**BRENDA J. COOPER, et al.**                                                      **PLAINTIFFS**

**V.**                                                                 **NO. 4:16-CV-52-DMB-JMV**

**MERITOR, INC., et al.**                                                         **DEFENDANTS**

## ORDER

Before the Court in these consolidated cases is the "Plaintiffs' Motion to Exclude Testimony and Opinions [of] Robert L. Powell, Ph.D." Doc. #575.

## I
## Relevant Background

These consolidated cases concern the Eastern Heights neighborhood ("Subdivision") in Grenada, Mississippi; a neighboring industrial facility ("Facility"); and various bordering properties.

The Facility property includes three areas of interest: (1) a former equalization lagoon on its northern border; (2) a known area of contaminant release referred to as AOC-A; and (3) another known area of contaminant release referred to as AOC-B, which is just to the west of AOC-A.

The footprint of the Eastern Heights neighborhood may be described as a rough inverted cone shape, with the angled "bottom" pointing northwest and the round "top" pointing southeast. The round part of the cone is bordered to the southwest by the Facility, to the south by a triangular-shaped railyard property ("Railyard") owned by the Grenada Railway, to the southeast by a stoneyard ("Stoneyard") now owned by Dunham, Inc., and to the east by a railroad which runs south past the Subdivision and the Facility.

To the east of the railroad is a large rectangular tract of land which the parties refer to as the Moose Lodge Road Area ("MLRA"). Four rectangular parcels of interest sit on the MLRA's western border, and run from north to south in the following order: (1) property owned by Kirk Family Holdings, LLC ("Kirk Property"); (2) property owned by Packaging Corp of America ("PCA Property"); (3) property owned by International Paper ("IP Property"); and (4) an area on the IP Property known as the former Buffing Compound Disposal Area ("BCDA"), where Facility employees disposed of chemicals in the late 1960s. These four areas are bordered to the east by Moose Lodge Road, which runs north to south through the MLRA and then turns east at the southern edge of the BCDA. A Permeable Reactive Barrier Wall ("PRB"), which was constructed in approximately 2004 to filter out chemicals from the groundwater, sits to the west between the Facility and Riverdale Creek.

The locations described above are roughly demonstrated in Figure 1[1] below.

---

[1] Doc #569-5. The plaintiffs take issue with the size of the BCDA reflected in Figure 1, which was generated by the defendants. The Court's use of the map does not reflect a finding of the precise locations and sizes of the relevant properties. The map is cited only as a demonstrative aid to show the general locations of the areas described.

**Figure 1**



The Kirk Property has housed various structures of unknown purpose and has been used, at least in part, for storage of drums of unknown substances. The drums were stored in the southwest portion of the property. The PCA Property was used primarily as agricultural land but has since been abandoned. The Railyard has "historically been used for railcar storage."

The various properties sit atop a layer of surficial soil, which is primarily made up of silt and clay. The surficial soil overlays an upper aquifer, which is comprised primarily of fine to coarse sand. The upper aquifer is divided in places into shallow and deep zones by a layer of intermediate clay, and overlays a layer of shaley clay, which itself overlays a lower regional aquifer comprised of sand with trace clay partings. The regional aquifer is the source of water for the area, including the Subdivision.

3

# II
# Procedural History

On March 16, 2016, Brenda Cooper, Sylvia Caffey, Margaret Odems, Bernice Richardson, Dora Ward, Rosie Brady, Pearl Seldon, Betty Phillips, Alice Crumley, and Sylvia Cunningham filed a complaint in the United States District Court for the Northern District of Mississippi against Rockwell International Corporation and the Randall Division of Textron, Inc. Doc. #1. On June 30, 2016, United States Magistrate Judge Jane M. Virden consolidated the case with four member cases[2] for purposes of discovery and motion practice. Doc. #41. The day after consolidation, the plaintiffs filed an amended complaint against Meritor, Inc., Rockwell Automation Inc., The Boeing Company, and Textron, Inc. Doc. #43.

In the amended complaint, the plaintiffs, residents or former residents of the Subdivision, seek damages for injuries to their homes and property caused by the operation of the Facility. The plaintiffs allege that the Facility was operated by (1) Rockwell International Corporation, the predecessor to Rockwell Automation, Inc., which itself is a predecessor to The Boeing Company, from 1965 until 1985; and (2) Randall Wheel Trim, a subsidiary of Textron, Inc., from 1985 until the present. The plaintiffs further allege that the Facility, which was used to manufacture chrome-plated wheel covers, utilized numerous chemicals, including hexavalent chromium and trichloroethylene ("TCE"), and that these chemicals were illegally placed into the environment, including the air and groundwater, with the defendants concealing such disposal.

During the discovery process, Meritor, Boeing, and Rockwell ("Meritor Defendants") designated Robert Powell as a retained expert witness. On August 18, 2017, Powell completed an expert report, Doc. #649-1, which the Meritor Defendants have relied on in numerous filings.

---

[2] *Sledge, et al. v Meritor, Inc., et al.*, No. 4:16-cv-53; *Cooke, et al.* v. *Meritor, Inc., et al.*, No. 4:16-cv-54; *SRA Investments, LLC, et al. v. Meritor, Inc., et al.*, No. 4:16-cv-55; *Willis, et al. v. Meritor, Inc., et al.*, No. 4:16-cv-56.

On May 9, 2018, the plaintiffs filed a motion to exclude certain opinions and testimony of Powell. Doc. #575. The Meritor Defendants responded in opposition to the motion on May 23, 2018, and the plaintiffs replied on May 30, 2018. Doc. #648; Doc. #715.

### III
### Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

A "district court has wide latitude when navigating the expert-qualification process." *Williams v. Manitowoc Cranes, L.L.C.*, 896 F.3d 607, 625 (5th Cir. 2018). "As long as there are sufficient indicia that an individual will provide a reliable opinion on a subject, a district court may qualify that individual as an expert." *Id.* (quotation marks omitted).

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), a district court has a "special obligation … to ensure that any and all scientific testimony is not only relevant, but reliable." *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 802 (5th Cir. 2018) (internal alterations and quotation marks omitted). "To establish reliability under *Daubert*, an expert bears the burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal alterations and quotation marks omitted).

When evaluating reliability, *Daubert* dictates that trial courts should consider: (1) "the extent to which a given technique can be tested;" (2) "whether the technique is subject to peer

review and publication; (3) "any known potential rate of error, the existence and maintenance of standards governing operation of the technique; and (4) "whether the method has been generally accepted in the relevant scientific community." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The *Daubert* factors "are not mandatory or exclusive." *Id*. Rather, the district court should consider whether the enumerated factors "are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id*. (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

In addition to the specific factors enumerated in *Daubert*, the Advisory Committee's Note to the 2000 Amendment to Rule 702 states that the following five "factors remain relevant to the determination of the reliability of expert testimony:"

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
> (3) Whether the expert has adequately accounted for obvious alternative explanations.
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amendment (quotation marks and citations omitted).

Overall, the Court must be mindful that "the fact that … testimony may be assailable does not mean it is inadmissible under Rule 702. The trial court's role as gatekeeper … is not intended to serve as a replacement for the adversary system." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012).

# IV
# Analysis

The plaintiffs' motion challenges four opinions offered by Powell: (1) that groundwater under the Facility "flows to the west, eventually discharging into Riverdale Creek;" (2) that TCE and toluene released onto the grounds of the Facility "formed a 'plume' of ground water contamination that flowed to the west … towards Riverdale Creek;" (3) that the PRB mitigated the migration of contaminants; and (4) that contaminants found in the Subdivision may be sourced to "several discrete releases into soils in an area of industrial, railroad and farming properties located … in the MLRA." Doc. #649-1 at 13, 14, 16.

## A. Flow of Groundwater

The plaintiffs argue Powell's opinion regarding the direction of groundwater flow under the Facility is unreliable because the opinion (1) is inconsistent with maps showing that groundwater under the Facility sometimes flowed to the north; and (2) is based on an unreliable methodology.

### 1. Connection to facts

Under *Daubert*, a district court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595. However, "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id*. Thus, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*.

Similarly, while the factual basis of an expert's opinion ordinarily goes to the weight, not the admissibility, of his opinion,[3] "selective use of facts fails to satisfy the scientific method and *Daubert* …." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001). An expert may not disregard without cause facts which are unfavorable to his opinion. *See, e.g.*, *Brown v. Roche Labs., Inc.*, No. 1:06-cv-3074, 2013 WL 2457950, at *5 (N.D. Ga. June 6, 2013) (opinion unreliable where expert "ignored or dismissed highly relevant and unfavorable evidence in reaching his causation opinion"); *Mejdrech v. Lockformer Co., a Div. of Met-Coil Sys. Corp.*, No. 01 C 6107, 2003 WL 22078388, at *3 (N.D. Ill. Sep. 5, 2003) ("The unreliability of his method is compounded by his seeming disregard of any unfavorable findings in this case.").

The plaintiffs contend Powell's opinion regarding westerly flow under the Facility is disconnected from contour map data showing a periodic northerly flow in the area, which they claim is acknowledged by James Peeples, the Meritor Defendants' other groundwater expert, in an April 15, 2013, e-mail which states:

> I went through the Quarterly report that you forwarded for the Moose Lodge Area. I do not see any major issues that have not shown up in previous reports. There have also been times in the past when similar northerly flow directions have been shown on the potentiometric maps. I do suggest that they begin to draw the isoconcentration maps with dashed lines where they cross the property boundary and no data points are present. They may also want to pull the lines in a bit, but that is a judgment call. In the part of the report where they discuss groundwater flow directions, it is no problem to interpret the flow direction consistent with the potentiometric map, but some discussion should be added to indicate the relevance (or lack of relevance) of a short period of flow in any direction. Indicate that groundwater may flow for a brief period in one or another direction, but that when the gradients revert to a more normal flow pattern, water that has traveled in a given direction, often reverses course and simply retraces its movement. It may also be helpful for them to start drawing average potentiometric surfaces for a one year period that are drawing from the water level data averaged over a full year. This is a better representation of the net direction of groundwater flow and the net location of the groundwater divide. I don't think these should replace the quarterly surfaces,

---

[3] *See Summit Health & Rehab Servs., Inc. v. Baker, Donelson, Bearman, Caldwell & Berkowitz*, No. 3:17-cv-127, 2018 WL 1722759, at *2 (S.D. Miss. Mar. 7, 2018) (collecting cases).

but perhaps augment them. For this report, I would just add a few sentences about the need to look at longer term trends to really evaluate net groundwater flow directions, and would not make much of the flow direction observed for this quarterly event.

Doc. #575-1.

The Meritor Defendants respond that Peeples' e-mail refers to the Moose Lodge Road Area, not the Facility. They also contend that Powell considered the data shown in contour maps—which show the gradient below the surface—but properly discarded the data in reaching his conclusion.

With regard to the first point, there is no indication that the e-mail, which begins with a statement that Peeples reviewed a report "for the Moose Lodge Area," was referencing the area underneath the Facility.

With respect to the contour maps, Powell explained:

> The potentiometric maps show that the elevation is much flatter in the Moose Lodge Road Area to the east of the Grenada facility than it is to the west beneath the facility property, where gradients are steeper and consistently towards the west. This pattern is consistent with the conclusion that groundwater is recharging the shallow aquifer in the Moose Lodge Road area. These maps show that the groundwater flow beneath the Grenada facility and in the Eastern Heights neighborhood is generally towards the west to Riverdale Creek, where the groundwater discharges.

Doc. #649-3 at 2. However, he clarified that the gradient on contour maps:

> is persuasive but not definitive as to the actual direction of ground water movement. Water and dissolved chemicals will tend to follow the most permeable pathways available to them in the depositional matrix of subsurface sediments that form an aquifer. Thus, when evaluating the actual direction of groundwater and chemicals in the subsurface, a hydrogeologist will also look at other data, including evidence of how contamination has actually migrated to the subsurface. Because subsurface contaminants typically move with the groundwater flow, contaminant plume maps provide compelling evidence of groundwater flow direction.

*Id*. at 3. To this end, Powell points to portions of his report which refer to "the absence of toluene in the groundwater beneath the Eastern Heights neighborhood" as being "consistent with [the] conclusion that the groundwater flow beneath the Grenada facility is westward." *Id*.

While, as explained below, the plaintiffs have challenged the underlying methodology of disregarding the contour maps, the Court finds that Powell's conclusions are not so divorced from the underlying facts as to warrant their exclusion.

### 2. Underlying methodology

Powell reached his conclusions regarding groundwater flow direction by reviewing contaminant plume maps and the annual potentiometric (contour) maps from the Facility and surrounding areas from approximately 2006 to 2017. *Id*. at 2–4. He also "relied initially quite a bit" on a 2016 report prepared by Peeples in order to "get grounded in what the hydrogeology of the area was and how contaminants were moving." Doc. #649-2 at 16. The plaintiffs argue Powell's methods are unreliable because (1) Powell did not perform "any ground flow studies, rather has only reviewed studies of other experts;" (2) the "opinion has not been evaluated in light of the potential rate of error for that scientific methodology;" (3) the "opinion has not been subjected to peer review or publication;" (4) the "opinion is not consistent with the generally accepted methods used for gathering relevant scientific evidence in the expert's discipline;" (5) the opinion was generated for this litigation; and (6) Powell's opinion failed to account for obvious alternative explanations.

#### a. Failure to perform studies

First, there is absolutely nothing in the record which suggests that Powell did not perform his own studies of groundwater flow. To the contrary, Powell avers that, in determining the direction of groundwater flow, he independently reviewed approximately ten years of

potentiometric data as well as contamination plume maps. While it is true that he did not create the contour maps or contamination plumes, an expert may rely on facts or data "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703.

With regard to reliability, the Meritor Defendants have introduced a text, *Field Methods for Geologists and Hydrogeologists*, which is unchallenged by the plaintiffs and states unequivocally that "[t]he horizontal gradient of the ground-water surface, the general shape of the water of the water table, and the general direction of movement can be determined from a water-level contour or potentiometric map." Doc. #649-19 at 233. Additionally, as quoted above, Powell represents that, in addition to contour maps, hydrologists look at contamination plumes in evaluating groundwater flow direction. In light of this undisputed evidence, the Court concludes that the materials relied on by Powell do not render his opinion unreliable.

*b. Rate of error*

Under *Daubert*, a court should consider "whether the known or potential rate of error is acceptable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). However, this factor "is not particularly relevant … where … the expert derives his testimony mainly from first-hand observations and professional experience in translating these observations …." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246 (5th Cir. 2002).

The plaintiffs contend that "Powell's groundwater flow direction opinion has not been evaluated in light of the potential rate of error for that scientific methodology." Doc. #576 at 4. Insofar as Powell's method of evaluating groundwater flow direction is based on the use of his professional experience to translate contour and contamination maps, the Court finds the lack of known rate of error to be of little weight.

*c. Peer review*

"The fact of publication (or lack thereof) in a peer reviewed journal … will be a relevant, though not dispositive, consideration …." *Daubert*, 509 U.S. at 594. Thus, "lack of peer review will rarely, if ever, be the single dispositive factor that determines the reliability of expert testimony." *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000). Furthermore, like absence of rate of error, the relevancy of the peer review factor has little bearing where a "methodology is based on … extensive practical experience in th[e] area, rather than novel methodology subject to publication …." *Id*.

As explained above, Powell's methodology involved applying his professional experience to maps and other data relevant to the area. Because this type of methodology is not amenable to publication, the lack of publication or peer review is of little relevance to the methodology's reliability.

*d. Acceptance in scientific community*

The plaintiffs argue:

> Powell's opinion is not consistent with the generally accepted methods used for gathering relevant scientific evidence in the expert's discipline. Peeples and … various contractors over the years have demonstrated the fluctuations in groundwater flow direction; Powell has not undertaken any study himself and seems to have only relied upon the information that suits the opinion he and/or the [Meritor] Defendants like.

Doc. #576 at 5. In advancing this argument, the plaintiffs evince a misunderstanding of the "acceptance" standard, which asks whether a *theory or technique* enjoys general acceptance within a relevant scientific community; not whether a specific *opinion* produced by such a theory or technique is accepted by other experts in a case. *See Daubert*, 509 U.S. at 595 ("The focus of [a Rule 702 inquiry] must be solely on principles and methodology, not on the conclusions that they generate.").

As explained above, the undisputed evidence establishes that hydrologists generally review contour maps and contamination plume maps to determine groundwater flow direction. Insofar as Powell followed this methodology, this factor weighs in favor of admission.

### d. Opinion prepared for litigation

The plaintiffs further argue that Powell's opinion is unreliable because it "was generated solely for the pending litigation." Doc. #576 at 5. As mentioned above, a court evaluating expert reliability may consider whether the expert is "proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation, or whether [he has] developed [his] opinions expressly for purposes of testifying." Fed. R. Evid. 702. Generally, if "the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)).

There is no indication Powell's opinions grew naturally and directly out of research he conducted independent of his litigation. Rather, it appears he developed his opinions regarding groundwater flow direction under the Facility expressly for purposes of testifying. However, because the Meritor Defendants have proffered other objective verifiable evidence of reliability (*Field Methods for Geologists and Hydrogeologists*), the Court gives the fact that Powell was retained very little weight.

### e. Alternative explanations

"A necessary ingredient [of opinions on causation] is the exclusion of alternative causes." *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2000). Accordingly, "[i]n deciding whether

13

an expert employed a reliable method, the district court has discretion to consider whether the expert has adequately accounted for obvious alternative explanations." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) (internal alterations and quotation marks omitted); *see Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 87 (1st Cir. 2017); *Redd v. DePuy Orthopaedics, Inc.*, 700 F. App'x 551, 554 (8th Cir. 2017). A "failure to test for … obvious and significant alternative explanations renders [an] analysis essentially worthless." *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F.Supp.2d 403, 428 (S.D.N.Y. 2005) (internal quotation marks omitted); *see Michaels*, 202 F.3d at 753 (failure to exclude other potential causes "would likely" render an opinion inadmissible under *Daubert*).

The plaintiffs contend Powell's groundwater direction opinion fails to account for obvious alternative explanations because Powell failed to "respond to experts designated by Plaintiffs and the findings of more than a decade of work on groundwater flows …." Doc. #576 at 6. This is not an argument regarding alternative explanations but rather an argument, addressed above, that Powell failed to consider relevant data. As this argument was rejected above, so too is it here.

### *f. Summary*

For the reasons above, and in consideration of the relevant *Daubert* factors, the Court concludes that Powell's opinion regarding groundwater flow direction is based on a reliable methodology and, therefore, need not be excluded under *Daubert*.

### B. TCE plume

Both parties agree that Powell's opinion on the flow of the TCE contamination plume rests on the reliability of his opinion regarding the flow of groundwater. Because this Court has concluded that the groundwater flow opinion is reliable, it reaches the same conclusion with respect to Powell's opinion regarding the TCE plume.

## C. Effectiveness of PRB

The plaintiffs next argue as both unreliable and irrelevant Powell's opinions that the PRB "historically mitigated" the migration of solvents from the Facility and "represent[s a] practical and effective means for initially limiting the migration of contaminants and reducing the significance of chemical mass remaining in the original source areas." Doc. #574-3 at 15. Specifically, the plaintiffs contend the opinions are not reliable and lack relevancy because they fail to account for the variability of flow direction, because the PRB was criticized by an EPA official, and because the opinions do not account for the fact that the PRB was periodically clogged.

First, for the reasons above, the Court rejects the plaintiffs' argument that Powell failed to account for changes in flow direction. Next, while an EPA official criticized the PRB, "a disagreement with an expert is not a legitimate basis on which to strike that expert's opinion." *In re NYSE Specialists Secs. Litig.*, 260 F.R.D. 55, 68 (S.D.N.Y. 2009). Finally, the plaintiffs' argument that Powell failed to account for clogging in the PRB is simply incorrect, as Powell specifically accounted for this issue when he concluded that the PRB:

> initially proved to be effective in reducing the chemical loading flowing into Riverdale Creek, but the treatment efficiency declined over time as the PRB gradually clogged from the accumulation of precipitates and biomass on its upstream face and more of the contaminated water began to divert around rather than filter through the wall. More recent work has since been undertaken to rejuvenate and enhance the performance of the PRB system to more effectively treat the solvent plume before it enters Riverdale Creek.

Doc. #649-1 at 12 (citation omitted). Accordingly, the Court rejects the plaintiffs' challenge to the PRB opinions.

## D. Discrete Releases

In his report, Powell opines:

15

> Solvent-related contaminants has also been found in shallow ground water beneath portions of the Eastern Heights neighborhood. The source(s) of this contamination are several discrete releases into soils in an area of industrial, railroad and farming properties located to the east of the Eastern Heights neighborhood and northeast of the Facility in the MLRA.

Doc. #649-1 at 12. Powell reached this opinion because "the principal axis of the TCE plume mapped at the Facility is westward, and no toluene (a 'tracer' unique to the Facility plume) is being consistently detected on Facility property north of the Equalization Lagoon …." *Id*. at 13. Powell also evaluated, and rejected, a hypothesis of the plaintiffs that leakage from the equalization lagoon could have altered the flow of water under the Facility.

The plaintiffs argue Powell's opinions regarding the releases are unreliable because there is no evidence supporting reliability under the remaining *Daubert* factors and because Powell could not state conclusively the locations of the releases. The plaintiffs also argue the opinion is unreliable and irrelevant because there is no evidence of a third-party dumper. Finally, the plaintiffs contend that opinions "included" in the opinion "related to clay layer sand permeability of the soil" are speculation unsupported by reliable methodology. Doc. #576 at 11.

As to the plaintiffs' general *Daubert* arguments, the Court concludes, for the reasons above, that Powell's opinion, which is based on his opinion on groundwater flow beneath the Facility, is reliable. This conclusion is not undermined by Powell's inability to pinpoint a release location in the area or an alleged absence of evidence of another polluter for two reasons. First, the opinion does not purport to opine as to the precise location of the releases; rather it sets forth "approximate source" areas and resulting contamination plumes from each area. *See* Doc. #649-1 at Fig. 1. Second, it does not appear Powell opines that the discrete sources of contamination in the MLRA are not attributable to the Facility. Accordingly, an absence of evidence of other dumping would

not alter the reliability of Powell's conclusions regarding the sources of contamination in the MLRA.

With regard to relevancy, the plaintiffs argue that under Miss. Code Ann. § 85-5-7, Mississippi's apportionment of fault statute, a defendant must show that another actor's conduct was negligent rather than intentional, and that since the Meritor Defendants cannot establish negligent conduct on the part of other parties, Powell's opinions on dumping locations in the MLRA are irrelevant to the Meritor Defendants' claims and defenses. Doc. #715 at 8–10. Put differently, the plaintiffs argue that the relevancy of Powell's source opinions are conditionally relevant and that the Meritor Defendants have not established the existence of the relevant condition.

When confronted with a question of conditional relevancy, "[t]he court may admit the proposed evidence on the condition that the proof be introduced later." Fed. R. Evid. 104(b). This Court concludes that the issue of the existence of other contributing conduct, which is addressed in detail in dispositive motion briefing, is more appropriately addressed in the context of the motions for summary judgment. Accordingly, to the extent Powell's source opinion depends on evidence of other negligent conduct, the Court will deny the motion on the condition that relevance be proven later.

Finally, the plaintiffs argue:

> Also included in Powell's Opinion 4 are opinions related to clay layers and permeability of the soil. His opinions do not rise above speculation about the permeability of the soil, including the soil in Eastern Heights. Any opinion about soil permeability is speculation and not based upon reliable methodology. There is **no evidence** in this case of permeability testing.

Doc. #576 at 11–12 (record citations omitted). In response, the Meritor Defendants point to testimony from Powell that "there w[ere] permeability tests performed on the facility property

because those were some things we looked at on the question of the influence of equalization basin on ground water flow." Doc. #575-6 at 291. However, in the same deposition, Powell testified that he was unaware of any testing performed on the property in the Subdivision. *Id*. Based on this testimony, the Court rejects the plaintiffs' contention that Powell's opinions on permeability beneath the Facility must fail for lack of testing. However, in the absence of any testing on the permeability of soil in the subdivision, Powell has no basis for offering testimony on the issue.

## V
## Conclusion

The plaintiffs' motion to exclude the described testimony and opinions of Powell [575] is **GRANTED in Part and DENIED in Part**. The motion is GRANTED to the extent it seeks to exclude opinions related to the permeability of soil in the Subdivision, and is DENIED in all other respects.

**SO ORDERED**, this 11th day of February, 2019.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**