IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**BRENDA J. COOPER, et al.** **PLAINTIFFS**

**V.** **NO. 4:16-CV-52-DMB-JMV**

**MERITOR, INC., et al.** **DEFENDANTS**

**ORDER**

Before the Court in these consolidated cases are Meritor, Inc., Rockwell Automation Inc., and The Boeing Company's motions to exclude the opinions and testimony of Dixie Clay and Joe Parker. Doc. #540; Doc. #544.

**I**
**Background**

These consolidated cases involve claims for property damage arising from decades of operation of a manufacturing facility ("Facility") in Grenada, Mississippi, by Meritor, Inc., the Boeing Company, Rockwell Automation, Inc., and Textron, Inc. The plaintiffs, all property owners or former property owners of land in Grenada's Eastern Heights subdivision ("Subdivision"), assert that the defendants negligently operated the Facility and that such negligence resulted in the contamination of the Subdivision. The plaintiffs' amended complaint, which asserts claims for fraud, civil conspiracy, negligence, nuisance, and infliction of emotional distress, seeks recovery for numerous damages including diminution of property values. Doc. #43 at ¶ 76.

During discovery, the plaintiffs produced the expert reports of two appraisers, Dixie Clay and Joe Parker, who opined on the unimpaired and actual values of the plaintiffs' properties. Meritor, Boeing, and Rockwell ("Meritor Defendants") moved to exclude the testimony and

opinions of each in limine. Doc. #540; Doc. #544. Textron joined both motions. Doc. #580; Doc. #581. Both motions have been fully briefed.

## II
## Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

A "district court has wide latitude when navigating the expert-qualification process." *Williams v. Manitowoc Cranes, L.L.C.*, 896 F.3d 607, 625 (5th Cir. 2018). "As long as there are sufficient indicia that an individual will provide a reliable opinion on a subject, a district court may qualify that individual as an expert." *Id.* (quotation marks omitted).

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), a district court has a "special obligation … to ensure that any and all scientific testimony is not only relevant, but reliable." *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 802 (5th Cir. 2018) (internal alterations and quotation marks omitted). "To establish reliability under *Daubert*, an expert bears the burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal alterations and quotation marks omitted).

When evaluating reliability, *Daubert* dictates that trial courts should consider: (1) "the extent to which a given technique can be tested;" (2) "whether the technique is subject to peer review and publication; (3) "any known potential rate of error, the existence and maintenance of

standards governing operation of the technique; and (4) "whether the method has been generally accepted in the relevant scientific community." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). The *Daubert* factors "are not mandatory or exclusive." *Id*. Rather, the district court should consider whether the enumerated factors "are appropriate, use them as a starting point, and then ascertain if other factors should be considered." *Id*. (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).

In addition to the specific factors enumerated in *Daubert*, the Advisory Committee's Note to the 2000 Amendment to Rule 702 states that the following five "factors remain relevant to the determination of the reliability of expert testimony:"

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
> (3) Whether the expert has adequately accounted for obvious alternative explanations.
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amendment (quotation marks and citations omitted).

Overall, the Court must be mindful that "the fact that … testimony may be assailable does not mean it is inadmissible under Rule 702. The trial court's role as gatekeeper … is not intended to serve as a replacement for the adversary system." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012).

# III
# Clay Opinions

In her report, Clay opines on the valuation of the plaintiffs' properties before contamination ("unimpaired value") and after contamination ("impaired value") to determine the diminution in value of each lot. Doc. #540-1 at 2. Clay ultimately determined each lot had an impaired value of $0, such that the diminution in value exceeded each lot's unimpaired value. Clay reached these opinions by utilizing the Uniform Standards of Professional Appraisal Practice ("USPAP"). *Id*. at 60. The defendants argue Clay's opinions and testimony should be excluded because they are unreliable and irrelevant.[1] Doc. #541 at 1–2.

## A. USPAP and Mississippi Law

The USPAP represent the "minimum standards for appraisal practice" in the state of Mississippi. *Miss. Real Estate Appraiser Licensing & Cert. Bd. v. Schroeder*, 980 So.2d 275, 282 (Miss. Ct. App. 2007). Thus, under Mississippi law, material breaches of the USPAP render an appraisal invalid. *Broadhead v. Bonita Lakes Mall, Ltd. P'ship*, 702 So.2d 92, 99 (Miss. 1997). A breach is material when it "would have materially affected [the] opinion of value on the subject property." *Id*. at 98. Accordingly, a material breach of the USPAP would render an appraiser's opinion irrelevant under *Daubert*. *See Tajonera v. Black Elk Energy Offshore Operations, L.L.C.*, No. 13-366, 2016 WL 9414205, at *12 (E.D. La. May 23, 2016) ("[S]ubstantive law regarding damages informs, on a *Daubert* motion, the question of whether an expert's opinions are relevant ….").

---

[1] The defendants also cite Federal Rule of Evidence 403, the provision governing undue prejudice, but make no specific argument in this regard.

## B. Unimpaired Valuations

Advisory Opinion 9 of the USPAP ("AO-9") governs "The Appraisal of Real Property That May Be Impacted by Environmental Contamination." Doc. #540-4. AO-9 defines "unimpaired value" as "[t]he market value of a contaminated property developed under the hypothetical condition that the property is not contaminated." *Id*. at 94. "In general, the unimpaired value of the property … can be estimated using the sales comparison approach, cost approach, and income approach." *Id*. at 96 (citations omitted). Clay's report utilized the cost approach and sales comparison approach to determine separate unimpaired values for each property. *See* Doc. #540-1 at 58. The defendants argue Clay's unimpaired value calculations departed from the USPAP guidance because she only inspected the exteriors of the property and because she did not apply a location adjustment to comparable sales.

### 1. Location adjustments

The defendants argue Clay erred in not "apply[ing] the requisite location adjustments to her identified comparable sales." Doc. #541 at 8. According to them, although "Clay testified that she attempted to identify subdivisions which, like Eastern Heights, were near industrial facilities for her comparable sales, she provided no information regarding whether she considered relevant factors such as Eastern Heights' proximity to a highway, operating railroad lines, or a stone yard." *Id*. By not making a location adjustment for the Subdivision's "disamenities," the defendants argue Clay has likely inflated the subject properties' unimpaired values. *Id*.

In response, the plaintiffs argue location adjustments are not mandatory and the decision to use one rests with the appraiser. Doc. #621 at 12–13. The plaintiffs also argue the defendants' expert Trevor Phillips conceded that location adjustments are not mandatory and committed to the discretion of the appraiser. *Id*. (citing Doc. #620-5 at 90–97). According to the plaintiffs, Clay

utilized two comparable homes from Grenada neighborhoods which, like the Subdivision, were proximate to industrial facilities, leading Clay to conclude that her market analysis did not require any location adjustments. *Id*. at 13. The plaintiffs argue that criticisms of Clay's appraisal methodology, as it relates to comparables and location adjustments, go to the weight of Clay's testimony rather than its admissibility. *Id. at* 14. The Court agrees.

As conceded by Phillips, location adjustments are discretionary and not required under the USPAP. Accordingly, challenges to location adjustments go to their weight rather than their admissibility. *See Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 332 (5th Cir. 2010) ("Whitehouse has not cited any authority, nor do we know of any, for the proposition that an appraiser's compliance with USPAP is the sole determining factor as to whether an appraiser's valuation report is reliable") (quotation marks omitted). Moreover, the plaintiffs have demonstrated Clay's opinions are reliable given her assessment of market data and adherence to the USPAP standards and AO-9—which commit the use of location adjustments to the sound discretion of a competent appraiser. Thus, Clay's decision not to use a location adjustment does not render her opinions unreliable.

### 2. Exterior inspections

The defendants also challenge Clay for performing "an exterior inspection of the properties, despite admitting that the preference is to inspect the interior of the properties as well …." Doc. #541 at 19. In response, the plaintiffs represent that while "Clay prefers to inspect a home's interior, [e]xterior-only inspections are not unusual, and Mrs. Clay has performed them in her non-litigation work for the [Mississippi Department of Transportation]." Doc. #621 at 16. Considering that the USPAP does not require an interior inspection—and the defendants cite no

6

authority for such a requirement—and that the defendants' appraisal expert did not conduct an interior inspection either, this argument is misplaced.

**C. Impaired Valuations**

Clay "determined the impaired value of the Plaintiffs' properties by deducting the cost effect of remediation applicable to the Plaintiffs' properties from their respective unimpaired values." Doc. #620-1 at ¶ 7. To do this, Clay relied on the expert report prepared by the plaintiffs' experts James Brinkman, Scott Simonton, and David Jenkins, which found contamination throughout the Subdivision, and opined that a remediation plan costing $1.7 million per lot was warranted. *See* Doc. #540-1 at 60. Clay also considered the stigma associated with the contamination in the Subdivision, as relayed to her by "local brokers." *Id*. at 59. The defendants challenge all such considerations. Doc. #541 at 12, 15–16. In response, the plaintiffs have withdrawn Clay's opinions related to stigma. Doc. #621 at 23–25. Accordingly, the Court need only address the propriety of Clay's consideration of the remediation plan costs.

The defendants argue Clay's consideration of the remediation costs for each property was improper because, to apply a remediation cost effect deduction, AO-9 and Guide Note 6 require: "(1) that each property is contaminated with concentrations of hazardous materials above appropriate regulatory standards; (2) that remediation of each property is necessary; and (3) that the costs of remediation will be borne by the Plaintiffs"—none of which Clay did. Doc. #541 at 19–20. The plaintiffs respond that Guide Note 6 is not a mandatory USPAP standard and that Clay otherwise complied with AO-9's requirements by relying on the Groundwater Report. Doc. #621 at 16–22. The defendants do not dispute that Guide Note 6 is non-binding by its terms but argue that it is "generally-accepted" and that because "Clay testified that she considered Guide Note 6" in formulating her report, "she was required to accurately apply it." Doc. #693 at 2 nn. 1, 2.

7

Because the Court ultimately concludes that Clay's analysis departed from AO-9, it need not determine the applicability of Guide Note 6.

According to AO-9, the impaired value of a property is "[t]he market value of the property being appraised with full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property. Conceptually, this could be considered the 'as-is' value of a contaminated property." Doc. #540-4 at 94. In accordance with this standard, an appraiser should consider the "cost effects" of the contamination, which "primarily represent deductions for costs to remediate a contaminated property." *Id*. Remediation costs, in turn, are defined as "[t]he cost to cleanup (or remediate) a contaminated property to the appropriate regulatory standards. These costs can be for the cleanup of on-site contamination as well as mitigation of off-site impacts due to migrating contamination." *Id*. Thus, by referring only to costs necessary to reduce contamination below regulatory levels, remediation costs clearly only relate to costs necessary to remediate super-regulatory contamination. Necessarily, therefore, a property can only receive a cost effect deduction for remediation costs if it is contaminated above regulatory levels.

The defendants argue Clay improperly applied the cost effect remediation deduction because there is no indication that the plaintiffs' properties are individually contaminated above regulatory levels. Doc. #541 at 9. The plaintiffs respond that Clay properly relied on the Groundwater Report, "which identified contaminants in the neighborhood which exceed regulatory levels."[2] Doc. #621 at 3.

---

[2] The plaintiffs, relying on an affidavit prepared by Simonton, argue that "Defendants' own test data proves that the Plaintiffs' properties are contaminated by multiple hazardous substances which do exceed the maximum contaminant level (i.e., regulatory level) …." Doc. #621 at 3–4. The Court has stricken this analysis as an untimely expert opinion, *see* Doc. #850 at 12–14, and there is no indication Clay relied on it in formulating her opinion.

In considering the plaintiffs' arguments, the Court observes that, though the Groundwater Report refers to super-regulatory levels of contamination in the Subdivision, it includes no opinion that these super-regulatory levels exist on each and every property. Indeed, Clay testified unambiguously that the report contains no such opinion. *See* Doc. #540-2 at 195–96. While AO-9 authorizes an appraiser to make "extraordinary assumptions … regarding … information obtained from other experts[,]"[3] the plaintiffs cite no authority that authorizes an appraiser to assume, without any stated basis, an opinion from a report when such opinion does not exist. In the absence of such authority, Clay's failure to properly consider remediation costs—a failure indisputably material to her appraisal opinion—compels exclusion of her opinion on impaired value and the related opinion on diminution of value.

## IV
## Parker Opinions

Parker, like Clay, reached an opinion on diminution of value by comparing the impaired and unimpaired values of the plaintiffs' properties. The defendants challenge both determinations.

### A. Unimpaired Valuations

Parker utilized the sales comparison approach to determine the unimpaired values of the plaintiffs' properties. Doc. #544-1 at 50. To accomplish this, Parker compared five residential sales from the Whitehaven subdivision in Grenada and extrapolated those sales to value the plaintiffs' property. Doc. #544-2 at 120, 129. The defendants argue Parker's opinion should be excluded because (1) he failed to perform a location adjustment for the Whitehaven neighborhood, despite being required to do so; (2) his results differ from the other experts in this case; and (3) his results produced unusual results for certain properties.

---

[3] Doc. #540-4 at 93.

### 1. Location adjustments

The defendants criticize Parkers' "improper" use of "five residential sales in the Whitehaven subdivision … to assess the [unimpaired] value of Plaintiffs' properties." Doc. #545 at 7. According to the defendants, "the average sale price per square foot of a residence in Whitehaven has been 24 to 61 percent higher than the price per square foot of a residence in [Eastern Heights] over the past ten years."[4] *Id*. The defendants also offer several criticisms of Parker's selection of comparables, contending that he (1) "admitted that he did nothing to confirm that the Whitehaven neighborhood was comparable to Eastern Heights, or whether a location adjustment was warranted for any of Plaintiffs' properties;" *id*. at 8 (citing Doc. #544-2 at 120–24); (2) "did not ask any realtors about whether the Whitehaven neighborhood was comparable to the Subdivision, nor did he perform an analysis of pre-2015 sales of homes in Whitehaven and Eastern Heights," *id*. (citing *Id*. at 127–28); and (3) "could not identify relevant comparison characteristics between the two neighborhoods, such as Whitehaven's proximity to the public schools, or whether Whitehaven, like Eastern Heights, is near an industrial plant or borders a stone yard facility, railroad yard or railroad tracks," *id*. (citing *Id*. at 121–22). Citing the report of their appraisal expert Phillips, the defendants assert that "even a cursory review of the data shows that the neighborhoods are not comparable and a location adjustment is necessary." *Id*. (citing Doc. #544-3 at 32).[5] Parker, for his part, testified he did not believe an adjustment was warranted based on the differences between the Whitehaven and Eastern Heights neighborhoods. Doc. #623-2 at 120.

---

[4] The defendants' memorandum brief includes a chart from Phillips' expert report illustrating a ten-year sales comparison of Whitehaven and Eastern Heights. Doc. #545 at 8; Doc. #544-3 at 32.

[5] The defendants also appear to challenge Parker's use of only five homes as comparables. *See* Doc. #545 at 8, 16. However, they cite no authority for the proposition that an appraiser is required to use more than five comparables. To the contrary, "[a]ppraisals typically use information regarding three or four comparables." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 510 (S.D.N.Y. 2015).

As explained above, location adjustments are not required under the USPAP and go to weight, not admissibility. Accordingly, the Court concludes that Parker's failure to perform location adjustments does not render his opinion inadmissible.

### 2. Validity of results

The defendants' remaining arguments seek to exclude Parker's unimpaired value opinions based on the fact that his valuations differ from those produced by Clay and are allegedly inconsistent with some past sales. Specifically, the defendants argue Parker's December 2016 appraisals produced a 21% higher average in valuation than Clay's opinions, a valuation 38% higher than a property's sales price in February 2015 (155 Tallahoma Drive), and a valuation 68% higher than another property's sale in 2014 (133 Lyon Drive). Doc. #545 at 9. The plaintiffs respond that 133 Lyon Drive's 2014 sale was 120% higher than its sale in 2011, that 155 Tallahoma Drive's 2015 sale was 130% higher than its sale in 2014, and that differences in expert opinions are not sufficient grounds for exclusion. Doc. #622 at 17.

"[A] *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). While the Court presumes that results may be so obviously wrong as to call into question the reliability of an opinion, the discrepancies identified by the defendants do not rise to such a level.

### B. Impaired Valuations

Parker, like Clay, based his impaired valuations on the remediation costs estimated in the Groundwater Report. Doc. #544-1 at 74. Additionally, Parker, like Clay, had no basis for assuming that the individual properties were contaminated at super-regulatory levels.

11

Accordingly, his opinion regarding the impaired values of the properties—and the related opinion of diminution of values—must be excluded.

# V
# Conclusion

The defendants' motions to exclude the testimony and opinions of Dixie Clay [540] and Joe Parker [544], including all joinders are **GRANTED in Part and DENIED in Part**.  The motions are DENIED to the extent they seek exclusion of Clay's and Parker's opinions on the unimpaired values of the plaintiffs' properties.  The motions are GRANTED to the extent they seek exclusion of Clay's and Parker's opinions on impaired value and diminished value.

**SO ORDERED**, this 11th day of February, 2019.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**